## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Angela Sanchez-Knutson,

                Plaintiff,

   v.

Ford Motor Company,

                Defendant.

_____/

Case No.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiff Angela Sanchez-Knutson, on behalf of herself and all other persons similarly situated brings this action against defendant, Ford Motor Company and, to the best of her knowledge, information and belief, formed after an inquiry reasonable under the circumstances, alleges as follows:

### NATURE OF THE ACTION

    1.    This case arises from Ford's sale and lease of hundreds of thousands of Explorer model vehicles that Ford knew or should have known are dangerous and defective such that exhaust and other gases, including lethal quantities of carbon monoxide, may enter the passenger compartments of the vehicles.  The potential exposure to carbon monoxide renders these vehicles unsafe to drive.

    2.    Ford's Technical Service Bulletin 12-12-4 titled "Explorer Exhaust Odor in Vehicle," acknowledges that "[s]ome 2011-2013 Explorer vehicles may exhibit an exhaust odor in the vehicle with the auxiliary climate control system on.  Customers may indicate the odor smells like sulfur."  Ford's TSB 12-12-4 provides instructions that Ford claims will correct the exhaust odor in 2011 through 2013 model year Ford Explorers.

3.      Ford's TSB 12-12-4, however, does not correct the condition, and it fails to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles.  Ford's TSB 12-12-4 is provided to authorized dealerships, and does not directly notify non-Ford automotive repair facilities about the defects associated with TSB 12-12-4. Further, although Ford has received numerous complaints relating to exhaust entering the passenger compartments of 2011 through 2013 model year Ford Explorers, and it developed a purported fix to the problem, Ford provided no notice to plaintiff or the proposed class members about the defect and the potential exposure to lethal carbon monoxide in 2011 through 2013 model year Ford Explorers.

4.      Upon information and belief, Ford sold or leased hundreds of thousands of defective vehicles nationwide.  Each such vehicle was sold or leased in a dangerous and defective condition because each such vehicle contains design flaws, and/or an exhaust and/or HVAC system that permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment during the normal and customary use of such vehicles.

5.      Ford designed, manufactured, sold and leased the 2011 through 2013 model year Ford Explorers when it knew or should have known of such defects, or Ford otherwise learned of such defects and failed to notify plaintiff and the proposed class members of the defect in the 2011 through 2013 model year Ford Explorers that exposed plaintiff, the proposed class members, and others, to a life safety hazard.

6.      Plaintiff and the members of the proposed class reasonably expect to operate their Ford Explorer vehicles in a normal and customary manner free from exposure to potentially deadly gases.

2

## JURISDICTION AND VENUE

7.      This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because the amount in controversy for the class exceeds $5,000,000, exclusive of interest and costs, there are more than 100 class members, and more than two-thirds of the class is diverse from Ford.

8.      The Court has personal jurisdiction over Ford because Ford conducts substantial business in this District, and some of the actions giving rise to this complaint took place in this District.

9.      Venue is proper in this District under 28 U.S.C. § 1391(a) because, among other things, a substantial part of the events or omissions giving rise to the claims occurred in this District, and caused harm to class members residing in this District.

## PARTIES

10.      Plaintiff Angela Sanchez Knutson is a resident of Broward County, Florida and lives and resides within this judicial district.

11.      Defendant Ford Motor Company, is a Delaware corporation with its principal place of business in Michigan. In this Complaint, "Ford" refers to the named defendant and all related, successor, predecessor, parent and subsidiary entities to which these allegations pertain.

## PLAINTIFF'S INDIVIDUAL ALLEGATIONS

12.      On March 31, 2012, plaintiff purchased a new 2013 Ford Explorer from an authorized Ford dealership in Gainesville, Florida.

13.      The 2013 Ford Explorer purchased by plaintiff was dangerous and defective when purchased because its design and exhaust and/or HVAC systems permitted an

3

exhaust odor, exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the vehicle. The defect is latent in nature because it is not obvious or ascertainable upon reasonable examination or inspection.

14.     At the time of the purchase, plaintiff was not notified that the 2013 Ford Explorer she was purchasing was defective, nor was she notified that she and all occupants, including her husband and children, would be exposed to lethal carbon monoxide and other potentially dangerous gases while driving in her 2013 Ford Explorer during its normal and customary use.

15.     Plaintiff brought her 2013 Ford Explorer in for service at an authorized Ford dealership in Sunrise, Florida, on or about the following dates: September 12, 2012, November 29, 2012, March 20, 2013, August 20, 2013, November 7, 2013, January 7, 2014, March 13, 2014, and April 14, 2014.

16.     Each time plaintiff's 2013 Ford Explorer was brought in for service, plaintiff, or her husband, notified the authorized Ford dealership that an exhaust odor was present in the passenger compartment while the 2013 Ford Explorer was in use. The odor would intensify when the driver accelerated the vehicle.

17.     When the vehicle was brought in for service on or about November 7, 2013, the authorized Ford dealership verified plaintiff's complaint of an exhaust odor in the passenger compartment of the vehicle. The authorized Ford dealership prescribed and performed TSB 12-12-4, which was intended to correct the problem.

18.     Plaintiff continued to smell exhaust in the passenger compartment of her 2013 Ford Explorer after TSB 12-12-4 was performed. Plaintiff, or her husband, continued

to notify the authorized Ford dealership on each service visit that an exhaust odor was present in the passenger compartment of the vehicle while the vehicle was in use.

19.     The authorized Ford dealership informed Plaintiff that Ford was aware of the exhaust odor problem but did not know how to fix the problem.

20.     An employee or agent of the authorized Ford dealership informed plaintiff that the wife of the owner of the authorized Ford dealership drove a Ford Explorer and had experienced the same problem as plaintiff – an exhaust odor in the passenger compartment of the vehicle.

21.     On numerous occasions, plaintiff, or her husband, questioned the authorized Ford dealership whether the exhaust odor problem posed a health risk, including, without limitation, whether carbon monoxide was entering the passenger compartment of the vehicle.

22.     Carbon monoxide is a colorless, odorless and tasteless gas that is toxic to humans.

23.     The authorized Ford dealership assured plaintiff that there was no carbon monoxide entering the passenger compartment of the vehicle, and that the problem was not a hazard to health.

24.     Based upon those representations, plaintiff continued to operate the vehicle.

25.     In or about April 2014, plaintiff learned that lethal quantities of carbon monoxide would enter the passenger compartment of the vehicle while the vehicle was being driven in a normal and customary manner.  Plaintiff immediately discontinued operating the vehicle.

26.     To date, Ford has not repaired plaintiff's 2013 Ford Explorer, nor has Ford acknowledged to plaintiff or the members of the proposed class that the 2011 through 2013 model year Ford Explorers contain design flaws and/or defective exhaust and/or HVAC systems permitting lethal carbon monoxide and other potentially dangerous gases into the passenger compartments of those vehicles.

27.     To date, plaintiff and her five year old daughter have, and continue to, suffer headaches as a result of their exposure to carbon monoxide while driving in plaintiff's 2013 Ford Explorer.

## GENERAL ALLEGATIONS

### Ford Sold and Leased Dangerous and Defective Vehicles

28.     Ford began selling and leasing a new generation of Ford Explorers – considered the fifth generation of Explorer vehicles – with the 2011 model year Ford Explorer.

29.     The subsequent model year Ford Explorers are not dramatically different in design from the 2011 model year Ford Explorer, and the Explorers sold today are considered part of the "fifth generation" of Ford Explorer vehicles.

30.     The 2011 through 2013 model year Ford Explorers were designed, engineered and manufactured by Ford with design flaws and/or defective exhaust and/or HVAC systems that permit carbon monoxide and exhaust to enter into the passenger compartments of those vehicles while being driven in a normal and customary manner.

31.     Ford designed, manufactured, assembled, inspected, distributed, sold and leased the 2011 through 2013 model year Ford Explorers in a manner so as to render the

6

subject vehicles defective and unsafe for their intended use and purpose by, among other things:

(a) Designing the vehicles such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of the vehicles;

(b) Designing the bumpers and/or tailpipes on the vehicles such that exhaust and other gases, including carbon monoxide, may accumulate behind the bumper and within the interior and exterior panels, allowing those gases to permeate the passenger compartments of the vehicles;

(c) Designing, manufacturing and assembling the vehicles using defective rear air extractors which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(d) Designing, manufacturing and assembling the liftgates in the rear of the vehicles using defective drain valves, which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(e) Designing, manufacturing and assembling the vehicles with sheet metal panels and overlaps which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles;

(f) Designing, manufacturing and assembling the vehicles with joints and seams which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartments of the vehicles; and,

(g) Designing, manufacturing and assembling the vehicles with rear auxiliary air conditioning system parts which are defectively designed and/or located too close in proximity to the driver side rear air extractor, such that exhaust and other gases, including carbon monoxide, may enter the auxiliary air conditioning system and the passenger compartments of the vehicles.

32. Ford knew or should have known that the 2011 through 2013 model year Ford Explorers were dangerous and defective such that drivers and passengers of those vehicles may be exposed to carbon monoxide and other dangerous gases while the vehicles are in operation.

7

33.     The defective vehicles were sold or leased pursuant to express and implied warranties.  These warranties assured consumers that the vehicles were free from defects and were properly equipped for the use for which they were intended.  At the time the defective vehicles were sold or leased by Ford directly and through its authorized agents, the vehicles were in violation of express and implied warranties.  All of the defective vehicles are still within the dates of the express written warranties, or the time or mileage limits in the express warranties should be inapplicable given Ford's fraudulent conduct, among other things.

34.     In promoting, selling and repairing its defective vehicles, Ford acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Ford representatives and agents.  That the dealers act as Ford's agents is demonstrated by the fact that: (i) the warranties provided by Ford for the defective vehicles directs consumers to take their vehicles to authorized dealerships for repairs or services; (ii) Ford dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers; (iii) Ford directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning defective vehicles; and (iv) Ford has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public.

35.     Ford's control over the actions of its dealers is also evidenced by its implementation of the company's express and implied warranties as they relate to the defects alleged herein.  Authorized Ford dealerships are instructed by Ford to address complaints of an exhaust odor by prescribing and implementing TSB 12-12-4.

## Ford Acknowledged the Subject Vehicles' Defective Condition in TSB 12-12-4

36.     In response to customer complaints of an exhaust odor in the passenger compartments of the subject vehicles, Ford issued TSB 12-12-4 in or about December 2012. TSB 12-12-4 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers.

37.     Despite issuing TSB 12-12-4, Ford did not inform plaintiff or the members of the proposed class of the defects in 2011 through 2013 model year Ford Explorers, despite the fact that those defects presented life safety issues to occupants of the vehicles.

38.     Notably, TSB 12-12-4 fails to disclose that the exhaust odor acknowledged therein is accompanied in the passenger compartment by lethal carbon monoxide.

39.     At all material times, Ford has failed to inform customers who purchased and/or leased 2011 through 2013 model year Ford Explorers that they are unsafe for operation or that they were designed, engineered and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartments of such vehicles.

40.     In addition, TSB 12-12-4 does not identify a specific fix to the exhaust odor problem.  Rather, TSB 12-12-4 requires various replacements and/or repairs to several unrelated vehicle parts.  This demonstrates that Ford knew of the defect, but did not know of a specific, effective fix to protect occupants of the 2011 through 2013 model year Ford Explorers from exhaust and other gases, including carbon monoxide.  Based upon information and belief, Ford issued TSB 12-12-4 *hoping*, but not knowing, that any one of the various replacements and/or repairs identified therein would remedy the exhaust odor complaints.

9

## Ford's TSB 12-12-4 Fails to Repair the Defects

41.     Ford's TSB 12-12-4 fails to repair the exhaust odor problem, and vehicles which have received the repairs outlined in TSB 12-12-4 may continue to have exhaust and other gases, including carbon monoxide, enter the passenger compartment.

42.     TSB 12-12-4 identifies flaws in the initial design and manufacture of the 2011 through 2013 model year Ford Explorer, and prescribes repairs and/or replacements which are inadequate and equally flawed and defective.

43.     In TSB 12-12-4, Ford requires installation or use of the following replacement parts in the subject vehicles, among others: (i) a dual rate air extractor (part number BB5Z-61280B62-A); (ii) valve assembly auto drains (part number 4M8Z-54280B62-A); and (iii) Motorcraft® Seam sealer (part number TA-2).

44.     TSB 12-12-4 requires that the dual rate air extractor replace the driver side rear air extractor initially installed on the subject vehicle.  The rear air extractor initially installed on the subject vehicle was dangerous and defective because it permitted exhaust and other gases, including carbon monoxide, to permeate the exterior panels of the subject vehicles and enter the passenger compartment.  Based upon information and belief, Ford requires the replacement of the driver side rear air extractor, and not the passenger side rear extractor, because the air intake from the auxiliary air condition system is situated dangerously close in proximity to the driver side rear air extractor.   The placement of the air intake system too close to the rear air extractor allows exhaust and other gases, including carbon monoxide, to enter the auxiliary air condition system.

45.     The replacement part – a dual rate air extractor – is formed of polypropylene and overmolded with thermoplastic elastomer (TPE).  The dual rate air extractor includes

"living hinges" and plastic torsional springs that are meant to function as a one-way pneumatic valve.

46.     The dual rate air extractor has a listed purchase price of $86.33, whereas the initially installed air extractor has a listed purchase price of $22.50.  However, the dual rate air extractor fails to prevent exhaust and other gases, including carbon monoxide, from entering the auxiliary air condition systems and the passenger compartments of the subject vehicles.  The replacement dual rate air extractors are therefore ineffective, dangerous and defective.

47.     In addition, Ford modifies the dual rate air extractors used as replacement parts per TSB 12-12-4, by haphazardly adding a silicone-like white substance to the uppermost of the three "living hinges."  Based upon information and belief, the silicone-like white substance found on replacement part number BB5Z-61280B62-A is not included, and was not meant to be included, as part of the dual rate air extractor as designed by its manufacturer.  Moreover, the silicone-like white substance added by Ford to the dual rate air extractor causes the "living hinges" to remain open, permitting exhaust and other gases to permeate the exterior panels of the vehicles, and enter the passenger compartment.

48.     Ford designed, manufactured and engineered the 2011 through 2013 model year Ford Explorers using valve assembly auto drains on the rear liftgate of the vehicles which are dangerous and defective because the parts permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment.  The replacement valve assembly auto drains fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment, and thus, they are ineffective, dangerous and defective.

49.     Ford designed, manufactured, engineered and assembled the 2011 through 2013 model year Ford Explorers without properly sealing the horizontal sheet metal lap joints on the left and right sides of the underbody of the subject vehicles.  Ford additional designed, manufactured, engineered and assembled the 2011 through 2013 model year Ford Explorers without properly sealing the rear sheet metal overlap flange across the rear of the vehicle, and the auxiliary air conditioning lines.  Accordingly, TSB 12-12-4 requires that the foregoing joints, flange and lines be sprayed with "generous amounts" of rubberized undercoating, and seam sealer.  However, the rubberized undercoating and seam sealer fail to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartment.

**Ford's Conduct and/or Inaction Has Damaged Plaintiff and Members of the Proposed Class**

50.     Plaintiff and each member of the proposed class has been damaged by Ford's conduct and/or inaction, as they have been exposed to harmful carbon monoxide and exhaust, they unknowingly purchased defective vehicles which cannot be safely operated, they have been forced to pay, or will pay, substantial amounts of money to repair the vehicles, if a repair can be made, and the value of their affected vehicles has been diminished because of this defect.

51.     A vehicle containing the defect described herein – that is, a defect that permits the entry of carbon monoxide and other gases into the passenger compartment of the vehicle – is worth less than a vehicle free from such defect.  Given that the defect renders driving the subject vehicles a health hazard which is potentially deadly, the

vehicles are valueless.  At the time plaintiff purchased the vehicle, she paid a price based on the value of such a vehicle free of such defect.

## CLASS ACTION ALLEGATIONS

52.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of herself and the members of a proposed Class.  The requirements of Rule 23(a), (b)(2) and (b)(3) are each met with respect to the classes defined below.

53.     Plaintiff seeks to represent the following class:

All persons in Florida who own or lease one of the following vehicles: 2011 Ford Explorer, 2012 Ford Explorer or 2013 Ford Explorer.

54.     **Numerosity**.  Members of the class are so numerous that individual joinder of all members is impracticable.  Based upon information and belief, Ford has sold tens of thousands of 2011 through 2013 model year Ford Explorers in Florida.  All of these vehicles are covered by TSB 12-12-4, and contain a defect that may cause carbon monoxide or exhaust to enter the passenger compartments of such vehicles.

55.     **Existence of Common Questions of Law and Fact**.  Common questions of law and fact exist as to all members of the class. These include, but are not limited to: whether the 2011 through 2013 model year Ford Explorers have been sold or leased subject to express and/or implied warranties; whether each 2011 through 2013 model year Ford Explorer is defective such that carbon monoxide and exhaust may enter the passenger compartments of such vehicles; whether the 2011 through 2013 model year Ford Explorers suffer from a design defect, are unreasonable dangerous and/or are unfit for their intended use; whether Ford has knowledge of such defect; when Ford learned of such defect; whether Ford failed to disclose the defect to plaintiff and the class; whether

Ford misrepresented that the affected vehicles were safe; whether Ford has a fix to the defect and, if so, how much the fix will cost; whether the defect reduces the value of the affected vehicles; whether Ford's express warranties cover the latent defects; whether Ford breached its warranties made to plaintiff and the class; whether Ford negligently designed/engineered/manufactured the affected vehicles; whether Ford concealed the defect; and whether plaintiff and the class have suffered damages as a result of the conduct alleged, and if so, the measure of such damage.

56. **Typicality**. The claims of plaintiff are typical of the claims of the class, as plaintiff and the members of the class have purchased or leased defective vehicles and have been harmed in some manner by Ford's conduct.

57. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff's interests do not conflict with the interests of the members of the class. Further, plaintiff has retained counsel competent and experience in complex class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action.

58. **Predominance and Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all the individual class members is impracticable. Questions of law and fact common to the members of the class predominate over any questions affecting only individual members. Likewise, because the damages suffered by each individual class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual class members to redress the wrongs done to each of them individually, and the burden imposed on the judicial system would be enormous.

59.     The prosecution of separate actions by the individual class members would also create a risk of inconsistent or varying adjudications for individual class members, which would establish incompatible standards of conduct for Ford.  The conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member. Further, plaintiff anticipates no difficulty in the management of this litigation as a class action.

60.     For all of the foregoing reasons, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### (15 U.S.C. § 2301, *et seq.*)

61.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 60 as if fully set forth herein.

62.     This Count is brought on behalf of the class.

63.     Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

64.     Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

65.     The subject 2011 through 2013 model year Ford Explorers are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

66.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by, among other things,  the failure of a warrantor to comply with written or implied warranties.

67.     Ford sells and leases its vehicles subject to express warranties which are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  Ford additionally sells and leases its vehicles subject to implied warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

68.     When plaintiff and members of the class purchased and/or leased their 2011 through 2013 model year Ford Explorers, Ford expressly warranted that the vehicles would be free from defects in design, materials and workmanship.  Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

69.     When plaintiff and members of the class purchased and/or leased their 2011 through 2013 model year Ford Explorers, Ford impliedly warranted that the vehicles were merchantable, fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by owners and lessees, and were not otherwise injurious to consumers.  Ford was under a duty to design, construct, manufacture, inspect and test the vehicles so as to make them suitable for the ordinary purpose of their use.

70.     The subject 2011 through 2013 model year Ford Explorers share a common defect in that they have been designed and manufactured such that exhaust and other gases, including carbon monoxide, may enter the passenger compartment of such vehicles during their normal and customary use.  Ford is aware of the defect, and has acknowledged

the problem of an exhaust odor inside the passenger compartment of such vehicles by its issuance of TSB 12-12-4.  However, TSB 12-12-4 does not disclose the presence of carbon monoxide inside the passenger compartment of the subject vehicles, nor does it fix the problem of exhaust and other gases entering the passenger compartment.  Ford has breached its express and implied warranties by failing to disclose a life safety defect in the subject vehicles, by failing to fix the defects in the subject vehicles, and by selling or leasing vehicles which are unsafe and unfit for the ordinary purposes for which they are intended to be used.

71.    Plaintiff and each of the members of the class have had sufficient direct dealings with either Ford or its agent dealerships to establish privity of contract between Ford, on the one hand, and Plaintiff and each of the members of the class, on the other hand.  Notwithstanding, plaintiff and each of the members of the class are the intended beneficiaries of Ford's express and implied warranties.  The dealers were not intended to be the ultimate consumers of the subject vehicles, and have no rights under the warranty agreements provided by Ford.  Ford's warranties were designed for and intended to benefit the consumers only.

72.    Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  Ford has known, or should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the subject vehicles' defect resulting in exhaust and other gases, including carbon monoxide, entering the passenger compartment of such vehicles.  Notwithstanding, Ford has failed to disclose the existence of this defect and the risk of carbon monoxide exposure, and has failed to rectify the situation.  Plaintiff, on numerous occasions, afforded Ford an

opportunity to cure by bringing her vehicle into an authorized Ford dealership for service, and notifying the dealership of an exhaust odor in the passenger compartment. Notwithstanding, the defect in plaintiff's vehicle was not repaired.  TSB 12-12-4 was performed on plaintiff's vehicle, but TSB 12-12-4 does not repair the defect.  Furthermore, Ford's authorized dealership expressly represented that no carbon monoxide enters the passenger compartment of the subject vehicles and that the problem is limited to a non-safety related issue of odor only – a false representation.  What is more, plaintiff was specifically informed by Ford's authorized dealer that Ford knows of the problem, and does not have a means to fix the problem.  Under the circumstances, any requirement that plaintiff afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

73.     The amount in controversy of plaintiff's individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000.00, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

74.     Plaintiff, individually and on behalf of the other class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

### COUNT II

### VIOLATION OF FLORIDA'S DECEPTIVE AND
### UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201 *et seq.*)

75.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 60 as if fully set forth herein.

76.     This Count is brought on behalf of the class.

77.     Plaintiff and each member of the proposed class is a "consumer" under FDUPTA, Fla. Stat. § 501.203(7).

78.     Ford engaged in "trade or commerce" within the meaning of FDUTPA, Fla. Stat. § 501.203(8).

79.     FDUTPA states that any unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

80.     Under the TREAD Act, 49 U.S.C. § 30101, *et seq.*, and its corresponding regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect, and must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect.

81.     Based upon information and belief, by the latest December 2012, Ford knew that 2011 through 2013 model year Ford Explorers were defective such that an exhaust odor would enter the passenger compartments of those vehicles, and Ford knew or should have known that carbon monoxide and/or other dangerous gases were entering the passenger compartments of such vehicles.

82.     Ford failed to disclose this defect, and has failed to notify plaintiff and the members of the class, and dealers, of such defect and how to correct it.

83.     Ford's failure to disclose this defect in 2011 through 2013 model year Ford Explorers constitutes a violation of the TREAD Act, and thereby, violates FDUTPA.

84.     Ford also violated FDUTPA by engaging in the following practices:

a. Ford, directly and through its salespeople and agents, has continued to inform potential purchases of Ford Explorer vehicles that those vehicles are safe and fit for the use for which they were intended.

b. Ford provided, disseminated, marketed and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the performance, reliability, quality and nature of the subject vehicles.

c. Ford represented that goods or services were of a particular standard, quality or grade, when they were of another.

d. Ford engaged in unconscionable commercial practices by failing to reveal material facts and information about the subject vehicles, which did, or tended to mislead plaintiff and the members of the class about facts that could not reasonably be known by the consumer.

e. Ford caused plaintiff and the members of the class to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct.

f. Ford failed to reveal material facts to plaintiff and the members of the class with the intent that plaintiff and the members of the class rely upon the omission.

g. Ford made material representations and statements of fact to plaintiff and members of the class that resulted in plaintiff and members of the class reasonably believing the represented or suggested state of affairs to be other than what they actually were.

20

    h.  Ford has known of the exhaust and carbon monoxide problem, but has failed to disclose its existence or its complete nature, even though Ford has known that such information was material to, among other things, those transactions in which plaintiff and the members of the class purchase the subject vehicles and each of their decisions to continue operating the vehicle.

    i.  Ford intended that plaintiff and the members of the class rely on their misrepresentations and omissions, so that plaintiff and the members of the class would purchase or lease the subject vehicles, and continue to operate the subject vehicles.

    j.  Ford continued to sell or lease the subject vehicles without informing buyers or lessees of the defects in the vehicles.

85.    Ford's actions affect the public interest because plaintiff and the members of the class were injured in exactly the same way as thousands of others purchasing and/or leasing the subject vehicles as a result of and pursuant to Ford's generalized course of wrongdoing and/or deception.

86.    Plaintiff and the members of the class were injured as a result of Ford's misconduct.  Plaintiff and the members of the class overpaid for the subject 2011 through 2013 model year Ford Explorers, and did not receive the benefit of their bargain.

87.    These acts, omissions and practices proximately caused plaintiff and the members of the class to suffer actual damages in the form of, among other things, monies spent to repair the defect and diminution in value of the subject vehicles.

88.     Plaintiff seeks damages and an order enjoining Ford's unfair and/or deceptive acts or practices and an order requiring Ford to recall the subject vehicles, completely remedy the defect in plaintiff's and the class members' vehicles, and to pay for attorneys' fees, together with any other just and proper relief available under FDUTPA.

## COUNT III

### BREACH OF EXPRESS WARRANTY
### (FLA. STAT. § 672.313)

89.     Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 60 as if fully set forth herein.

90.     This Count is brought on behalf of the class.

91.     For each defective vehicle sold by Ford, an express written warranty was issued which covered the vehicle, warranting the vehicle to be free of defects in materials and workmanship at the time of delivery.

92.     As an express warrantor and manufacturer and merchant, Ford had certain obligations under Fla. Stat. § 672.313 to conform the subject 2011 through 2013 model year Ford Explorers to the express warranties given by Ford.

93.     When plaintiff and members of the class purchased and/or leased their 2011 through 2013 model year Ford Explorers, Ford expressly warranted that the vehicles would be free from defects in design, materials and workmanship.  Ford promised to pay for all repairs and parts to remedy defects introduced during the design and manufacturing process.

94.     Ford breached its express warranties by offering for sale, and selling or leasing as safe, defective vehicles that were by design and construction unsafe, thereby

subjecting occupants of the defective vehicles purchased or leased by plaintiff and members of the class to the risk of injury or death.

95.     The defects at issue in this litigation were present in the subject vehicles at the time of sale or lease to plaintiff and the members of the class.

96.     The defects at issue in this litigation must be corrected by Ford, and the expenses of such repairs must be borne by Ford, per Ford's express warranties.

97.     Ford breached its express warranties (and continues to breach its express warranties) because it has not fixed the defects which permit exhaust and other gases, including carbon monoxide, to enter the passenger compartment of the subject vehicles, nor has it covered the expenses associated with correcting the defect.

98.     Plaintiff and the members of the class have performed the duties required of them under the terms of the warranties, except as may have been excused or prevented by the conduct of Ford or by operation of law in light of Ford's conduct described throughout this Complaint.

99.     Any arbitration or class waiver provisions included in Ford's express warranties are substantively and procedurally unconscionable, and therefore, unenforceable.

100.    Ford has received timely notice regarding the problems at issue in this litigation, and notwithstanding, Ford has failed and refused to offer an effective remedy.

101.    Plaintiff and the members of the class have suffered damages caused by Ford's breach of the express warranties and are entitled to recover compensatory damages, including but not limited to the cost of repairs and diminution in value.

**COUNT IV**

## BREACH OF IMPLIED WARRANTY
### (FLA. STAT. § 672.313)

102.    Plaintiff repeats and re-alleges the allegations in Paragraphs 1 through 60 as if fully set forth herein.

103.    This Count is brought on behalf of the class.

104.    Ford impliedly warranted that the subject vehicles, which Ford designed, manufactured, sold or leased, were merchantable, fit for the ordinary purposes for which they were intended to be used, and were not otherwise injurious to consumers.  The ordinary purpose for which the subject vehicles are used is, among other things, to drive in a manner that does not unnecessarily and unreasonably exposes occupants to needless harm or risk.

105.    Ford breached its implied warranty of merchantability when it designed, manufactured, distributed, sold and leased the 2011 through 2013 model year Ford Explorers in an unsafe and un-merchantable condition.  The subject vehicles threaten to expose occupants to carbon monoxide and other dangerous gases while the vehicles are being driven in a normal and customary manner.

106.    Plaintiff and the members of the class have suffered damages caused by Ford's breach of the implied warranty of merchantability and are entitled to recover compensatory damages, including but not limited to the cost of repairs and diminution in value

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on her own behalf and on behalf of the class and the sub-class, respectfully requests judgment against Ford:

(a)      Certifying the class and appointing plaintiff and her counsel to represent the class;

(b)      Ordering Ford to provide notice to the class of the defect with, among other things, the design of the vehicles, and/or the exhaust and/or HVAC systems in the 2011 through 2013 model year Ford Explorers, such that carbon monoxide and exhaust gets into the passenger compartments of such vehicles during their normal and customary use;

(c)      Ordering Ford to initiate a statewide recall of all defective vehicles;

(d)      Ordering Ford to promptly repair and/or replace, without charge, all subject vehicles to prevent exhaust and other gases, including carbon monoxide, from entering the passenger compartments of such vehicles; or ordering Ford to offer rescission to plaintiff and the members of the class by returning the full costs paid to purchase or lease the defective vehicles in exchange for a return of the defective vehicles;

(e)      Awarding damages which include, but are not limited to, the cost of any repairs and the diminution of value of the vehicles;

(f)      Awarding pre-judgment and post-judgment interest;

(g)      Awarding attorneys' fees and costs; and

(h)      Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable.

Dated: June 9, 2014

**Kelley/Uustal, PLC**
700 S.E. 3rd Ave., Suite 3000
Fort Lauderdale, Florida 33316
Phone: (954) 522-6601
Fax: (954) 522-6608


By: ___/s/ John J. Uustal_____
       John J. Uustal, Esq.
       Florida Bar No.
       jju@kulaw.com
       Jordan M. Lewis, Esq.
       Florida Bar No. 0097997
       jml@kulaw.com
       Michael A. Hersh, Esq.
       Florida Bar No. 0056019
       mah@kulaw.com

*Attorneys for Plaintiff Angela Sanchez-Knutson*