IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Angela Sanchez-Knutson, individually, and
on behalf of all those similarly situated,

    CASE NO.  14-cv-61344 WPD

  Plaintiff,

v.

Ford Motor Company,

  Defendant.
_____/

## PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
## AND INCORPORATED SUPPORTING MEMORANDUM

### I. MOTION FOR CLASS CERTIFICATION

Plaintiff Angela Sanchez-Knutson, pursuant to Fed. R. Civ. P. 23, moves this Court for an order certifying the following class (the definition is slightly from the version at paragraph 53 in plaintiff's **Complaint**):

> All persons who purchased or leased in Florida at least one of the following vehicles: 2011 Ford Explorer, 2012 Ford Explorer or 2013 Ford Explorer.

This case satisfies the elements of Rule 23. The class members will be identifiable based on defendant Ford Motor Company's records and their damages will be readily calculable. What's more, the proposed class fits well within the outlines already established by this Court in *Rosen v. J.M. Auto Inc.*[1]

The Court should grant Sanchez-Knutson's motion.

---

[1] 270 F.R.D. 675 (2008).

## II. INCORPORATED MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY

### A. Background

#### 1. Introduction

The timing of this motion (this early) is unusual. But so are the facts.

It is nearly conceded that Ford's 2011-13 generation of Explorers have a problem with exhaust leaking into the passenger cabin. This is known through Technical Service Bulletin 12-12-4, an internal publication that goes to dealers, not consumers, that advise them of this problem. And it *appears* (though it should not be surprising) that the leaking exhaust contains carbon monoxide, which surely raises both health and safety concerns. It is plaintiff's (and her counsel's) belief that swift action is necessary.

#### 2. Facts concerning plaintiff

On March 31, 2012, Sanchez-Knutson purchased a new 2013 Ford Explorer from an authorized Ford dealership in Gainesville, Florida. Within a few weeks of purchasing the vehicle, Sanchez-Knutson and her husband began noticing an exhaust odor while operating their Ford Explorer. In response to the odors, Sanchez-Knutson had her Ford Explorer serviced at Sawgrass Ford, an authorized Ford dealership in Sunrise, Florida, on the following dates: September 12, 2012, November 29, 2012, March 20, 2013, August 20, 2013, November 7, 2013, January 7, 2014, March 13, 2014, and April 14, 2014. Each time the vehicle was serviced, Sanchez-Knutson or her husband notified the authorized Ford

dealership that an exhaust odor was present in the passenger compartment while the 2013 Ford Explorer was in use and that the odor would intensify when the vehicle accelerated.[2]

When the vehicle was brought in for service on or about November 7, 2013, the Ford dealership verified the Knutsons' complaints of an exhaust odor in the passenger compartment of the vehicle.[3] The Ford dealership's service records indicate that the dealership prescribed and performed Technical Service Bulletin 12-12-4,[4] including resealing the rear of the vehicle and replacing various parts.[5]

Notwithstanding, Sanchez-Knutson continued to smell exhaust in the passenger compartment of her Ford Explorer even after TSB 12-12-4 was performed. Sanchez-Knutson and her husband continued to notify their Ford dealership on each service visit that an exhaust odor was present in the passenger compartment of the vehicle while the vehicle was in use.[6]

The Ford dealership eventually informed the Knutsons that Ford was aware of the exhaust odor problem but did not know how to fix the problem.[7]

Concerned about the continued exhaust odor inside the car, Tim Knutson, a firefighter and paramedic, tested the vehicle for carbon monoxide in or about April 2014. Tim Knutson discovered that carbon monoxide was entering the passenger compartment of the Explorer while the vehicle was being driven. Tim Knutson had driven the vehicle for approximately one-half hour, and upon arriving at his destination, the vehicle had 132

---

[2] **Sanchez-Knutson Decl.**
[3] *Id.*
[4] **Lewis Decl., Ex. A.**
[5] **Sanchez-Knutson Decl.,**
[6] *Id.*
[7] *Id.*

3

parts per million of carbon monoxide inside the passenger compartment. Anything above 100 parts per million is hazardous to one's health.[8]

The Knutsons immediately stopped operating the vehicle.[9]

### 2.   *Facts concerning the class*

Ford began manufacturing, selling and leasing a new generation of Ford Explorers – considered the fifth generation of Explorer vehicles – with the 2011 model year Ford Explorer. All subsequent model year Ford Explorers continue to fall within the "fifth generation" of Ford Explorer vehicles.

In response to customer complaints of an exhaust odor in the passenger compartments of certain Ford Explorer vehicles, in December 2012, Ford issued Technical Service Bulletin 12-12-4 acknowledging that its 2011 through 2013 model year Explorers "may exhibit an exhaust odor in the vehicle with the auxiliary climate control system on."[10] TSB 12-12-4 was intended to provide instructions to authorized Ford dealerships to correct the presence of an exhaust odor in 2011 through 2013 model year Ford Explorers.[11]

TSB 12-12-4 does not identify a specific fix to the exhaust odor problem. Rather, TSB 12-12-4 requires repairs and/or replacement of three unrelated vehicle parts, each of which is ostensibly defective given Ford's decision to repair or replace those parts. Moreover, TSB 12-12-4 demonstrates Ford knew of the defect, but did not know of a specific, effective fix to protect occupants of the 2011 through 2013 model year Ford Explorers from exhaust and other gases entering the passenger compartment.

---

[8] **Tim Knutson Decl.**
[9] **Sanchez-Knutson Decl.**
[10] **Lewis Decl., Ex. A.**
[11] *Id.*

4

Ford's TSB 12-12-4 requires the following:

*First*, TSB 12-12-4 requires replacement of the "left side rear air extractor" with a dual rate air extractor (part number BB5Z-61280B62-A).[12] The rear air extractor initially installed on the subject vehicle permitted exhaust and other gases to permeate the exterior panels of the subject vehicles and enter the passenger compartment. Ford's TSB requires the replacement of the driver side rear air extractor, and not the passenger side rear extractor, because the air intake from the auxiliary air condition system is situated close in proximity to the driver side rear air extractor. Thus, whatever penetrates the vehicle's exterior panels through the driver side rear air extractor may easily enter the rear air conditioning system through the air intake device. Accordingly, use of a defective air extractor together with the proximity of the rear A/C air intake part results in exhaust and other gases entering the passenger compartment through the auxiliary air conditioning system, as noted in the TSB.

*Second*, TSB 12-12-4 requires replacement of the valve assembly auto drains found on the lift gates of the subject vehicles with new valve assembly auto drains (part number 4M8Z-54280B62-A).[13]

*Third*, TSB 12-12-4 requires dealers to reseal the horizontal sheet metal lap joints on the left and right sides of the underbody of the vehicle, the rear sheet metal overlap flange across the rear of the vehicle, and the auxiliary air conditioning lines, using Motorcraft® Seam sealer (part number TA-2), among other things.[14]

---

[12] *Id.*
[13] *Id.*
[14] *Id.*

5

Despite these purported fixes, Ford's TSB 12-12-4 fails to repair the exhaust odor problem, and vehicles which have received the repairs outlined in TSB 12-12-4 may continue to have exhaust and other gases enter the passenger compartment. Furthermore, TSB 12-12-4 fails to acknowledge that carbon monoxide may enter the passenger compartment of affected vehicles, posing a substantial health hazard to occupants of those vehicles.

The Knutsons smelled exhaust in their vehicle even *after* TSB 12-12-4 was performed, and Tim Knutson's test revealing carbon monoxide in the vehicle occurred *after* TSB 12-12-4 had been performed on the vehicle. In addition, Sanchez-Knutson's counsel performed a carbon monoxide test which revealed hazardous levels of carbon monoxide in the passenger compartment while the vehicle is being operated. Counsel's test also revealed carbon monoxide inside the passenger compartment when the vehicle is sitting idle, but the engine is on.

Sanchez-Knutson is not alone in experiencing an exhaust odor and carbon monoxide in her vehicle, even after Ford's purported fix was conducted. Ford's TSB 12-12-4 demonstrates that Sanchez-Knutson's experience smelling an exhaust odor is a problem that spans the fleet of 2011 through 2013 model year Ford Explorers. In addition, the National Highway Traffic Safety Administration website includes numerous complaints of an exhaust odor inside Ford Explorers.[15] Several complaints, including complaints made on March 18, 2014 and February 13, 2014, complain of an exhaust odor persisting even after TSB 12-12-4 was performed.[16]

---

[15] **Lewis Decl., Ex. D.**
[16] **Lewis Decl.**

Furthermore, Ford has acknowledged repeat exhaust odor issues on vehicles even *after* TSB 12-12-4 was performed. One individual in Texas, Victor Del Angel, purchased a 2011 Ford Explorer which contained an exhaust odor while being operated. Angel's dealer acknowledged the odor, but informed the customer that the source of the odor was unknown and no fix was available. Thinking the problem was not widespread, Angel turned in his 2011 Ford Explorer and purchased a 2012 Ford Explorer. Almost immediately, Angel began smelling exhaust in his 2012 Explorer. His dealer performed TSB 12-12-4, but the problems persisted. Angel's dealer provided him with a printout of a Hotline Assistance Request, in which the dealer asks Ford for guidance on how to fix the problem. In the document, Ford acknowledges having received "a few reports of repeat concerns after TSB 12-12-4 is performed," and admits its engineers, as of July 2013, are "currently investigating repeat exhaust odor issues." [17]

In addition, TSB 12-12-4 acknowledges that the exhaust odor enters the passenger compartment when the auxiliary air conditioning system is on. Testing reveals that carbon monoxide enters Sanchez-Knutson's Ford Explorer primarily through the auxiliary air conditioning system. Thus, the problem of exhaust in Ford Explorers is accompanied by dangerous carbon monoxide entering affected vehicles, and this poses a health hazard to *those who own or lease 2011 through 2013 model year Ford Explorers.*

### 3. *Rosen v. J.M. Auto Inc.*

While it may not be absolutely dispositive, this Court's class certification decisions in *Rosen v. J.M. Auto Inc.*[18] are – at minimum – critically instructive. In *Rosen*, this Court was presented with a potential class of persons who purchased in Florida 2007 Lexus ES 350s.

---

[17] **Angel Decl.**
[18] 270 F.R.D 675 (S.D. Fla. 2009).

7

The issue in *Rosen* was claimed defects to the vehicle's passenger airbag system that left the car – according to plaintiffs – defective and unreasonably dangerous.

The *Rosen* plaintiffs brought claims for breaches of express and implied warranty, a claim for equitable relief and a final claim brought under the Florida Deceptive and Unfair Trade Practices Act (known as FDUPTA). The Court certified the class under both warranty claims and the claim for equitable relief[19] and – on reconsideration – also certified the FDUPTA claim.[20]

It may be possible that Ford can distinguish the *Rosen* holding here. But it is simply not possible, at this juncture, to predict how.

### 4. *Certification*

In conformity with Local Rule 7.1(a)(3), the undersigned counsel certifies that he has conferred with Ford's counsel in a good-faith effort to resolve the issues raised in the motion and that Ford's counsel objected to the requested relief.

### B. Argument

#### 1. *Legal standard*

Rule 23 "establishes the legal roadmap courts must follow when determining whether class certification is appropriate."[21] While the Court's class certification analysis "may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage."[22]

---

[19] *Id.* at 685.
[20] *Id.* at 688 ("Nevertheless, having again reviewed the case law of Florida and this Court, we find that it was clear error to have ruled that reliance is an element of a FDUPTA claim.").
[21] *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).
[22] *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, __U.S. __, 133 S. Ct. 1184, 1195 (2013) (citations omitted).

Rather, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."[23]

The burden of proof to establish the propriety of class certification rests with the advocate of the class.[24] Rule 23(a) is satisfied where:

- the class is so numerous that joinder of all members is impracticable;
- there are questions of law or fact common to the class;
- the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
- the representative parties will fairly and adequately protect the interests of the class.

In addition, Sanchez-Knutson must satisfy one of the three prongs of Rule 23(b). Plaintiff seeks certification under 23(b)(2) and, alternatively, 23(b)(3).

Rule 23(b)(2) requires that the defendant has acted in a manner generally applicable to the class; it also applies when the class seeks primarily injunctive or declaratory relief. "In this Circuit, as between Rule 23(b)(2) and Rule 23(b)(3) classes, (b)(2) classes are preferred."[25] Thus, if the Court finds that both subdivisions are satisfied, the Court should certify under 23(b)(2).

As for Rule 23(b)(3), its elements are met when plaintiff shows that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[26]

---

[23] *Id.*
[24] *Valley Drug Co.*, 350 F.3d at 1187.
[25] *Drayton v. Western Auto Supply Co.*, 203 F.R.D. 520, 529 n.4 (M.D. Fla. 2000).
[26] *See* Fed. R. Civ. P. 23(b)(3); *Vega*, 564 F.3d at 1265.

The purpose behind class actions is to eliminate the possibility of repetitious litigation and provide small claimants the means of obtaining redress for claims too small to justify individual litigation.[27] Thus, "[d]oubts regarding the propriety of class certification should be resolved in favor of certification,"[28] as it is well established that class-action lawsuits were designed to be effective tools for deterring wrongdoing.[29] This case, involving relatively small individual damages inflicted on large numbers of people, presents a classic example of appropriate circumstances for class certification.

### 2. *Plaintiff has standing*

Though not embedded within the actual text of Rule 23, "[i]t is well-settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim."[30] "To have standing, a plaintiff must show (1) an 'injury-in-fact,' (2) a causal connection between the alleged injury and defendant's challenged action, and (3) that 'the injury will be redressed by a favorable decision.' "[31]

---

[27] *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 249 (3d Cir. 1975) ("Any resultant unfairness to the members of the class was thought to be outweighed by the purposes behind class actions: eliminating the possibility of repetitious litigation and providing small claimants with a means of obtaining redress for claims too small to justify individual litigation.").
[28] *Singer v. AT&T Corp.*, 185 F.R.D. 681, 685 (S.D. Fla. 1998)
[29] *See In re Checking Account Overdraft Litig.*, 830 F. Supp.2d 1330, 1355 n.24 (S.D. Fla. 2011) ("As one of Plaintiffs' experts opined, 'in small-stakes cases, the most important function of the class action device is not compensation of class members but deterrence of wrongdoing ... [and] if defendants did not pay someone-even third parties like *cy pres* charities-for such harms, then defendants would have every incentive to cause such harms in the future...'") (citation omitted; alterations in original).
[30] *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).
[31] *County of Monroe, Fla. v. Priceline.com, Inc.*, 265 F.R.D. 659, 666 (S.D. Fla. 2010) (quoting *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001)).

As for these elements, there cannot be any doubt that Sanchez-Knutson has standing. She bought the car, which is subject to Technical Service Bulletin 12-12-4, and further can demonstrate carbon monoxide contamination in her car's passenger cab. Under any formulation, Sanchez-Knutson has standing.

### 3. *Plaintiff satisfies Rule 23(a)(1)-(4)*

#### a. **Numerosity**

Rule 23(a)(1) requires that there be a sufficient number of class members to make joinder impracticable. "Under Rule 23(a)(1), the numerosity requirement is met if joinder of all members is impracticable. This requirement does not demand that joinder would be impossible, but rather that joinder would be extremely difficult or inconvenient."[32] While there is no hard and fast numeric requirement, "generally less than twenty-one is inadequate, more than forty adequate, with numbers in between varying according to other factors."[33] The "sheer number of potential class members may warrant a conclusion that Rule 23(a)(1) is satisfied."[34] "The Court may also consider factors such as the geographic diversity of the class members, the nature of the action, the size of each plaintiff's claim, judicial economy and the inconvenience of trying individual lawsuits, and the ability of the individual class members to institute individual lawsuits."[35] The "sheer number of potential class members may warrant a conclusion that Rule 23(a)(1) is satisfied."

---

[32] *Israel v. Avis Rent-A-Car Systems, Inc.*, 185 F.R.D. 372, 377 (S.D. Fla. 1999).
[33] *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.), *cert. denied*, 479 U.S. 883 (1986).
[34] *Rosen v. J.M. Auto Inc.*, 270 F.R.D. 675, 680 (S.D. Fla. 2009)(internal quote marks and citation omitted).
[35] *Muzuco v. Re$ubmitIt*, 2013 WL 4566305, *6 (S.D. Fla. Aug. 28, 2013)(internal quote marks omitted).

11

At this early stage, Sanchez-Knutson does not know how many persons fit within the described class. But Ford cannot possibly contest that it numbers more than 40, which is the presumptive threshold here.

### b. Commonality

Rule 23(a)(2) demands that there be "questions of law or fact common to the class."[36]

> This part of the rule does not require that all the questions of law and fact raised by the dispute be common, or that the common questions of law or fact predominate over individual issues.[37]

The Eleventh Circuit has noted that commonality requirement is a "low hurdle."[38] "[F]or purposes of Rule 23(a)(2), '[e]ven a single [common] question' will do."[39]

The test is easily met here. As the Court observed in *Rosen*:

> The critical issue of whether the OCS in 2007 Lexus ES 350s was defective is common to all putative class members.... [T]his issue predominates over the individual issues.[40]

The Court's calibration of the common issue in *Rosen* applies here, as well.

### c. Typicality

Rule 23(a)(3) requires that the claims of the representative party be typical of the claims of the class. "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3). Typicality measures whether a sufficient nexus exists between the claims of the named

---

[36] Fed. R. Civ. P. 23(a)(2).
[37] *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009) (internal quotation marks and citations omitted).
[38] *Williams v. Mohawk Indus., Inc.*, 562 F.3d 1350, 1356 (11th Cir. 2009).
[39] *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2566 (2011).
[40] *Rosen*, 270 F.R.D. at 681-82.

representatives and those of the class at large."[41] Typicality and commonality are often merged; "we have distinguished the two concepts by noting that, traditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class."[42]

Again, plaintiff meets the challenge. Sanchez-Knutson's claims are typical of the class: She is a member of her proposed class and has suffered the same injury. In this context, that's all that's required.

### d.    Adequacy

The final requirement of Fed. R. Civ. P. 23(a)(4) is that the representative parties will fairly and adequately protect the interests of the class. "Rule 23(a)(4) requires that the representative party in a class action 'must adequately protect the interests of those he purports to represent.' "[43] There are two distinct questions:

- The class representative must adequately prosecute the action; and
- There must not be any substantial conflict of interest exist between the representatives and the class.[44]

Both are met here.

Here, Sanchez-Knutson's claims are identical to the other members of the class and she seeks no preferential treatment. Her interests are not antagonistic to those of the class. In fact, even at the beginning of this case, Sanchez-Knutson has already performed valuable

---

[41] *Busby v. JRHBW Realty, Inc.,* 513 F.3d 1314, 1322 (11th Cir. 2008) (citations, internal quote marks and brackets omitted).
[42] *Vega,* 564 F.3d at 1275 (citation, internal quote marks and brackets omitted).
[43] *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003) (citing *Phillips v. Klassen,* 502 F.2d 362, 365 (D.C. Cir. 1974)).
[44] *Valley Drug,* 350 F.3d at 1189.

service to the putative class by identifying the potentially dangerous problem with the Explorers.

As to counsel's adequacy, "[a]bsent specific proof to the contrary, the adequacy of class counsel is presumed."[45] Indeed, some authorities state that the burden is on the defendant to prove that plaintiff's counsel is inadequate.[46] Plaintiff's counsel is well-known in the legal community; they are well qualified to represent this class. To remove any possible doubt, they have submitted a declaration (filed contemporaneously) that evidences adequacy.

### 4. *Plaintiff satisfies Rule 23(b)(2) and (b)(3)*

In addition to satisfying all of the elements found at Fed. R. Civ. P. 23(a), plaintiff must satisfy one of the three prongs of Fed. R. Civ. P. 23(b). In this case, Sanchez-Knutson meets the requirements of Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

#### a. Rule 23(b)(2)

Under Rule 23(b)(2), the Court must "determine (1) whether Defendant has acted on grounds generally applicable to the class as a whole, and if so, (2) whether declaratory or final injunctive relief is the appropriate and primary remedy[ ]."[47] And where – as here - plaintiff seeks money damages in addition to equitable relief, "Rule 23(b)(2) certification is only appropriate if the money damages are incidental to the requested injunctive or

---

[45] *In re Seitel, Inc. Securities Litig.,* 245 F.R.D. 263 (S.D. Tex. 2007).
[46] *E.g., Ballan v. Upjohn Co.,* 159 F.R.D. 473, 487 (W.D. Mich. 1994). *C.f., Walton v. Franklin Collection Agency, Inc.,* 190 F.R.D. 404, 410 (N.D. Miss. 2000) ("While the burden in a class certification motion is on the Plaintiffs, the adequacy of the putative representatives and of Plaintiffs' counsel is presumed in the absence of specific proof to the contrary.") (internal citations omitted).
[47] *Jones v. American General Life and Acc. Ins. Co.,* 213 F.R.D. 689, 698 (S.D. Ga. 2002) (citing *In re Managed Care Litig.,* 209 F.R.D. 678 (S.D. Fla. 2002) and 7A Wright, Miller, & Kane, FEDERAL PRACTICE & PROCEDURE § 1775 (2d ed.1986)).

declaratory relief. Money damages are 'incidental' only when class members would be 'automatically entitled' to them once class-wide liability is established."[48]

Sanchez-Knutson satisfies this subdivision. She seeks an order from the Court that, among other things, would require Ford to recall all of the 2011-2013 Explorers and fix (if that's possible) the exhaust problem. This is the sort of injunctive relief that this Court found sufficient to satisfy Rule 23(b)(2) in Rosen.[49]

### b.   Rule 23(b)(3)

Rule 23(b)(3) can be divided in two: predominance and superiority.

#### i.   Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." The common questions need not be dispositive of the entire action because "predominate" as used in the rule should not automatically be equated with "dispositive."[50] A leading commentator has observed:

> Courts have held that [a class action] can be brought ... even though there is not a complete identity of facts relating to all class members, as long as a 'common nucleus of facts' is present ... The common questions need not be dispositive of the entire action.... Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the [class] will be considered proper.[51]

---

[48] *Colomar v. Mercy Hospital, Inc.*, 242 F.R.D. 671, 682 (S.D. Fla. 2007)(internal citations and quote marks omitted).
[49] *Rosen*, 270 F.R.D. at 684-85 ("Yet Plaintiffs do request actual injunctive or declaratory relief, such as an injunction ordering recall of the cars or ordering repairs at no cost. [][T]he Court cannot say that the monetary damages are merely incidental to the injunctive or declaratory relief.").
[50] *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 694 (S.D. Fla. 2002) ("Nonetheless, '[c]ommon questions need only predominate; they need not be dispositive of the litigation.'").
[51] 7A Wright, Miller & Kane, *Federal Practice and Procedure*, § 1788, at 528-29.

resolving, this controversy. *Finally*, there will be no unusual difficulties in managing this class action.

In short, a class action is not only superior, *it is effectively the only means of redress for class members.* A leading commentator explains:

> In the normal group litigation situation, most classes seeking damages consist of both large and small claimants or all small claimants. For that segment of the class with small individual claims, the costs of litigation and lack of notice would mean that small or unsophisticated claimants would go unprotected. It must be remembered that Rule 23(b)(3)'s superiority requirement expressly compares class actions "to other available methods for the fair and efficient adjudication of the *controversy.*"... When the claims of the class members are small, denial of a class action would effectively exclude them from judicial redress.[55]

In sum, prosecution of this action as a class action will "achieve economies of time, effort and expense, and promote uniformity of decisions as to persons similarly situated," thus benefiting all parties, not to mention the Court.[56] The alternatives to a class action are either "no recourse for thousands of [prospective class members] to whom the courthouse would [be prohibitively expensive] or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake."[57]

### 5. *The Court should appoint the undersigned law firm as class counsel*

Under Fed. R. Civ. P. 23(g), "a court that certifies a class must appoint class counsel." In this case, plaintiff requests that the Court appoint her attorneys Kelley Uustal as class counsel. In appointing class counsel, the Court must consider the following factors:

---

[55] *Newberg*, § 4.27, at 4-107 to 4-109 (emphasis in original; citation omitted).
[56] Fed. R. Civ. P. 23(b)(3) advisory committee's note.
[57] *Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir. 1968), *cert. denied*, 395 U.S. 977 (1969).

17

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.[58]

Plaintiff's lawyers have demonstrated that they are capable of prosecuting this action. They warrant appointment as class counsel.

### D. Conclusion

Plaintiff has satisfied all of Rule 23's elements. The Court should certify the proposed class.

Dated: June 25, 2014.

> By: /s/ Jordan M. Lewis
> Jordan M. Lewis (FBN: 97997)
> Kelley Uustal, PLC
> 700 S.E. 3rd Avenue, Suite 300
> Fort Lauderdale, Florida 33316
> Telephone: (954) 522-6601
> Facsimile: (954) 522-6608
> Email: jml@kulaw.com
> Email: jju@kulaw.com
> Email: mah@kulaw.com
>
> *Attorneys for Plaintiff*

### CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by US Mail this 25TH day of June, 2014 to the following: Registered Agent for Ford

---

[58] Fed. R. Civ. P. 23(g)(1)(A).

Motor Company, CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.

                                                  */s/ Jordan M. Lewis*
                                                  Jordan M. Lewis (Florida Bar No. 97997)