IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Angela Sanchez-Knutson, individually, and
on behalf of all those similarly situated,

          CASE NO.  14-cv-61344 WPD

        Plaintiff,

v.

Ford Motor Company,

        Defendant.

_____/

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**Kelley✒Uustal, PLC**
John J. Uustal
Jordan M. Lewis
Michael A. Hersh
700 S.E. 3rd Avenue, Suite 300
Fort Lauderdale, Florida 33316
Telephone:   (954) 522-6601
Facsimile:    (954) 522-6608
Email:        jml@kulaw.com
Email:        jju@kulaw.com
Email:        mah@kulaw.com

*Attorneys for Plaintiff*

1

# I.   INTRODUCTION

Defendant Ford Motor Company's motion to dismiss teeters on two unexplored and ultimately false premises. The *first* premise is this: A consumer who buys a car that is so materially defective that she risks carbon monoxide poisoning when operating it has no recourse against the car's manufacturer. Ford, of course, doesn't quite say this, but that's the logical extension of its motion to dismiss, which argues that plaintiff Angela Sanchez-Knutson cannot possibly state a valid *prima facie* claim. The *second* premise underpinning Ford's motion is this: it can generally ignore this Court's holding on a case that is impossible to distinguish. The case is *Rosen v. J.M. Auto, Inc.*[1] and it involved (a) class claims (b) asserting the *same* claims brought here (c) against a car manufacturer for design and manufacture defects. This Court denied those defendants' motion to dismiss, on many grounds mimicked here by Ford. While it might be possible to argue that *Rosen* was decided incorrectly, or somehow can be distinguished, its treatment requires more than a single footnote,[2] which is all that Ford (in 20 pages) spends on this Court's decision.  This doesn't mean that *Rosen* can't be distinguished; it does mean that *Rosen* commands greater deference and attention than Ford permitted in its opening brief.

These two mistakes – an unspoken assumption that a consumer has no recourse against the manufacturer of a dangerously defective car and a failure to concede this Court's analysis and holding in *Rosen* – contaminate Ford's motion to dismiss.

---

[1] 2008 WL 9901501 (S.D. Fla. March 6, 2008).
[2] Ford 7/7/2014 Br. at 15 n.3.

## I.   BACKGROUND

On March 31, 2012, plaintiff Angela Sanchez-Knutson – a citizen of this judicial

district[3] - purchased a new 2013 Ford Explorer from an authorized Ford dealership in

Gainesville, Florida.[4]  Knutson noticed the smell of exhaust in the passenger cab, which

would intensify when the car accelerated.[5] To remedy the problem, she serviced her car at

an authorized Ford dealership on: Sept. 12, 2012, Nov. 29, 2012, March 20, 2013, Aug. 20,

2013, Nov. 7, 2013, Jan. 7, 2014, March 13, 2014, and April 14, 2014.[6]

When the vehicle was brought in for service on Nov. 7, 2013, the authorized Ford

dealership verified Knutson's complaint of an exhaust odor.[7]  The authorized Ford

dealership prescribed and performed Transportation Safety Bulletin 12-12-4.[8] The bulletin

was issued in December 2012 and expressly states that it is intended to provide

instructions to authorized Ford dealerships to correct the presence of an exhaust odor in

2011 through 2013 model year Ford Explorers.[9]  More specifically, the bulletin

acknowledges that

> some 2011-2013 Explorer vehicles may exhibit an exhaust odor in the
> vehicle with the auxiliary climate control system on. Customers may
> indicate the odor smells like sulfur.[10]

In TSB 12-12-4, Ford requires installation or use of the following replacement parts

in the subject vehicles, among others: (i) a dual rate air extractor; (ii) valve assembly auto

---

[3] **Complaint, ¶ 10.**
[4] *Id.* at ¶ 12.
[5] *Id.* at ¶ 16.
[6] *Id.* at ¶ 15.
[7] *Id.* at ¶ 17.
[8] *Id.*
[9] *Id.* at ¶¶ 36-37.
[10] *Id.* at ¶ 2.

drains; and (iii) a seam sealer.[11]  The bulletin requires that Ford dealers replace the driver

side rear air extractor initially installed on the vehicle.[12]  The replacement part is formed of

polypropylene and over-molded with thermoplastic elastomer.[13]  The dual rate air

extractor includes "living hinges" and plastic torsional springs meant to function as a one-

way pneumatic valve.[14]  In addition, Ford adds a silicone-like substance to one of the three

"living hinges."[15]  This silicone-like substance is not included, and was not meant to be

included, as part of the dual rate air extractor as designed by its manufacturer and causes

the "living hinges" to stay open, permitting exhaust to permeate the exterior panels of the

vehicles, and enter the passenger compartment.[16]

Knutson continued to smell exhaust in the passenger compartment after TSB 12-12-

4 was performed.[17]  Knutson notified the authorized Ford dealership on each service visit

that an exhaust odor was present in the passenger compartment of the vehicle while the

vehicle was in use.[18]  The authorized Ford dealership informed Knutson that Ford was

aware of the exhaust odor problem but did not know how to fix it.[19] In April 2014, Knutson

learned that carbon monoxide entered the passenger compartment of the vehicle while the

vehicle was being driven in a normal manner.  She stopped driving the vehicle.[20]

---

[11] *Id.* at ¶ 43.
[12] *Id.* at ¶ 44.
[13] *Id.* at ¶ 45.
[14] *Id.*
[15] *Id.* at ¶ 47.
[16] *Id.*
[17] *Id.* at ¶ 18.
[18] *Id.* at ¶ 16.
[19] *Id.* at ¶ 19.
[20] *Id.* at ¶ 25.

To date, Ford has not repaired Knutson's 2013 Ford Explorer, nor has Ford acknowledged to Knutson (or anyone else) that the 2011 through 2013 model year Ford Explorers contain design flaws and/or defective exhaust and/or HVAC systems permitting lethal carbon monoxide and other potentially dangerous gases into the passenger compartments of those vehicles.[21]

On June 9, 2014, Knutson commenced a four-count complaint against Ford, on her own behalf and on behalf of all persons who purchased or leased in Florida at least one of the following vehicles: 2011 Ford Explorer, 2012 Ford Explorer or 2013 Ford Explorer.[22] The claims are for breach of express[23] and implied warranties,[24] violation of the Magnuson-Moss Act[25] (which, in effect, federalizes and broadens common-law warranty claims), and for violation of the Florida Deceptive and Unfair Trade Practices Act.[26]

## II.   LEGAL STANDARD

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all of the Complaint's allegations as true, construing them in the light most favorable to the plaintiff.[27] Under Federal Rule of Civil Procedure 8, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[28] "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-

---

[21] *Id.* at ¶ 26.
[22] *See* Docket Entry # 5, at 1.
[23] **Complaint, Count III, ¶¶ 89-101.**
[24] *Id.*, **Count IV, ¶¶ 102-06.**
[25] *Id.*, **Count I, ¶¶ 61-74.**
[26] *Id.*, **Count II, ¶¶ 75-88.**
[27] *Pielage v. McConnell,* 516 F.3d 1282, 1284 (11th Cir. 2008).
[28] Fed. R. Civ. P. 8(a)(2).

unlawfully-harmed-me accusation."[29] The plaintiff must therefore articulate "enough facts to state a claim to relief that is plausible on its face."[30]

Ford asserts that Knutson's FDUPTA claim is subject to Rule 9(b)'s heightened fraud pleading standard.[31] This is contrary to Florida law. This Court has explained:

> Generally "[t]he requirements of Rule 9(b) do not apply to claims under the FDUTPA." *Galstaldi v. Sunvest Comtys. USA, LLC*, 637 F.Supp.2d 1045, 1056 (S.D.Fla.2009). Because FDUTPA was enacted to provide remedies for conduct outside the reach of traditional common law torts like fraud, "the plaintiff need not prove the elements of fraud to sustain an action under the statute." *Id.* (quotations omitted). Accordingly, the heightened pleading requirements of Rule 9(b) cannot serve as a basis to dismiss FDUTPA claims. *Id.; see also State, Office of Atty. Gen., Dep't of Legal Affairs v. Wyndham Int'l, Inc.*, 869 So.2d 592, 598 (Fla.Dist.Ct.App.2004) ("A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue."). Accordingly, the Court finds that Rule(9) is inapplicable to Plaintiff's FDUTPA claims.[32]

## III.   ARGUMENT

### A.   Knutson has stated a *prima facie* claim for breach of express warranty

Knutson's express warranty claim asserts that "[f]or each defective vehicle sold by Ford, an express written warranty was issued … warranting the vehicle to be free of defects in materials and workmanship at the time of delivery."[33] Ford, which attached what it claims to be the operative written warranty to its motion, argues (1) that Knutson's express

---

[29] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).
[30] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).
[31] Ford 7/7/2014 Br. at 5-6.
[32] *Guerrero v. Target Corp.*, 889 F. Supp.2d 1348, 1354-55 (S.D. Fla. 2012). *See also Rosen*, 2008 WL 9901501, *2 (S.D. Fla. March 6, 2008)(applying Rule 8 standard to motion to dismiss lawsuit that included FDUPTA claims).
[33] **Complaint, ¶ 91.**

warranty claim "is plainly a design defect claim"[34] and (2) its written warranty "expressly excludes warranty coverage for claims of a design defect."[35]

### 1.      The argument relies on materials outside the complaint

Ford's argument relies on its introduction of materials outside the record. In *Rosen*, under essentially identical circumstances, this Court refused to consider a defendant's attempt to introduce its written warranty.[36] Ford does not even attempt to explain why its attempt to introduce evidence here should be treated differently.

### 2.      Ford's argument is premised on narrowing Knutson's claims

Ford's argument inaccurately narrows Knutson's theory to design defect only. That's not accurate.  Her Complaint extends the theory to, at minimum, defective manufacture, defective assembly, defective engineering and defective inspection.[37] Is it fair – as Ford asserts – that Knutson claims design defect? Yes. Is it fair – as Ford asserts – that Knutson claims *only* design defect? Not remotely.

---

[34] Ford 7/7/2014 Br. at 9.

[35] *Id.*

[36] *Rosen*, 2008 WL 9901501, *5 ("These determinations are better made at a later stage of the litigation.").

[37] **Complaint, ¶ 30 ("The 2011 through 2013 model year Ford Explorers were designed, engineered and manufactured by Ford with design flaws and/or defective exhaust and/or HVAC systems..."); ¶ 31 ("Ford designed, manufactured, assembled, inspected, distributed, sold and leased the 2011 through 2013 model year Ford Explorers in a manner so as to render the subject vehicles defective and unsafe.."); ¶ 31(c)-(g)(In all paragraphs, asserting that Knutson's claims arose from Ford's "[d]esigning, manufacturing and assembling."); ¶ 48 ("Ford designed, manufactured and engineered the 2011 through 2013 model year Ford Explorers using valve assembly auto drains on the rear liftgate of the vehicles which are dangerous and defective..."); ¶ 49 ("Ford designed, manufactured, engineered and assembled the 2011 through 2013 model year Ford Explorers without properly sealing the horizontal sheet metal lap joints....");**

### 3.      Ford's warranty booklet does not exclude design flaws

Notwithstanding Ford's unqualified representation to this Court that its warranty booklet "expressly excludes warranty coverage for claims of a design defect,"[38] there is <u>no</u> such limitation. In fact, it's just the opposite. On page 9 of the warranty booklet is this:

> Defects may be unintentionally introduced into vehicles during the <u>design</u> and manufacturing processes <u>and such defects could result in the need for repairs</u>. For this reason, <u>Ford provides the New Vehicle Limited Warranty in order to remedy any such defects</u> that result in vehicle part malfunction or failure during the warranty period.[39]

### 4.      Ford's cited cases are, at best, inapposite

The cases cited by Ford to support its position here are, at best, irrelevant to the issues presented. While it probably doesn't matter – as explained above, Ford's arguments fail because they misstate Knutson's Complaint and the actual warranty language – the cases warrant comment, in part, because they are so far afield.

Ford cites *David v. American Suzuki Motor Corp.*[40] for that proposition that it "den[ied] claim for design defect under limited warranty."[41] That's not accurate. The *David* court converted the defendant's motions to dismiss into motions for summary judgment, and provided a briefing schedule.  Ford quotes *Troup v. Toyota Motor Corp.*[42] as follows: "[E]xpress warranties covering defects in materials and workmanship exclude defects in design."[43] The two words Ford removed from the beginning of the sentence were: "In California," which changes its significance materially. Finally, Ford cites *In re Toyota Motor*

---

[38] Ford 7/7/2014 Br. at 9.
[39] Docket Entry #19-2, at 15 (emphasis added).
[40] 629 F. Supp. 2d 1309 (S.D. Fla. 2009).
[41] Ford. 7/7/2014 Br. at 10.
[42] 545 Fed. App'x 668 (9th Cir. 2013).
[43] Ford 7/7/2014 Br. at 10.

*Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*[44] as holding that the case "barr[ed] plaintiff's express warranty claim against manufacturer that was based on design defects as opposed to defects in 'material or workmanship.' "[45] Again, this is inaccurate; the court ruled that the plaintiff's breach of express warranty claims – which asserted (as Knutson does here) allegations of defective design, assembly and manufacture - were not barred.[46]

**B.      Knutson has stated a *prima facie* claim for breach of implied warranty**

Citing two cases (discussed below) Ford argues that Knutson's implied warranty claim should be dismissed because she is not in privity with Ford.

**1.      *Florida law does not require privity in this context***

The appropriate starting place is the Florida Supreme Court's opinion in *Manheim v. Ford Motor Company*,[47] which held that "an action may be brought against a manufacturer notwithstanding want of privity."[48] Like this case, *Manheim* involved a breach of implied warranty claim against Ford Motor Company by a consumer alleging economic damages. The Florida Supreme Court supported its holding by observing that the "world of merchandising is . . . no longer a world of direct contract."[49] The court noted that manufacturers make use of newspapers, periodicals and other media to call attention to the qualities and virtues of their products, and that advertising is directed to ultimate

---

[44] 754 F. Supp.2d 1145 (C.D. Cal. 2010).
[45] Ford 7/7/2014 Br. at 10.
[46] 754 F. Supp.2d at 1181.
[47] 201 So.2d 440 (Fla. 1967).
[48] *Id.* at 441.
[49] *Id.* at 443.

consumers with whom they have no privity.[50]  The *Manheim* court concluded that the

absence of privity between a manufacturer and a purchaser does not preclude recovery for

implied warranty of a product due to its defects and lack of fitness and suitability.[51]

*Manheim* remains good law.[52]

Last year, a federal court in New Jersey, applying Florida law, relied favorably upon

*Manheim*.  The court in *Morano v. BMW of North America, LLC* [53] found that traditional

privity requirements "were logical in an era when manufacturers and ultimate buyers

negotiated face-to-face over products that were relatively simple to understand and easy to

inspect for quality."[54]  Courts moved away from traditional privity requirements, however,

as manufacturers shifted from "direct sales and increasingly sold their products through

authorized dealers and retailers."[55]  "[C]onsumers now make their purchases from a retail

seller who is nothing more than an economic conduit for the manufacturer's product."[56]

Finding that strict privity requirements may lead to unjust results, *Morano* relied upon

*Manheim*, noting that *Manheim*'s "rejection of a strict privity requirement in an action

---

[50] *Id.*
[51] *Id.* at 442.
[52] *Dudley v. Mae's Discount Fabrics*, 323 So.2d 279, 280 (Fla. 2d DCA 1975) ("It is well settled that one need not be in privity with the retailer in order to have an action against him for breach of an implied warranty if the plaintiff can prove that the product in question is inherently dangerous."); *Rehurek v. Chrysler Credit Corp.*, 262 So.2d 452, 455 (Fla. 2d DCA 1972) ("We come next to the question of whether or not a purchaser of a new automobile is prohibited from asserting breach of implied warranty of merchantability and fitness against a manufacturer . . . notwithstanding want of privity.  We think the law in Florida on this point is well settled and has been enunciated in the following cases: *Manheim v. Ford Motor Company*, Fla. 1967, 201 So.2d 440 . . . .").
[53] 928 F. Supp.2d 826 (D.N.J. 2013).
[54] *Id.*
[55] *Id.*
[56] *Id.*

between a buyer and a car manufacturer remains instructive."[57]

Ford doesn't mention *Manheim*. Instead it cites two cases[58]: *Mesa v. BMW of North America, LLC*,[59] and *McCabe v. Daimler AG & Mercedes-Benz USA, LLC*.[60] *McCabe* relies on *Mesa*,[61] and *Mesa* relies on and cites[62] the Florida Supreme Court's decision in *Kramer v. Piper Aircraft Corp.*[63] To understand Ford's authority, it's necessary to understand *Kramer*.

And here's the rub: *Kramer* involved plaintiffs suing under an implied warranty theory for <u>personal injuries</u>. The narrow question presented in *Kramer*:

> Although we did not expressly state in *West* that the common law implied warranty claim for personal injury no longer exists under Florida law absent privity, it is implicit from the language of the opinion that it was this Court's intent to abolish that cause of action where the remedy of strict liability is appropriate.[64]

That distinction – that *Kramer* involved personal injury claims – explains how it stands alongside *Manheim*. Both decisions make sense. Only one – *Manheim* – applies to Knutson's claims.

**2.     *Ford's warranty booklet contemplates an implied warranty***

Ford has another problem with its implied warranty argument: Its warranty booklet (if it is to be considered) appears to assume that Ford extends implied warranties to the car purchaser.  The warranty booklet provides:

---

[57] *Id.* at 836.
[58] Ford 7/7/2014 Br. at 10.
[59] 904 So.2d 450 (Fla. 3d DCA 2005).
[60] 948 F. Supp.2d 1347 (N.D. Ga. 2013).
[61] *Id.* at 1362.
[62] 904 So.2d at 458.
[63] 520 So.2d 37 (Fla. 1988).
[64] *Id.* at 39.

11

- "You may have some implied warranties."[65]
- "These implied warranties are limited, to the extent allowed by law, to the time period covered by the written warranties, or to the applicable time period provided by state law, whichever period is shorter."[66]
- "These implied warranties do not apply at all if you use your vehicle for business or commercial purposes. In addition, the implied warranty of fitness for a particular purpose does not apply if your vehicle is used for racing, even if the vehicle is equipped for racing."[67]
- "Some states do not allow Ford to limit how long an implied warranty lasts or to exclude or limit incidental or consequential damages, so the limitation and exclusions described above may not apply to you."[68]
- "The remedy under this written warranty, and any implied warranty, is limited to repair, replacement, or adjustment of defective parts."[69]

To be clear: Knutson does not contend that these references to implied warranties is

<u>dispositive</u> of anything. But, at minimum, Ford must be required to reconcile these

references to its litigation argument that it did not extend implied warranties at all.

### 3.    *Privity is established through third-party beneficiary law*

"In an appropriate case, ... straightforward traditional third party beneficiary

analysis can be successfully used to impose liability on a warrantor not in privity with a

purchaser."[70]   Though there does not appear to be a Florida case on this point, there are

automobile cases on point, holding that automobile purchasers can state a claim of breach

---

[65] Docket Entry #19-2, at 6.
[66] *Id.*
[67] *Id.*
[68] *Id.* at 7.
[69] *Id.* at 9.
[70] 13 Richard A. Lord, *Williston on Contracts* § 37:39 at 259-60 (4th ed.2000)(footnote omitted).

of implied warranty through third-party beneficiary law.[71] To be fair, Knutson's **Complaint**

doesn't squarely raise this claim; she will in later iterations.

C.    **Knutson has stated a *prima facie* claim for violation of Magnuson-Moss**

    Knutson's Count I[72] is brought under Magnuson-Moss. In general, the claims are

derivative of Knutson's breach of express and implied warranty claims. Ford makes two

arguments in urging dismissal. First, it argues that, if it prevails in its arguments concerning

Knutson's express and implied warranty claims, then Knutson's Magnuson-Moss claims

must be dismissed. Knutson cannot dispute that position, but notes that the converse must

also be true: If Ford's arguments concerning her express and implied warranty claims fail,

then her Magnuson Moss claim will also proceed. Ford's second argument doesn't address

the merits. Instead, Ford argues that Knutson cannot state a Magnuson Moss claim without

first exercising its "informal" administrative review process.

    *1.    Ford's exhaustion argument is based on materials outside the record*

    Ford argues that Knutson's Magnuson-Moss claim must be dismissed because she

didn't satisfy "the statutory conditions precedent to bringing a suit ... under the Magnuson-

procedure" that it claims is described in its warranty booklet.[73]

    Ford's first problem here is that it overstates the statutory authority that it says

establishes a "condition[] precedent."  The statute is 15 U.S.C. § 2310(a)(3), which "imposes

---

[71] *E.g., In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litig.*, 754 F. Supp.2d 1145, 1185 (C.D. Cal. 2010)("Here, Plaintiffs have pled that they purchased vehicles from a network of dealers who are agents of Defendants. .... , Plaintiffs allege they were the intended consumers. ... Like those plaintiffs, they allege facts tending to support that they are third-party beneficiaries;  therefore, Plaintiffs' breach of implied warranty claim is not precluded by the lack of vertical privity.").
[72] **Complaint, ¶¶ 61-74.**
[73] *Id.* at 7-8.

three conditions to the application of § 2310(a)(3)(C)(ii), including that the warrantor "

'incorporate[ ] in a written warranty a *requirement* that the consumer resort to [an

informal dispute settlement procedure].' If any one of the conditions is not satisfied, §

2310(a)(3)(C)(ii) does not apply."[74]

The reason this distinction – that the requirement must be found in the warranty –

is important is that Ford's exhaustion argument cannot be considered without

consideration of Ford's warranty documents. If, for example, Ford's warranty described an

optional exhaustion process, then it could not be invoked now as compelling dismissal.[75]

Accordingly, exhaustion cannot be considered absent the warranty booklet that

Ford says is the only express warranty that applies to Knutson.  Consistent with this Court's

holding in *Rosen*,[76] (discussed above) Ford's exhaustion argument fails.

### 2.    Exhaustion is an affirmative defense that is Ford's burden to raise

In its brief, Ford summarizes its exhaustion argument as follows:

---

[74] *Keegan v. American Honda Motor Co., Inc.,* 838 F. Supp.2d 929, 956 (C.D. Cal. 2012).
[75] *Id.* ("Here, defendants have clearly chosen to make their informal dispute resolution
mechanism voluntary, rather than mandatory. Compare *In re Toyota Motor Corp.,* 754 F.
Supp.2d at 1188–89 (requiring compliance with § 2310(a)(3)(C)(ii) because the warranty
in question stated that consumers *must* use the Dispute Resolution Program before seeking
remedies pursuant to the Magnuson-Moss Act'). Consequently, a plain reading of the
statute renders § 2310(a)(3)(C)(ii)'s jurisdictional bar inapplicable in this case.").
[76] *Rosen*, 2008 WL 9901501, at *5 ("In this case, however, the Plaintiffs dispute that the
documents attached by the Defendants represent the entirety of the express warranties
upon which they rely. Furthermore, Plaintiffs do not specifically cite to the document
attached by the Defendants in their Complaint, nor rely on any language contained therein,
but simply state that an 'express written warranty' was issued and that 'written and
express' warranties accompanied the vehicle. Finally, Plaintiffs point out in their Response
that the pleadings do not reveal precisely when the Warranty, containing the disclaimers,
was issued. ... Accordingly, the Court finds that at this point in the proceedings it cannot
hold, as a matter of law, looking only at the allegations of the Complaint, that the
Defendants have effectively limited all damages to repair and/or replacement and that any
other claims for incidental and/or consequential damages are barred.").

> [N]owhere in the Complaint does [Knutson] allege that she submitted her
> warranty claims to BBB AUTO LINE prior to bringing this civil action, and
> for this straightforward reason, her Magnuson-Moss claims should be
> dismissed.[77]

This simply misstates the law. Boiled down, this is an exhaustion defense that (1) Knutson is not required to plead to state a claim; and (2) is an affirmative defense that Ford must raise.

### a.   Knutson is not required to plead exhaustion

In most contexts "courts typically regard exhaustion as an affirmative defense."[78] Accordingly, where – like here – a federal statute imposes exhaustion and where – like here - the statute doesn't indicate whether failure to exhaust is a jurisdictional or affirmative defense, "[t]his is strong evidence that the usual practice should be followed, and the usual practice under the Federal Rules is to regard exhaustion as an affirmative defense."[79]

### b.   Exhaustion is an affirmative defense that Ford must raise

Federal courts have applied the rule that failure to exhaust is an affirmative and not a jurisdictional defense in a variety of contexts, including cases involving ERISA,[80] the

---

[77] Ford 7/7/2014 Br. at 8.
[78] *Jones v. Bock*, 549 U.S. 199, 212 (2007).
[79] *Id.*
[80] *E.g., Paese v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445-46 (2d Cir. 2006) (finding that ERISA's exhaustion requirement is "purely a judge-made concept that developed in the absence of statutory language demonstrating that Congress intended to make ERISA administrative a jurisdictional requirement" and concluding that ERISA exhaustion is an affirmative defense.).

Prison Litigation Reform Act,[81] the Telecommunications Act,[82] the Labor Management Reporting and Disclosure Act,[83] and Individuals with Disabilities Education Act.[84] There is no reason the rule should not apply here as well.

"[A] plaintiff is not required to negate an affirmative defense in his complaint."[85] Thus, Ford has the test backwards. It is not Knutson's obligation to raise exhaustion, and her failure to do so doesn't compel dismissal. Instead, it is Ford's obligation to raise exhaustion. And because exhaustion is not a jurisdictional requirement, "[t]he proper procedural vehicle for assertion of the affirmative defense of lack of [] administrative exhaustion is by way of properly supported motion for summary judgment."[86]

---

[81] *E.g., Richardson v. Goord,* 347 F.3d 431, 434 (2d Cir. 2003) (stating, in the context of the Prison Litigation Reform Act, that "[n]umerous circuits have pointed out that [the PLRA] lacks the sweeping and direct language that would indicate a jurisdictional bar rather than a mere codification of administrative exhaustion requirements") (internal quotation marks omitted).

[82] *E.g., Ohio Bell Tel. Co., Inc. v. Global Naps Ohio, Inc.,* 540 F. Supp.2d 914, 921 (S.D. Ohio 2008)("Even if exhaustion requirements may be judicially engrafted onto statutes based on what can be inferred from their text and purpose and Congress's intent, courts require the language of the statutes in question to speak with much greater clarity than does § 252(e)(6), for the exhaustion requirement to take on jurisdictional significance.").

[83] *E.g., Knight v. International Longshoremen's Ass'n,* 457 F.3d 331, 344 n.15 (3rd Cir. 2006)("In addition, ILA claims that because union members are required to exhaust intraunion remedies before bringing suit, and that plaintiffs failed to do so here, this claim is barred. Because the ILA failed to raise exhaustion in its Answer, this affirmative defense is waived.").

[84] *E.g,. Mosley v. Board of Educ. of City of Chicago,* 434 F.3d 527 533 (7th Cir. 2006)("A failure to exhaust is normally considered to be an affirmative defense []and we see no reason to treat it differently here.").

[85] *Tregenza v. Great American Communications, Co.,* 12 F.3d 717, 718 (7th Cir. 1993).

[86] *Thibodeaux v. Prudential Ins. Co. of America,* 2008 WL 5397236, *1 (W.D. La. Oct. 30, 2008). *Accord, Gunn v. Bluecross Blueshield of Tenn., Inc.,* 2012 WL 1711555, at *4 (E.D.Tenn. May 15, 2012) (Because exhaustion is an affirmative defense, a Rule 56 "summary judgment motion is the proper vehicle for considering a defendant's claim that a plaintiff has failed to exhaust administrative remedies before filing a civil action.").

**D.      Knutson has stated a *prima facie* claim for FDUPTA violations**

Ford launches a variety of challenges to Knutson's claim for FDUPTA violations, asserting (a) that the claims are preempted; (b) that this Court should "stand down" in deference to federal transportation agencies; (c) that violations of a federal act (known as the "Tread Act") cannot be the basis for a FDUPTA claim; and (d) that Knutson's allegations don't satisfy federal pleading requirements.[87] None of these arguments finds traction.

### 1.      Knutson's FDUPTA claim extends beyond the TREAD Act

To start with, Knutson's FDUPTA claim does assert that Ford's violation of the Tread Act is a basis for liability. But it's not the only basis asserted,[88] which even Ford acknowledges: "The vast majority of [Knutson's] allegations supporting Count II do not involve conduct regulated by the TREAD Act."[89] The significance is that none of Ford's TREAD arguments (discussed below) bear whatsoever on these other claims.

### 2.      Violations of TREAD have served as a predicate for a consumer claim

Ford declares that Knutson cannot base her FDUPTA claim on violations of the TREAD Act because the statute was "not designed to prevent misleading or deceptive acts...."[90] In fairness, Ford should have conceded *In re Toyota Motor Corp.*[91]

*In re Toyota* involved a putative class claim seeking diminution in value damages after the subject vehicles were subject to sudden, unintended acceleration. The plaintiffs in those cases brought claims under California's consumer protection statute, which – like

---

[87] Ford 7/7/2014 Br. at 12-18.
[88] **Complaint, ¶¶ 84(a)-(j).**
[89] Ford 7/7/2014 Br. at 13 n.2.
[90] Ford 7/7/2014 Br. at 12.
[91] 790 F. Supp.2d 1152 (C.D. Cal. 2011).

Florida's FDUPTA statute – provides relief for consumers who have "suffered injury in fact and [have] lost money or property as a result of the unfair competition."[92] Like here, the plaintiffs asserted that Toyota's violation of the TREAD Act formed the basis for a claim under California's consumer protection statute. The court agreed: "...Plaintiffs have alleged a violation of the CLRA based on a duty to disclose material information. The fact that Toyota had a duty to disclose to NHTSA rather than consumers does not exonerate the statutory duty to disclose material facts to consumers."[93] The same logic should apply here.

### 3.   Primary jurisdiction - *This Court has jurisdiction and should exercise it*

Ford argues that "[i]f the Court concludes that [Knutson] can maintain a violation of TREAD or Safety Act as a private right of action under FDUPTA, it should ... dismiss Count II under the doctrine of primary jurisdiction."[94] There is much wrong with this argument, starting with the heavy presumption *against* this result:

> Given that the court has a "virtually unflagging obligation" to exercise jurisdiction, abstention is extraordinarily disfavored. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 19 [] (1983); *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 821 (1976). Nevertheless, the court may choose to invoke primary jurisdiction in cases "raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion." *Far East Conference v. United States,* 342 U.S. 570, 574 [] (1952).[95]

Ford's argument, that a court should defer to NHTSA because a plaintiff's claims implicate safety issues that the agency is supposed to regulate, has been offered before:

> Here, the Court does not find that exercise of the doctrine of primary jurisdiction is necessary at this stage of the case, either to ensure uniformity of regulation or because NHTSA is better-equipped than the

---

[92] *Id.* at 1168.
[93] *Id.* at 1173.
[94] Ford 7/7/2014 Br. at 16.
[95] *Williams v. Alabama Dept. of Transportation*, 119 F. Supp.2d 1249, 1254 (M.D. Ala. 2000).

Court to address the issues raised by Plaintiffs' claims. First, because Plaintiff does not challenge a safety standard or any NHTSA regulation, and because Defendant has not identified any specific conflict between this action and the on-going NHTSA investigation of the same problem, the need for "uniformity and consistency in the regulation of business" does not justify application of the doctrine of primary jurisdiction at this time. *See id*. at 304, 96 S.Ct. 1978 (holding that consideration of uniformity did not justify invoking primary jurisdiction doctrine where plaintiff did not challenge any regulation or practice of the agency). Second, the Court does not find that Plaintiffs' claims raise "issues of fact not within the conventional experience of judges." *See Far East Conference v. United States*, 342 U.S. 570, 574[] (1952) (holding that claims had to be brought before agency before court could consider them because their resolution required "a high degree of expert and technical knowledge" and the agency therefore would be better able to deal with these issues). Rather, the state law claims brought by Plaintiffs are "within the conventional competence of the courts." *See Nader*, 426 U.S. at 305 []. Therefore, based on the record that is currently before this Court, the Court does not find that the issues raised by Plaintiffs in this action need be addressed by NHTSA before this Court can consider them.[96]

A second problem is that it is based on two false premises; *first* that Knutson's FDUPTA claim necessitates a finding that the TREAD Act provides a private cause of action, and *second* that the TREAD Act allegations comprise the entirety of her FDUPTA claim.

One final point needs to be made.  Knutson's Complaint, in her Prayer for Relief, requests that this Court order a recall of the affected vehicles. Knutson stipulates that she will not seek such relief and will be happy to file whatever the Court requires – beyond this unqualified assertion here – to memorialize this stipulation.

### 4.    Ford has not demonstrated "implied preemption"

Under the heading "Count II should be dismissed because there is no private right of

---

[96] *Kent v. Daimler-Chrysler Corp.*, 200 F. Supp.2d 1208, 1218-19 (N.D. Cal. 2002).

action for a violation of the TREAD Act or the Safety Act,"[97] Ford argues that Knutson's

claims that are tied to the TREAD Act "are impliedly preempted by federal law."[98] Knutson

will assume that that Ford intends these as separate arguments.

As to Ford's argument that there is no private right of action for a TREAD Act

violation, it is a non-issue. Knutson doesn't assert one.  As to Ford's implied preemption

argument, this was thoroughly explored in *Rosen*, where this Court

> fails to see how the enforcement, via state law, of the federal standard
> itself, could possibly contradict with the objectives of the Safety Act, when
> the Safety Act specifically provides that it was not intended to be the
> exclusive remedy in the area of motor vehicle safety. While the lack of a
> private cause of action prevents the Plaintiffs from bringing a federal claim
> under the statute, the savings clause permits states to enforce the
> standards via their common law and statutory regulations so long as these
> laws do not conflict with the objectives of the Safety Act.[99]

Ford acknowledges the Court's holding, but argues it relied "on a single case"[100]

and did not consider *In re Bridgestone/Firestone, Inc., Tires Product Liability Litig.*[101]

The "single case" (Ford doesn't state the name) this Court relied on is *Chamberlan v.*

*Ford Motor Co.*[102] A third case, *In re Toyota Motor Corp. Unintended Acceleration Marketing,*

*Sales Practices, and Products Liability Litig.*,[103] explained the different results:

> The conflicting outcomes of *Bridgestone* and *Chamberlan* are attributable,
> in large part, to the contrary conclusions those courts drew on this issue.
> The courts reached contrary conclusions because they defined the area of
> law relevant to the inquiry differently. In *Bridgestone*, the court concluded
> that the presumption against preemption did not apply to a claim for
> injunctive relief in the form of a recall because "states have never

---

[97] Ford 7/7/2014 Br. at 13.
[98] *Id.* at 15.
[99] *Rosen*, 2008 WL 9901501, *4.
[100] Ford 7/7/2014 Br. at 15 n.3.
[101] 153 F. Supp.2d 935 (S.D. Ind. 2001).
[102] 314 F. Supp.2d 953 (N.D. Cal. 2004).
[103] 754 F. Supp.2d 1145 (C.D. Cal. 2010).

> assumed a significant role in *recalls* related to vehicle safety." *Id.* at 942.
> (emphasis in original). In *Chamberlan*, on the other hand, the court
> concluded that the relevant area of law was not that of recalls, but rather
> of motor vehicle safety. 314 F.Supp.2d at 958. Thus, the *Chamberlan*
> court found that the presumption against preemption was triggered
> because motor vehicle safety "is an area of traditional State police power."
> *Id.* (citing *City of Columbus v. Ours Garage & Wrecker Serv.*, 536 U.S.
> 424, 439, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002)).[104]

*In re Toyota* held that *Chamberlan* got it right,[105] but this Court doesn't need to

choose. As discussed above, Knutson will withdraw the request for a recall from her prayer

for relief, which renders *Bridgestone* irrelevant to this analysis.

### 5.    *Knutson has satisfied the pleadings standards*

Finally, Ford argues that Knutson hasn't satisfied federal pleading standards. Ford

isn't specific with its criticism, other than taking issue with seven words found at the end of

a sentence in paragraph 85 of her **Complaint**.[106] In any case, Knutson will stand by her

allegations; to the extent the Court requires greater specificity, the correct remedy is leave

to amend, not dismissal.

### IV.    CONCLUSION

Ford's arguments uniformly miss their mark. The Court should deny Ford's motion

in its entirety and require Ford to address these issues on the merits.

---

[104] *Id.* at 1196.
[105] *Id.* ("This Court agrees with the *Chamberlan* court that the proper area of law to
consider in determining whether Plaintiffs' requested relief falls within an area of law
traditionally occupied by the States or one where there has been a significant federal
presence is that of motor vehicle safety.").
[106] Ford 7/7/2014 Br. at 17.

Dated: July 25, 2014.

By: */s/ Jordan M. Lewis*
      Jordan M. Lewis (FBN: 97997)
      Kelley Uustal, PLC
      700 S.E. 3rd Avenue, Suite 300
      Fort Lauderdale, Florida 33316
      Telephone:  (954) 522-6601
      Facsimile:  (954) 522-6608
      Email:      jml@kulaw.com
      Email:      jju@kulaw.com
      Email:      mah@kulaw.com

      *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by CM/ECF Notification this 25th day of July, 2014 to:

E. Colin Thompson, Esquire
J. Trumon Phillips
DLA Piper LLP
100 North Tampa Street, Suite 2200
Tampa, FL 33062-5809

Joel A. Dewey, Esquire
DLA Piper LLP
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209-3600

Janet Conigliaro, Esquire
Dykema
400 Renaissance Center
Detroit, Michigan 48243

      */s/ Jordan M. Lewis*
      Jordan M. Lewis (Florida Bar No. 97997)