**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**CASE NO.  14-61344-CIV-WPD/LSS**



ANGELA SANCHEZ-KNUTSON,

                    Plaintiff,

        vs.

                                        Fort Lauderdale, Florida
                                        March 17, 2015
FORD MOTOR COMPANY,

                    Defendant.
_____

**TRANSCRIPT OF DISCOVERY HEARING**
**BEFORE THE HONORABLE LURANA S. SNOW**
**UNITED STATES MAGISTRATE JUDGE**


APPEARANCES:

FOR THE PLAINTIFF:
                        *Kelley Uustal*
                        **BY:  MICHAEL A. HERSH,  ESQ.**
                        **BY:  CATHERINE DARLSON, ESQ.**
                        700 Southeast Third Avenue
                        Suite 300
                        Fort Lauderdale, Florida 33316


FOR THE DEFENDANT:
                        *Dykema*
                        **BY:  JANET CONIGLIARO, ESQ.**
                        400 Renaissance Center
                        Detroit, Michigan 48243

                        *DLA Piper, LLP*
                        **BY:  EDWARD COLIN THOMPSON, ESQ.**
                        100 North Tampa Street
                        Suite 2200
                        Tampa, Florida 33602

```
 1    REPORTED BY:        DAWN M. WHITMARSH, RPR
                          Official Court Reporter
 2                        400 N. Miami Avenue, 10S03
                          Miami, Florida  33128
 3                        Telephone:  305-523-5598
```

4                            P-R-O-C-E-E-D-I-N-G-S

5              COURTROOM DEPUTY:  Calling case number 14-61344,

6    Sanchez-Knutson versus Ford Motor Company.

7              THE COURT:  All right.  May I have counsel's

8    appearances, please.

9              MR. HERSH:  Michael Hersh with Kelley Uustal.  I'm here

10   with Catherine Darlson, also with Kelley Uustal and our client,

11   Angela Sanchez-Knutson is in the courtroom as well.

12             THE COURT:  Okay.

13             MS. CONIGLIARO:  Good afternoon, Your Honor.  Janet

14   Conigliaro on behalf of Ford Motor Company.

15             MR. THOMPSON:  Colin Thompson with DLA Piper on behalf

16   of Ford Motor Company.

17             THE COURT:  Okay.  All right.  We're here on two

18   motions filed by the Plaintiff.  We'll take them one at a time

19   and we will sort of group them together by similarity so that

20   what I'll do is I'll hear some argument from the Plaintiff, I'll

21   hear the response, and we'll just sort of take each group as we

22   go.

23             So let's start with the Plaintiff's motion to compel

24   better responses to Plaintiff's request for production dated

25   August 1, 2014.  And, let's see, I guess we can start with

1    requests three and four.

2          MR. HERSH:  Thank you, Your Honor.  In the motion

3    there's a few sections to it.

4          THE COURT:  If you have a better way to divide it up,

5    that's fine with me.

6          MR. HERSH:  What I would suggest is perhaps allowing me

7    to address first the issue of several of the answers because

8    this comes up in the individual requests.

9          THE COURT:  Sure.  However -- and then we can address

10   them as they come up.  Go right ahead.

11         MR. HERSH:  Thank you, Your Honor.

12         So I'm going to begin, there's a portion of the motion

13   where we address several requests.  For the record, I'll state

14   them.  It's requests three, four, five, six, seven, eight, 13,

15   14, 15, 16, 17, 18, 19, 20, 21 and 24.  And in response to each

16   of those requests, Ford states objections, and then without

17   waiver of those objections, provides an answer.

18         The objections, generally speaking, are that the

19   requests are vague, overbroad, burdensome, irrelevant; the

20   formulaic objections that any party may assert, followed by an

21   answer.

22         The general order on discovery objections and

23   procedures in this case, which is Docket Number 27 --

24         THE COURT:  Says don't do that.

25         MR. HERSH:  -- says don't do that.  And there are

1    several cases that -- there's one case that seems to either

2    follow the general order or the general order follows the case.

3    That particular case is --

4            THE COURT:  Well, I don't need the case.

5            The problem is that when you do that, you don't know

6    if, having reserved the objection, this is now the complete

7    answer.  We don't know that.  So as to each of these, we'll have

8    to be sure that whatever answer is provided is the actual answer

9    and nothing has been held back.

10           MR. HERSH:  Yes, Your Honor.  If I may add one thing on

11   this point?

12           THE COURT:  Sure.

13           MR. HERSH:  About three months ago in December, we were

14   here before Your Honor on this motion, and I think this was the

15   first topic we began to discuss.  And since that time, Ford has

16   certainly produced materials, they produced lots of materials,

17   we've got plenty of work to do.  But there being plenty of work

18   for us really isn't enough.  We want to make sure that what we

19   have is all that is responsive and if there are responsive

20   documents that are not being produced as a result of those

21   objections, we certainly want to know that.  So that's really

22   the concern we have with objections followed by answers.  We

23   don't know what we're not getting.

24           THE COURT:  All right.  Well, perhaps we should just

25   address that general comment first because if they are providing

1   all responsive documents, then we have not too much to discuss.

2   If not, then I guess we need to know what Ford has decided are

3   inappropriate to produce.

4           So do you have anything that you wish to say in

5   response to their comments?

6           MS. CONIGLIARO:  Yes, Your Honor.  Thank you.

7           One of the things -- and Mr. Hersh and I have discussed

8   this on a couple of different occasions -- Ford is not

9   withholding -- other than attorney-client privilege where we'll

10  provide an appropriate log, Ford is not withholding documents

11  based on the objections.  Any objections that were made were

12  there to preserve any objection that we might have because of

13  the breadth of the request.  And we made an attempt, and I feel

14  that we did, for the most part, to try to comply with the local

15  rule where it was not just a boilerplate objection.

16          One of the things that we discussed doing was

17  supplementing our discovery responses once the document

18  production is substantially complete.  With regard to the first

19  set of discovery, we are getting close to being substantially

20  complete, and we can either go through all of these that they've

21  raised and talk about why Ford made the objections or we can

22  agree to supplement our response and state that, you know, if we

23  can, based on the breadth of the request, that we're not

24  withholding anything based on that.

25          So if they want to provide more guidance based on the

1   request that we've objected to, we're happy to engage in those

2   discussions as well.  But I can assure you that objections were

3   not made --

4            THE COURT:  So what you're saying, I guess -- I mean,

5   if you're providing everything, why would you need more

6   guidance?  Would that be in order to get these documents to them

7   faster by not having to find so many?

8            MS. CONIGLIARO:  Correct.  Or providing some

9   perimeters.

10            For example, Ford's a very large corporation, and when

11   they ask for all documents about any specific topic, it's almost

12   -- it's almost impossible to ever say that we produced every

13   single document within the entirety of the company that could

14   ever mention X.  Have we made a good faith effort to produce

15   these categories of documents we believe to be relevant to what

16   you're asking us for?  Yes, we can make that assertion.  But

17   just as a broad and overly burdensome objection does not help a

18   Plaintiff when made by a Defendant, requests that generally ask

19   for all documents are not helpful or instructive to a Defendant

20   who is trying to comply with these discovery obligations.  And

21   looking at just the shear volume we have produced to date, I

22   think it's obvious that we're trying to comply with discovery.

23            THE COURT:  All right.  Well, let's just go through

24   them so that we're clear on everything.

25            Requests three and four seek documents exchanged

1    between Ford and any government agency related to the two

2    technical service bulletins, TSBs, at issue in this case.

3           So what, if anything, have you responded to that and

4    what further guidance do you need about that?

5           MS. CONIGLIARO:  I would say -- and this is one where I

6    think our objection here may be not as clearly stated as it

7    should have been, is what type of governmental entities are you

8    talking about as it relates to these TSBs?  Are you talking

9    about any instance where Ford may have -- you know, this issue

10   deals with exhaust systems.  It could potentially involve

11   emissions requirements to some degree if a change is made to any

12   part of that component.  Do you want all communications with

13   Ford and the EPA about the issues in this TSB?  Or do you simply

14   want communications with NHTSA about the publication of this TSB

15   or any questions from NHTSA about the publication of this TSB.

16          THE COURT:  All right.  Let's hear from the Plaintiff.

17          MR. HERSH:  Thank you.  The request, we think, is

18   pretty clear.  It would be any documents exchanged between Ford

19   and any government entity, and the limitation in each of the

20   requests is the technical service bulletins 12124 and 140130. In

21   the response, Ford has limited what it will produce are letters

22   to NHTSA which we have not received yet.

23          This did come up at the last hearing, and one of the

24   points that I made then, which I'll make again, is we don't know

25   who Ford would correspond with relating to a technical service

1    bulletin.  If there is a response -- excuse me, a correspondence

2    with EPA, then that would be encompassed within this request and

3    it is something we are looking for.

4         Had we, you know, intended to limit the request to just

5    correspondence with NHTSA, we would have put that there. We

6    don't know if there is any entity beyond NHTSA with whom Ford

7    corresponded.  And if I recall correctly, I think one of the

8    responses to this issue a few months back was that as part of

9    Ford's search for responsive materials, was going to be if

10   there's any correspondence with any governmental entity aside

11   from NHTSA, because I believe counsel at that time did not know.

12        So yes, we are asking for documents exchanged between

13   Ford and any governmental entity.  It doesn't seem to us to be

14   unlimited or overbroad in scope, it's limited to the TSBs.  And

15   there's a finite number of government entities I would presume

16   who Ford corresponds with, but we don't know who those entities

17   are.

18        THE COURT:  And you're talking about correspondence

19   directly related to the TSBs as opposed to the general subject

20   matter discussed in the TSBs.

21        MR. HERSH:  Yes, Your Honor.

22        THE COURT:  All right.  So that should narrow it

23   considerably.

24        MS. CONIGLIARO:  I think we can agree to supplement

25   these two responses based on the specific TSB rather than the

1   overall subject matter in the TSB.

2           THE COURT:  All right.  Have you produced anything in

3   response to three and four yet?

4           MS. CONIGLIARO:  This one, Your Honor, I don't believe

5   we have.

6           THE COURT:  All right.

7           MS. CONIGLIARO:  I can definitely make sure we get --

8   we make that a priority.

9           THE COURT:  All right.  So that takes care of that.

10          Were you able to determine if there were other

11  agencies?

12          MS. CONIGLIARO:  Not -- I believe under the general

13  subject matter, yes.  Things as far as submissions to the EPA,

14  making sure vehicles still meet standards once certain

15  components are revised.  But outside of the EPA, that search is

16  not yet complete.

17          But with regard to specifically just the TSBs, I do

18  believe it is limited to NHTSA and various departments within

19  NHTSA.

20          THE COURT:  Okay.  All right.

21          Five, six, seven and eight talks about drafts of the

22  TSBs and documents relating to Ford's investigation which

23  resulted in the TSBs.

24          What have you produced in response to this?

25          MS. CONIGLIARO:  We've produced actually quite a bit of

1  materials in response to this, and the basis for our objection

2  on five and six -- actually five, six, seven and eight, were to

3  talk about the overall breadth when someone asks for all drafts

4  or all documents related to a subject matter.  We went on with

5  our objection to kind of describe what that process is at Ford.

6         With the TSB, it's not simply here's a document,

7  someone populates it and then the drafts are revised.  There's a

8  lot that goes into it just from an every day working manner

9  before it even gets to the point where it's actually a draft

10  TSB.  There's a lot of analysis that's done, and we've agreed to

11  produce all of those materials.  A lot of that analysis is done

12  via e-mail communications between employees, again, before it

13  ever gets into that what you would think to be just a normal

14  draft form.

15         THE COURT:  Okay.  So you have more seven and eight

16  than you have five and six.

17         MS. CONIGLIARO:  Sometimes there may only be one draft

18  copy of something.

19         THE COURT:  Right.  Well, you know, you're not required

20  to make up something if all you have is one draft.

21         MS. CONIGLIARO:  Right, Your Honor.  But portions of

22  the language that end up in the TSB are often in e-mail

23  communications which we've agreed to produce under seven and

24  eight.

25         MR. HERSH:  Your Honor, with respect to -- and I hate

1   to focus on something small immediately, but I think I'll just

2   put it aside.

3          But with respect to the objection, and this comes up in

4   a few requests to all drafts or all documents, I'd only cite --

5   and it's in the motion -- to Arthrex, Inc.V Parcus, P A R C U S,

6   Medical, LLC.  It's 2012 Westlaw 5382050, it's out of the Middle

7   District of Florida.  And I would just, quote, just by

8   indicating the presence of the word "all" within the request

9   does not automatically make a request overly broad, burdensome

10  or oppressive.  I understand that using the word "all" in some

11  contexts may cause something, a request to be overbroad, but in

12  this instance, requests five and six ask for all drafts of the

13  two TSBs.  If Ford is producing those, then there is no reason

14  for these objections.

15         Certain drafts have been produced and we've seen those.

16  Again, this just leaves us questioning what are we not

17  receiving, and we don't believe it's vague or overbroad or

18  burdensome.  It's simply asking for drafts of the TSBs to the

19  extent they exist, they should be produced.

20         In terms of requests seven and eight, the requests

21  themselves are not vague, they're very pointed.  Each relates to

22  the two TSBs, and we're asking for documents with respect to

23  Ford's investigation, testing and analysis.  I think the

24  majority of what Ford has produced to date is in response to

25  these requests, and so we have the same issue which is Ford is

1   producing documents in response to the requests.  If there's

2   something that Ford's not producing based on an objection of

3   vague, overbroad or burdensome, we would want to know what that

4   is.

5          But producing all of these documents, it would suggest

6   that Ford's okay with responding to this request and producing

7   documents.

8          THE COURT:  Is that correct?

9          MS. CONIGLIARO:  As shown by Ford's production to date,

10   we have no problem with producing relevant information.  Again,

11   the objections are based on the overall scope of the response,

12   and we felt that our response did try to educate the Plaintiff

13   as to what's involved before we get to a TSB, and the different

14   analyses that's done by individual employees including

15   engineering analysis, warranty analysis, sometimes high-level

16   engineering testing and things of that nature.

17          So if you look at them very specifically, and take the

18   four requests apart, you know, are the objections that were made

19   exact for each one or the level of objection made?  Perhaps not.

20   But we made an attempt to try to respond to these as a whole and

21   be fully compliant with the discovery by producing whatever

22   documents we could locate about this more exhaustive process.

23          Our other concern is while Mr. Hersh cites to that case

24   that says just the presence of the word "all" does not

25   automatically make it overly broad, our objection to that it

1   included language about what the process entails to get to the

2   level of the TSB, we do think it does make it broad,

3   particularly when we get into request number seven and eight.

4   And it is our understanding under the local rules that any

5   ground not stated in an objection within the time provided shall

6   be waived.  So...

7        THE COURT:  It sounds to me that what Ford is saying is

8   we are a gigantic company, we're doing our best to find these,

9   but should we inadvertently miss something during that process,

10  you really asked us for an awful lot of material.

11       MS. CONIGLIARO:  That's exactly correct, Your Honor.

12       THE COURT:  Which is just a good faith matter.  So to

13  the extent that that's what you're claiming, and I get that, I

14  think you've preserved that.  So what we need to do is find out

15  which of these things that you are making your very best efforts

16  to turn over, and it sounds like five through eight, you're not

17  withholding anything, you're just saying we're doing our best,

18  but this is a giant corporation.

19       MS. CONIGLIARO:  That's correct, Your Honor.  We're not

20  withholding anything because of the objection that was stated.

21       THE COURT:  Okay.  All right.  And I guess what we'll

22  get to fairly quickly is going to be the time frame.

23       18 is internal test studies, analyses, reports, finding

24  or recommendations reflecting or relating to exhaust or carbon

25  monoxide inside the passenger cabin of any Ford Explorer, model

1    years 2011 through 2015.

2           That seems pretty straightforward, no?

3           MS. CONIGLIARO:  We preserved -- we stated an objection

4    in our supplemental response -- let me back up.

5           We withdrew one of our objections based on our

6    supplemental response once they amended the complaint and

7    included the additional model years, 14 and 15.  The other

8    objections included in our response -- oh, I'm sorry.  I'm

9    looking at the wrong one.  No, I'm not.  Never mind -- is that

10   we felt this request, based on what we've agreed to produce in

11   response to number five through eight, this is cumulative of

12   what -- of other requests that they've already stated herein and

13   the same thing.  We're not withholding anything based on the

14   objection that's made.  Again, it's more in an effort to

15   preserve something in the event some document is missed based on

16   Ford's efforts here.

17          THE COURT:  Okay.  Well, it certainly overlaps, but

18   they're making sure that they are not eliminating production

19   based on specific wording of a request, I imagine.  I mean, as

20   it turns out, your response to seven and eight end up being 18.

21          MR. HERSH:  Yeah.  What I was going to say, I think

22   what's cumulative is Ford's response.  We are separating -- I

23   mean, in request seven and eight, we're focusing on the TSBs.

24   And in request 18, we focus on exhaust, odor or carbon monoxide

25   to the extent they're different.  Perhaps they're not internally

1     for Ford.

2          THE COURT:  Yeah.  You're just making sure you capture

3     everything.

4          All right.  21, video or audio tapes that document,

5     reflect or record any tests.  This is the same thing except it's

6     dealing with video or audio?

7          MS. CONIGLIARO:  Correct, Your Honor.  Our position is

8     the same with regard to this.

9          THE COURT:  Okay.  13 and 14, documents exchanged

10    between Ford and other persons.  I think they're all attempting

11    to get at the same information and make sure that they word it

12    correctly so that nothing is withheld.  So I assume that

13    position is the same as to that.

14          MS. CONIGLIARO:  I'm sorry.  Number 24?

15          THE COURT:  No, 13 and 14.

16          MS. CONIGLIARO:  Okay.  You went back.  Okay.  Never

17    mind.  Hold on.  I'm sorry.

18          THE COURT:  Yeah.  I'm just looking at --

19          MR. HERSH:  I think that's how in the motion, I guess,

20    I may have grouped everything.  So my apologies.

21          THE COURT:  That's all right.

22          MS. CONIGLIARO:  Our objections for number 13 and 14

23    were based primarily on we don't know who you and any person is.

24    We made a good faith effort to identify those types of

25    information, and for lack of a better term, the people that Ford

1   may communicate with about this and identify those in the

2   response.  But to the extent there was, you know, a random

3   employee who may have said something to someone outside of the

4   company about it and we don't produce whatever record of that is

5   because we're not aware of it, it's the same argument that we

6   made on five through eight.

7              THE COURT:  You don't want to be blind-sided when it

8   comes to somebody finding a document that technically falls

9   within this that you didn't capture by means of your search

10  terms.

11             MS. CONIGLIARO:  Correct.

12             THE COURT:  Do you have any response to that?  I don't

13  think that's what the Plaintiffs are out to do.  I understand

14  your --

15             MR. HERSH:  I think we would hope that everything is

16  produced, but I understand Ford is a large company, it's

17  certainly not the fault of the Plaintiff, it is company, it's

18  large, there's many departments.  We're not trying to blind-side

19  anybody.  We just simply are asking for the responsive documents

20  and Ford has its obligations under the rules and presumably

21  cannot know if there's one random document out there.

22             THE COURT:  I think all anyone is expecting in this

23  matter is a good faith effort.  So again --

24             MS. CONIGLIARO:  And Your Honor, I believe we are

25  complying.

1      THE COURT:  And again, you're covered.  It's not an

2   unreasonable statement, especially when you deal with any other

3   persons.  I suppose if there were any issue, you and the

4   Plaintiffs could discuss the means -- the electronic queries

5   that you're using if there is a question as to any of these.

6      MS. CONIGLIARO:  We're always happy to -- you know, if

7   any questions come up, if they review our production and they

8   see things that are mentioned that we haven't produced, I'm

9   happy to have those conversations about whether it was something

10  that maybe we weren't aware of that they spot in the documents.

11  Maybe it's something that, you know, is no longer available.

12  Whatever that is, we're happy to have those conversations

13  throughout discovery.

14      THE COURT:  Okay.  And yes, I'm going in the way the

15  motion was.

16      15 and 20 seek documents that reflect or record Ford's

17  internal discussions concerning whether to recall the Explorers

18  2011 through 2013 over issues identified in the TSBs.  And

19  documents that reflect or record all repurchases by Ford of any

20  Explorers of those model years because of exhaust, odor or

21  carbon monoxide inside the passenger cabin.

22      That sounds pretty specific as well.

23      MS. CONIGLIARO:  Right.  And our objections were based

24  on, again, the all documents and preservation of any

25  attorney-client privileged communications that come out of that

1      search.  We did offer to produce various categories of

2      documents.

3             In response to number 15, the critical concern review

4      group is generally the body that would evaluate whether

5      something should be proposed for recall or not.  We've agreed to

6      produce those files.  I don't believe we've produced them yet.

7      I do think that I did receive them maybe last week, and we can

8      get those turned around.  I'll double-check on that for sure.

9             And then with regard to number 20, again, we've agreed

10     to produce -- the same objections were made and we agreed to

11     produce those categories of documents where we believe that

12     information about these categories would exist.  You know, a

13     list of all lawsuits and claims, and then reports from Ford's

14     database where these types of things would normally be recorded.

15            THE COURT:  All right.  Yes.

16            MR. HERSH:  Your Honor, in terms of request number 15,

17     I think I now understand why Ford has asserted attorney-client

18     privilege.  We have not yet received a privilege log, that may

19     just simply be that Ford hasn't reviewed all of the documents.

20     To the extent there is eventually a document or documents that

21     are not produced based on privilege, we would want to know that

22     that is the case.  It may not ultimately become the case.  The

23     critical concern review file we have not received yet.

24            In terms of request 20, we're asking for documents

25     relating to repurchases by Ford.  It's clear from what it been

1    produced that there had been repurchases by Ford relating to

2    this issue.  The response itself, aside from the objections, is

3    perhaps not responsive, we think, to the request.  Consumer

4    lawsuits and claims and then there's a database query. Perhaps

5    somewhere in there there's some information about that, but to

6    the extent there are documents that identify repurchases, that

7    is something that we would want and we think is relevant and

8    responsive, although perhaps that doesn't exist.  Again, we

9    don't know what Ford has.

10          MS. CONIGLIARO:  Your Honor, if I could respond to

11   that.

12          THE COURT:  Sure.

13          MS. CONIGLIARO:  We have produced a variety of e-mail

14   communications, some of which Mr. Lewis cites in his

15   declaration, the second motion before the court today that talks

16   about potential buy-backs of vehicles.  So we clearly have

17   produced -- where that is discussed in e-mail communications

18   with Ford employees, we have produced those.  They are also

19   overlapping of the broader category we agreed to produce in

20   response to all discussions about the TSBs, because some of the

21   documents fell there as well.

22          Here with regard to the database query that we've

23   agreed to produce and which I believe we have produced, I do

24   recall that late last fall Mr. Hersh and I had a discussion

25   about this, and if a vehicle is going to be repurchased, that is

1    documented in this database.  And depending on the state in

2    which it's repurchased, there are different protocols that are

3    followed and whether it is before a Better Business Bureau-type

4    activity or not. So that information is maintained within this

5    database.  If the Better Business Bureau process is part of

6    what's gone on with a particular vehicle, those files aren't

7    always in Ford's possession.  A lot of that may be handled by an

8    outside administrator.

9           So we do believe that the two categories of documents

10   that we've referenced are relevant to this request and we also

11   believe we've produced additional documents such as those e-mail

12   communications that discussed, you know, particular customers

13   and whether a vehicle is going to be bought back in connection

14   with the TSB repair, we clearly produced relevant information

15   here.

16          THE COURT:  All right.  Well, you can't produce things

17   that you don't maintain.  But they just want to make sure that

18   you're giving them what you have that pertain to the repurchases

19   and you're saying you're doing that.

20          MS. CONIGLIARO:  We are doing that, Your Honor.

21          THE COURT:  Okay.  16 and 17, internal discussions

22   concerning the smell of exhaust or carbon monoxide within the

23   passenger compartments of those model years.  What are you doing

24   with that?

25          MS. CONIGLIARO:  Your Honor, I believe with regard to

1    16, we do refer back to our responses in five and six and we do

2    think those things that we are producing in connection with five

3    through eight would cover what's being produced here.  This is

4    one where we could obviously agree to supplement and further

5    identify those documents once the production is substantially

6    complete.

7          THE COURT:  All right.  What you're saying is you don't

8    know where else to look except for what you're looking for to

9    respond to five through eight.

10         MS. CONIGLIARO:  Correct.

11         MR. HERSH:  I think, Your Honor, in terms of request 16

12    and 17, it's the same issue.  They're objections as to vague and

13    overbroad.  We don't think these are vague and overbroad.  We

14    think they're quite pointed.

15         THE COURT:  Well, I think we've established that that

16    was just a cover-themselves in case something gets missed

17    because the query didn't capture everything.  So understanding

18    that, they are agreeing to produce this material.

19         MR. HERSH:  Then yes, Your Honor, that's what we're

20    hoping to accomplish.

21         THE COURT:  Okay.  19, same thing.  Customer complaints

22    relating to exhaust, odor or carbon monoxide inside the cabin of

23    Explorer during model years 2011 through 2015.  I guess I tend

24    to agree with Ford that the complaint could include a lot of

25    things.  What is Ford construing that term to include?

1    MS. CONIGLIARO:  We are construing it to include a

2    filed lawsuit or complaint or claim to the company.  A contact

3    to Ford's customer relationship center where a customer may call

4    in and complain about something or inquire, make an inquiry to

5    Ford about it.  We've also produced technical contacts which are

6    inquiries a customer may make at the dealership where the

7    dealership then contacts Ford's technical hotline about these

8    types of things, as well as warranty reimbursement records for

9    any repairs made to these vehicles based on the subject matters.

10   So we do think that those are extremely broad

11   categories.  To the extent that he wants something else, we

12   would want some clarification from Plaintiff as to what they

13   mean by complaint.

14   THE COURT:  Are you satisfied with the categories of

15   documents that they have said they are producing?

16   MR. HERSH:  Your Honor, I think that that does cover

17   what we intended when we said customer complaints with one

18   caveat, and this may be a nonissue.  In terms of lawsuits, we

19   are including, or at least we expect to include in that,

20   informal dispute resolutions.  So under the BBB auto line or

21   arbitration proceeding that, to us, would be inclusive of a

22   customer complaint and that may be how Ford is interpreting it

23   as well.  But just to clarify that.

24   The only other thing I would add is in terms of

25   privilege, and this may be just an effort not to waive the

1    objection, the complaint itself between the customer and Ford,

2    we simply don't see how that could be an attorney-client

3    privileged document.

4            THE COURT:  All right.  Are you including disputes that

5    are resolved in some manner with the Better Business Bureau as

6    included by the term "complaint"?

7            MS. CONIGLIARO:  Your Honor, that would be included in

8    the one database, FMC 360 database as I referenced in our prior

9    discussion.

10           THE COURT:  So you're including it.

11           MS. CONIGLIARO:  We're not excluding them to the extent

12   they're there.  And to the extent the BBB information is in

13   Ford's possession, yes.

14           THE COURT:  Right.  As I say, you know, if it's not in

15   your possession, obviously you're not obliged to go find it.

16   The -- I just lost what his other point was.

17           MR. HERSH:  Privilege.

18           THE COURT:  Oh, the privilege issue.  You're not

19   claiming privilege as to these.

20           MS. CONIGLIARO:  With regard to any lawsuit files in

21   their entirety, we would have a privilege preservation there.

22   We agree to produce a list of lawsuits and complaints.  When

23   counsel and I were talking about this, I specifically asked him

24   in one of my correspondence that to the extent -- if they would

25   clarify whether they were also seeking anything that's

1   privileged or not, and we never got a response to that.

2          THE COURT:  All right.  Well, I think that's fair

3   enough with respect to the lawsuit files.  I think that it would

4   be appropriate for any lawsuits that have been filed that you

5   provide the case numbers and at that point, they can access any

6   public record documents.

7          MS. CONIGLIARO:  That's exactly what our intent would

8   be.  Our list will include the case name, the case number, the

9   jurisdiction, whether it's open, closed and I believe the

10   Plaintiff's attorneys contact information we have as well.  So

11   there's information there where they could obtain additional

12   information about these complaints in the public record.

13          THE COURT:  Okay.  24, organizational chart.  That's

14   the last.  I imagine that would be a big chart.

15          MS. CONIGLIARO:  Your Honor, our objections here, and

16   what I discussed with Mr. Hersh during our call on this one, is

17   that Ford doesn't have a specific organizational chart so to

18   speak.  I did provide some language about the history of that,

19   and when Ford ceased keeping an historical directory for the

20   purposes of explaining why this type of request could be

21   problematic for a company this size of Ford, but then we did

22   agree to go and search for any department level org charts for

23   the individuals or the departments that were working on the

24   issues in this lawsuit.

25          THE COURT:  Is that satisfactory?

1          MR. HERSH:  Yes, Your Honor.  Nothing has been produced

2     to date.  To the extent nothing exists, then obviously we cannot

3     ask Ford to produce it, you know, create something for us.  It's

4     just simply the fact that the response begins with an objection.

5     This kind of goes back to the same issue.  If there's something

6     out there that's being withheld based on the objection.

7          THE COURT:  All right.  On this one, if it turns out

8     that you have nothing to produce, then I think they need a

9     statement from Ford stating we looked, there isn't anything.

10          MS. CONIGLIARO:  Your Honor, we can agree to supplement

11     any response where that's the case.  Where we're conducting a

12     search and we don't find anything, we will do that.

13          THE COURT:  All right.  So I think we've covered

14     everything to everyone's satisfaction.

15          I guess the question ends up, what kind of time frame

16     are you looking at to satisfy these requests?  Because you said

17     you haven't produced everything yet.

18          MS. CONIGLIARO:  We have not.  One of the challenges to

19     a couple of the categories of these documents is that there is

20     ongoing business activity within the company, so I do think

21     based on what we have collected and what we're aware of that

22     exists now, we should be able to substantially complete the

23     production in the next 30, maybe 45 days, I'm guessing more

24     towards 30 days.  But to the extent additional materials are

25     generated by the company, we would want the ability to

1     supplement those responses and produce those materials.

2               THE COURT:  Well, I think everybody understands that.

3     If materials are being produced -- generated, you can't produce

4     them until they're generated or until they're compiled.  Is 45

5     days satisfactory as an outside limit for this?

6               MR. HERSH:  Yes, Your Honor.

7               THE COURT:  All right.  You think it's closer to 30

8     days?  We'll give you 45.

9               MS. CONIGLIARO:  Okay.

10              THE COURT:  And obviously the sooner the better.  I

11    think it's been a rolling production anyway, right?

12              MS. CONIGLIARO:  It has, Your Honor.

13              THE COURT:  Okay.  So today is St. Patrick's Day.  So

14    April 17th -- we're looking at May 1st.  Is that agreeable to

15    everyone?

16              MR. HERSH:  Yes.

17              THE COURT:  May 1st.  Okay.

18              MS. CONIGLIARO:  Your Honor, if I could just ask one

19    question.

20              THE COURT:  Sure.

21              MS. CONIGLIARO:  I appreciate your guidance in going

22    through these and recognizing Ford's interests and preserving

23    some of these objections, if they locate something beyond, you

24    know, our good faith effort.

25              We are -- Plaintiff's counsel and I are discussing

1    Ford's responses to the second RFPs which have some of these

2    same things.  Are we allowed to keep these objections in with

3    the understanding why we're preserving them?

4            THE COURT:  Well --

5            MS. CONIGLIARO:  We can agree to --

6            THE COURT:  You can make the objection as interpreted

7    by the court in today's hearing.

8            MS. CONIGLIARO:  Okay.

9            THE COURT:  Which is basically saying we want to be

10   sure that if we make a good faith effort and we inadvertently

11   miss something, we're not going to be penalized for that.  I

12   think that's implicit in the discovery process.  But if you want

13   to say you're preserving the objection as interpreted by the

14   court on March 17, 2015, that's fine.

15           MS. CONIGLIARO:  Thank you, Your Honor.

16           THE COURT:  I assume the Plaintiff has no problem with

17   that.

18           MR. HERSH:  We do not, Your Honor.

19           THE COURT:  Okay.  All right.

20           Let's turn to the next motion, which not blanket, but

21   close to blanket, claim of confidentiality.  It looks as though

22   it's not all, but pretty close to all.

23           So let's hear Ford's statement on that first.

24           MS. CONIGLIARO:  Your Honor, the issue for the court is

25   whether Ford took a blanket approach to designate documents as

1    confidential under the protective order and that simply isn't

2    the case.

3         Looking just solely at the numbers of documents Ford

4    produced, or pages, and trying to compare them is really not a

5    fair application of the standard for whether something should be

6    maintained as confidential.

7         This case deals with 2011 through 2015 model year

8    Explorers, Explorers that are still be manufactured today.  This

9    case also deals with technical service bulletins that Ford

10   issued about certain of these vehicles in 2012 and again in

11   2014, some of which are -- some aspects of those publications

12   are still being evaluated by the company as is shown in the

13   various documents that Ford did produce. A number of these

14   vehicles are still under warranty.

15        As part of Ford's every day business activities, it

16   monitors the warranty of its vehicles whether there's a vehicle

17   concern out there or not.  All of these materials and all of

18   this business activity is displayed in the documents that Ford

19   has produced.  Whether they are part of e-mails or whether they

20   are in some official record, Ford's ongoing business activity,

21   its internal e-mail communications based on what it's doing to

22   address product concerns, considerations for potential changes

23   made to particular products, particularly products that are

24   being manufactured right now, should not be part of the public

25   record and do deserve protection under Rule 26.

1          THE COURT:  What does your -- what type of restrictions

2     does the confidentiality order entered in this case impose?

3          MS. CONIGLIARO:  As far as the categories of documents

4     that are covered?

5          THE COURT:  No, in terms of what can be done with them.

6     Is it "attorneys' eyes only" or what's the restriction?

7          MS. CONIGLIARO:  No, Your Honor.  It's not "attorneys'

8     eyes only".

9          THE COURT:  I didn't think so.

10          MS. CONIGLIARO:  They can share them -- they can fully

11     use them to litigate this matter, they can share them with their

12     experts, provided their experts agree and consultants agree to

13     the terms of the protective order and sign an agreement to be

14     bound.  They can be used with any motions that Plaintiffs want

15     to file.

16          And given the number of documents that are under the

17     protective order before the motion was filed, I offered to

18     Plaintiff's counsel that I would work with them on any

19     logistical issues that might come up when it came time to filing

20     motions under seal because I understand the practical reality of

21     that.  The shear fact that there's a number of documents

22     produced under the protective order, again, should not, you

23     know, penalize Ford for complying with the discovery obligations

24     by producing those documents and making those documents part of

25     a public record.

1        There's no prejudice to Plaintiff's counsel by keeping

2    them under the protective order.  But there would be a huge

3    irreparable harm to Ford if all of its internal decision-making

4    process, the efforts that its employees go through to try to

5    resolve problems, looking at things such as is this what the

6    root cause is, maybe not.  Let's talk about it, let's do some

7    testing, let's bring someone else in and analyze it, oh, it

8    might be X, there's no benefit to Plaintiff by producing those

9    and putting them in the public record that they can't already

10   get by reviewing those documents under the guidelines of the

11   protective order.

12        THE COURT:  Let's hear from the Plaintiff.

13        MR. HERSH:  Your Honor, I'd like to clarify something

14   in our motion, and I guess before I do that, I would just note

15   that whether there's prejudice to the Plaintiff is really not

16   the standard.

17        THE COURT:  No, it's not, but it's certainly something

18   I'm going to consider.  You know, if I find that they're

19   arguably all privileged or confidential, then I'm going to look

20   at whether it's going to harm you if they stay confidential for

21   the time being.  But go ahead.

22        MR. HERSH:  I understand, Your Honor.  And I think that

23   eventually in this inquiry, the balancing approach that the case

24   cited by Ford, Chicago Tribune versus Bridgestone ultimately

25   requires the court to have -- and perhaps privilege is

1   considered, but that's really not before the court on this

2   motion.  On this motion, we're focusing on the fact that there

3   is a blanket claim to confidentiality now.  That's what I want

4   to clarify.

5          Ford has produced documents in three categories and

6   each category is labeled SZK 1, SZK 2, SZK 3.  SZK 3 is a

7   category of documents produced by a nonparty to the case.  SZK 1

8   is an amalgamation of materials, including engineering documents

9   and drawings that Ford has marked as confidential.  It also

10  includes warranty guidelines that Ford has not marked as

11  confidential.  We did not intend to include that category of

12  documents as part of our concern raised in the motion.  What we

13  were focusing on is SZK 2, which is the vast majority of

14  documents produced.  It's about 80,000 pages of the

15  approximately 90,000 pages of documents produced in this case.

16         In counsel's declaration attached to Ford's responsive

17  motion, it is the documents that are identified as under various

18  records custodians and it includes, for the most part, e-mails

19  and various e-mail attachments.  In terms of the numbers, Ford

20  notes in its responsive materials, and adding up the numbers, in

21  notes that 187 pages, just 187 pages of the just under 80,000

22  pages falling under this category of SZK 2, 187 is marked as not

23  confidential, excuse me, it's not marked as confidential. That

24  means, from my calculation, nearly 100 percent, 99.76 percent of

25  these documents are marked confidential.

1          Under the stipulated protective order, Ford is supposed

2     to, in good faith, designate documents as confidential.  Under

3     section 3D of the stipulated protective order, Ford is required

4     as the designating party, and I quote, the designating party

5     bears the burden of proving that a protected document contains

6     confidential information.  Prior to designating something

7     confidential, the designating party must make a bonafide

8     determination that the material actually constitutes a trade

9     secret or other confidential research, development or

10    commercially sensitive information pursuant to Rule 26(c)(1)(g).

11         What raised the concern for us is as we were reviewing

12    these documents, not only do all of the documents seem to not

13    constitute trade secrets or confidential, but some are so

14    obviously not confidential that Ford cannot have done what it

15    was supposed to do under the protective order.  And for that

16    reason, we attached just some examples and those examples

17    include, in exhibits B and V to the motion, Ford designated as

18    confidential correspondence with dealerships.  In this case,

19    Ford is taking the position that dealerships are third parties

20    not related to Ford.  So that cannot be confidential.  In

21    addition, in Exhibit O, Ford designated as confidential

22    correspondence between Ford and a third party marketing firm.

23    How can that be confidential?  In exhibits I -- and I apologize,

24    I'm going out of order on those exhibits, Ford designated a

25    letter that was sent to consumers, to customers, as

1   confidential.  That cannot be confidential.  So, you know,

2   documents like that that are so clearly not confidential and not

3   trade secret, those alone such that Ford did not do what it was

4   supposed to do under the stipulated protective order in making a

5   bonafide determination as to whether something is confidential.

6        A number of other documents we attached are perhaps

7   less clear, but in our opinion, are certainly not confidential.

8   The e-mails discussed, and I'm going to broadly or generally

9   categorize them in kind of three -- there's three topics that

10  come up.  The e-mails, one, generally discuss that there's a

11  defect in these vehicles and that consumers across the globe are

12  complaining about this issue.  Two, there are e-mails that

13  consider and discuss various potential fixes and then there are

14  comments that many of these fixes, for the most part, are not

15  effective.  And last, there are discussions about how Ford can

16  and should and what it can do to avoid buying back these

17  vehicles, and what Ford should say to its consumers, its

18  dealerships, governments, even in terms of while Ford is working

19  on trying to find a fix.

20       Those documents are not confidential or trademark

21  materials.  There's no competitive advantage that Ford gets by

22  maintaining the secrecy of e-mails discussing the fact that its

23  vehicles have a defect.  There is no competitor that would care

24  for that information.

25       What Ford is doing is trying to maintain the secrecy,

1    not to lose some competitive advantage based on some trade

2    secret or confidential design or engineering process that it

3    has.  It's trying to avoid embarrassment.  These documents talk

4    about the fact that there is a significant flaw in these

5    vehicles that is a potential safety hazard and consumers don't

6    know about it, consumers are complaining to dealerships about it

7    and to Ford, and they're not getting answers.  And yet there is

8    a plethora of materials out there that discuss the fact that

9    there's a defect, which the fact that there's a defect is not

10   giving Ford a competitive advantage over any competitor. It's

11   just simply a problem Ford doesn't want the public to know

12   about.

13        But again, we're not really even at the point where we

14   are asking or requesting that Ford do as it's required under the

15   rules in the order, which is show good cause that these

16   materials are trade secret or confidential.  We are asking that

17   they not take advantage of the protective order and just use a

18   blanket claim of confidentiality to nearly 100 percent of those

19   documents when some are clearly not confidential.

20        THE COURT:  What process was utilized to determine

21   which categories or which documents to designate confidential?

22        MS. CONIGLIARO:  All documents, Your Honor, under my

23   supervision which what I mentioned in my declaration that I

24   submitted with Ford's response, is that every document is

25   evaluated to determine whether it should be under a

1    confidentiality order or not.

2            Plaintiffs are -- they're saying it's one simple issue,

3    but I think what's happening here is there are two.  They're

4    making a broad allegation about a simple number of documents

5    that Ford produced that Ford violated the protective order and

6    did not follow the guides of the protective order.  I provided

7    evidence to the contrary by signing my declaration.  I attempted

8    to have a meet and confer with Mr. Hersh's colleague who

9    absolutely refused to discuss the matter with me or provide any

10   specificity.  The Plaintiffs have provided no authority or any

11   showing other than their opinion based on the shear percentage

12   and their snippets of information that they take from some of

13   these documents, that I'll be happy to discuss, and use that to

14   mischaracterize Ford's internal e-mail communications.

15           Yes, Ford is a company that addresses customer concerns

16   whether a defect exists or whether a defect doesn't exist.  And

17   in doing that, it has to have the ability and the freedom to

18   discuss these matters and try to understand what customers are

19   complaining about or issues that may be brought to their

20   attention without the fear that they're going to be put in the

21   public record.  And there is good case authority out there that

22   supports that under Rule 26, a protective order issue is not

23   limited to trade secrets.

24           They're trying to say that -- combine that issue backed

25   up against the fact that Ford violated the protective order by

1    using a blanket confidentiality, therefore these documents

2    should not be protected because they don't meet the trade secret

3    standard and that's not the evaluation at all.

4            THE COURT:  Well, I think what they're saying is based

5    on their preliminary review of the documents produced, they were

6    startled to find some things designated as confidential which

7    they believed were not confidential, and therefore that caused

8    them to question the process.  I think that's where we are at

9    the moment.

10           MS. CONIGLIARO:  Correct, Your Honor.  And they could

11   have easily not filed their motion and engaged in a conversation

12   with me to talk about what their concerns are.  They refused to

13   do that.  I asked them to provide specific documents.

14           I recognize from a practical reality -- I handle lots

15   of cases, that time -- you know, once in a while a document

16   could slip through, and I would be happy to look at it to see if

17   that's what happened here.  But his co-counsel refused to

18   provide me any specific documents.  The documents that they

19   attached to their motion, they wouldn't give me a copy of them.

20   I personally spent six hours trying to locate the documents that

21   they were referring to.  Mr. Lewis's declaration clearly

22   mischaracterizes the state of what those documents entail.

23           For example, if you look at exhibit M, it states that

24   this is a Power Point discussing the nature of the problem that

25   customers in the United States are going to file a class action

1    lawsuit.  There is one sentence in that Power Point

2    presentation, an e-mail that discusses the existence of a class

3    action lawsuit.  The entirety of that Power Point goes to the

4    efforts Ford is trying to do and the engineering analysis that

5    Ford is trying to conduct to get to the root cause of the

6    problem for customer quality improvement.  It's not trying to

7    hide anything.  If Ford were trying to hide anything, why did it

8    produce all those documents in discovery.  Plaintiffs appear to

9    be more worried about how they can use these documents outside

10   of the guides of a protective order than they do by following

11   the rules of what they agreed to back in December for the

12   protective order.  My declaration states that this is not the

13   process that was followed here.

14        We took the sampling of documents that they provided,

15   had an engineer at Ford sign a declaration attesting to the fact

16   that these documents, yes, go to the nature of how Ford resolves

17   issues. What Ford does on a day-to-day business activity.  And

18   Plaintiff can think that that is not confidential or because

19   their allegation that a defect exists no competitor would want

20   that information, but the automotive industry is a highly

21   competitive industry, and methodologies that engineers and other

22   employees may employ to get to that resolution is confidential.

23        And if you look at -- you know, there's case law out

24   there that shows that.  The Eleventh Circuit -- let me back up a

25   minute.

1          Had Plaintiffs followed the right protocol to challenge

2      a specific document, even so, the interests of Ford protecting

3      this information far outweigh Plaintiff's access to this.  They

4      have access to the documents.  The Eleventh Circuit and the

5      Southern District of Florida have both analyzed similar types of

6      situations and the Southern District of Florida has specifically

7      held that documents, internal memos, should -- customer

8      information, data regarding what is going on are all protected

9      under Rule 26. The In Re: Denture Cream case is the one that I'm

10     referring to.  They looked at the same exact scenario and found

11     that you have to employ this balancing test of the interest of

12     the party to access the documents which Plaintiff clearly has

13     access to here.  No, they cannot post them in the public record,

14     but they can litigate their case against the interests of Ford

15     in maintaining that information is confidential.

16          We're not talking about a vehicle that went out of

17     production ten years ago or an issue that was fully resolved by

18     the company three or four years ago.  We're talking about

19     current model vehicles that are still be manufactured in Ford's

20     plants today, ongoing business activities that the company is

21     evaluating, and vehicles that are still under warranty where

22     Ford, in its normal course of business, outside of any

23     allegation of a defect, would still be evaluating the warranty

24     and customer feedback to make sure that their customers are

25     satisfied. Ford should not be punished for doing the right thing

1    here, and it would be a punishment to Ford by taking all of

2    those internal recordkeeping and that analysis and putting it

3    out in the public record.  We would be punished for complying

4    with our discovery obligations by turning all that information

5    over to Plaintiffs, and the case law does not support a finding

6    that Rule 26 is limited to trade secrets or that this type of

7    information is not confidential to a company like Ford.  It's

8    the exact opposite.

9            So while Plaintiffs have tried to frame this that Ford

10   didn't meet its standard under the protective order, what

11   they're really trying to do is challenge the entirety of it so

12   that the court strikes everything we did produce under the

13   protective order, and that's not fair to Ford.  If there are

14   specific examples or specific documents that are produced that

15   they truly believe are not protected, we're happy to engage in

16   the process and evaluate documents on an individual basis.

17           But my declaration stating that that's not what

18   happened here, combined with the declaration of Mr. Engel, who

19   is a Ford engineer who looked at the sampling that Plaintiff

20   provided, attesting to the fact that yes, this is part of Ford's

21   overall process, should be sufficient for the court to weigh in

22   Ford's favor that our interests need to be protected for these

23   documents not to appear in the public record.

24           THE COURT:  Anything further?

25           MR. HERSH:  Yes, Your Honor.  We're not asking for the

claim of confidentiality to be stricken to the prejudice of
Ford.

THE COURT:  Well, that wouldn't happen anyway.  I mean,
the worst that would happen is I make them go look at it again.
So we don't even need to discuss that.

MR. HERSH:  I wanted to be clear on that.

The other thing I would like to mention is that counsel
mentioned the balancing approach which goes back to the very
first thing I said.  There is a balancing approach that the
court ultimately would have to do.  But even the In Re Denture,
and I may not be pronouncing the case properly, that counsel
just mentioned, it identifies this as a two-step process.  The
first step in the process is that the designating party, Ford
here, the party who wants the document to be protected, has to
meet a burden to show that the document or material is either
trade secret or confidential.  And only after that, even if the
document is trade secret, a balancing approach should occur.

We're not at the balancing approach.  We are simply
challenging the fact that Ford used a blanket claim of
confidentiality to all of the -- excuse me.  All but 187 of the
nearly 80,000 pages of documents.  And while Mr. Engel, a Ford
employee, signed a declaration saying that all the documents we
attached as examples to the motion are confidential or trade
secret, as I just mentioned, some of those documents are
communications with third parties including customers.  Some of

1   those documents are correspondence with dealerships who,

2   presumably, are also produced in those database productions that

3   were not marked as confidential.  And so that's the concern,

4   that there are documents in here that are very clearly not

5   confidential.  They're communications with entities and people

6   not related to Ford.

7           You know, our rationale for this is really irrelevant.

8   The protective order requires Ford to comply with the burden

9   under Rule 26.  The reason we did the protective order was to

10  streamline things, but that doesn't mean that Ford doesn't have

11  to make a bonafide determination and these documents show that

12  Ford has not.

13          MS. CONIGLIARO:  Your Honor, could I just add one thing

14  there?

15          THE COURT:  Sure.

16          MS. CONIGLIARO:  If Plaintiff's true intent was to

17  understand why very specific documents were included under the

18  protective order when they should not have been, Mr. Hersh's

19  co-counsel should have then provided me examples of those or the

20  specific documents when I asked him for them.  I asked him for

21  them multiple times, he refused to give them to me and said I'll

22  attach them all to my motion to the court.  If Plaintiffs really

23  want the opportunity to proceed, as most parties do under these

24  types of challenges where the party who believes the information

25  is not confidential provides the specific information to Ford

1    that they challenge us, we can come back and respond to those

2    individual documents.

3         The true matter is the motion that they filed attested

4    to everything, and Mr. Lewis said this is just a sampling of

5    what's there. We can disagree all day long about why something

6    that may contain commentary from a customer or why a specific

7    document that contains the portion of a communication to a

8    dealership is confidential, but that would all be in theory.

9    And if Plaintiffs, you know, go back and designate specific

10   things or identify specific Bates numbers, we're happy to go

11   through that process in a limited fashion.  What I don't want to

12   occur is they go back and designate every document, identify

13   every Bates Number we produced because we'll be right back here.

14   But he can't criticize Ford's response in its efforts to prove

15   to the court under existing case law and standards with the

16   evidence it produced via the declarations that that is not

17   confidential simply because of the shear volume, more of it is

18   protected than not.

19        THE COURT:  All right.  Well, what I have before me is

20   a motion to strike a blanket claim of confidentiality.  In

21   response to that challenge, I have declarations from counsel,

22   who is an officer of this court, and another individual employed

23   by the Defendant that says this wasn't a blanket claim, and I am

24   satisfied that it wasn't a blanket claim.  It also sounds as

25   though, not Mr. Hersh, but at least one of his colleagues was

1    not helpful in terms of trying to keep this court out of this

2    kind of dispute at this stage.

3        I'm going to deny the motion without prejudice to file

4    something later down the line that's more specific because even

5    though the standard doesn't deal with prejudice, I don't know

6    any judge who is not going to look at that.  And the reality is

7    at any point, if the court strikes a designation in any way, you

8    can't unring that bell. It's now part of the public record.

9        By contrast, the Plaintiff suffers no prejudice if, for

10   the time being, these documents are deemed confidential.  At

11   some point down the line if they need to come out in trial or

12   they need to be utilized in such a way that they need to be part

13   of the public record, we can address that when it comes.  But I

14   don't think anybody, wholesale, said everything is confidential

15   and that's the issue before the court.

16       So that motion is denied without prejudice.

17       MS. CONIGLIARO:  Your Honor, could I make one

18   additional request?  Thank you.  That if they do raise other

19   documents, that --

20       THE COURT:  They need to talk to you first.  We have a

21   conferral requirement, if that's what you're talking about.

22       MS. CONIGLIARO:  Correct.  We would ask that -- we

23   produced these documents with Bates numbers.  If they could

24   provide those Bates numbers, we could get through this process a

25   lot quicker.

1          THE COURT:  I think so.  And I think that if there are

2    matters that need to be in the record that are incorrectly

3    designated, that that can be raised with you and we can resolve

4    a lot of this without the court being involved.

5          MS. CONIGLIARO:  We're happy to do that.

6          THE COURT:  But, yes.  Any specific documents, identify

7    them, both sides, by Bates Number and then it's simpler.

8          MS. CONIGLIARO:  Thank you.

9          THE COURT:  I don't think they had Bates Numbers to

10   begin with, so that was part of the problem.

11         MS. CONIGLIARO:  They did have Bates Numbers, Your

12   Honor.  We produced an electronic file and when I print them

13   out, the same number I produce to Plaintiff, my Bates Numbers

14   appeared.

15         THE COURT:  And it didn't show up.  All right.

16         Thank you all.  Court's in recess.

17         MS. CONIGLIARO:  Thank you, Your Honor.

18         (PROCEEDINGS CONCLUDED)

19                              *  *  *  *  *

20                      C E R T I F I C A T E
     I certify that the foregoing is a correct transcript from the
21   record of proceedings in the above-entitled matter.

22

     _____        /s/ Dawn M. Whitmarsh
23   Date                    DAWN M. WHITMARSH, RPR

24

25