# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

**Angela Sanchez-Knutson**,                    Case No. 14-61344-CIV-DIMITROULEAS

                    Plaintiff,

v.

**Ford Motor Company**

                    Defendant.

_____/

## DEFENDANT FORD MOTOR COMPANY'S MOTION *IN LIMINE* TO EXCLUDE THE <u>TESTIMONY OF STEVEN GASKIN</u>

Defendant Ford Motor Company ("Ford") hereby moves *in limine* to exclude the expert testimony of Steven Gaskin. Rule 702, Supreme Court precedent, and Eleventh Circuit case law all require that an expert's testimony be both reliable and helpful to the factfinder to be admissible.  Gaskin's proposed testimony is neither.  The marketing survey tool he used to develop his opinion here—known as "conjoint analysis"—is legally insufficient to answer the damages question in this case, which is whether class members' cars suffered a diminution in market value.  As many courts have held while rejecting conjoint analysis in a variety of circumstances, this type of analysis considers only what consumers are willing to pay and ignores real-world market conditions.  An expert methodology that ignores real-world market data is particularly unreliable and unhelpful when such data is readily available, as is the case here. What is more, Gaskin's analysis is fundamentally flawed because, among other methodological shortcomings, the survey on which his opinion is based does not address the specific defect for which the class was certified in this case, and Gaskin's methods significantly departed from the way other practitioners in the field routinely conduct conjoint analysis.  The former flaw undermines the helpfulness of his proposed testimony, and the latter undermines its reliability.  His testimony should be excluded.

## BACKGROUND

Plaintiff Angela Sanchez-Knutson ("Plaintiff") filed her Second Amended Complaint ("SAC") on behalf of herself and a putative class of Florida residents who had purchased or leased a 2011-2015 Ford Explorer. Plaintiff alleged that these model year Explorers are defective because they experience exhaust odor under certain driving conditions. Plaintiff sought, on behalf of herself and the class, damages comprised of the cost to repair and diminution in the market value of these vehicles due to Ford's alleged violation of the Magnuson-Moss Warranty Act, Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and breach of express and implied warranties. (ECF 85, SAC ¶¶ 83; 96; 110; 116).

Plaintiff subsequently filed her Renewed Motion for Class Certification on June 8, 2015, which Ford opposed, arguing, *inter alia*, that Plaintiff had failed to provide evidence that she could calculate classwide FDUTPA or warranty damages, as required by *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430 (2013).  For the first time in this litigation, in Reply to Ford's opposition, Plaintiff proposed two methods for calculating such damages: 1) a straight arithmetic theory based on the cost to repair the subject vehicles, and 2)  "conjoint analysis to determine the

cars' diminished value." (ECF 114 at 7-8). In support of these methodologies, Plaintiff submitted the Declaration of Steven Gaskin, who is not an economist but a marketing expert. In his Declaration, Gaskin opined that he could design a conjoint analysis survey to administer to class members that would enable him to "determine the difference in value . . . that customers place on a Ford Explorer with no exhaust leaking into the cabin compared to an otherwise identical Ford Explorer subject to the problems with exhaust . . . [or] [s]tated differently . . .  the difference in the amount relevant customers are willing to pay" for the two different Explorers. (ECF 122, ¶¶ 6, 12). Gaskin's Declaration made clear, however, that he had yet to design the survey and perform the analysis he described.

At the September 24, 2015 hearing on Plaintiff's renewed motion for certification, this Court pointedly inquired about Plaintiff's proposed damages theories:

> **Court**: So how do you calculate the damages . . . if [the vehicles are] not repairable? They get the whole price of the car back?
>
> **Plaintiff's Counsel:** No. No, your Honor . . . One of the unique aspects . . . about the problem with the Explorers, is that it's a problem that manifests only in very unique circumstances . . . the car has to be driven relatively fast [and] . . . the air conditioning has to be on recirculate . . . When those things occur at the same time . . . then the exhaust . . . is sucked in [. . .]
>
> **Court:** So if I'm an elderly person . . . and I never drive my car fast, and I like fresh air and keep the windows open, what damages do I get? . . . How do I find out how much I overpaid for the car? [. . . ]
>
> **Plaintiff's Counsel:** We offer two proposals. And one is the cost of repair. And the second involves the conjoint analysis that we've embarked on –
>
> **Court:** You ask a bunch of people, how much would you pay for a Ford Explorer that has carbon monoxide in it, and they're all going to say nothing.
>
> **Plaintiff's Counsel:** The analysis is a bit more sophisticated than that, and it's the type of analysis that manufacturers, like Ford, use all the time to determine . . . how much to charge extra for bucket seats, how much to charge extra for the camera that sees in the back –
>
> **Court:** Well, I understand that. For bucket seats . . . I understand that. I don't understand . . . how much to, you know, pay for safety features. I don't know how you do that analysis when no one's gonna buy a car if it fills up with carbon monoxide when you drive it.

(Class Certification Hearing Transcript, Ex. 1, at 8:4-10:25). Although the Court expressed skepticism about Plaintiff's ability to design a survey that could accurately measure classwide damages, ultimately, and based upon, *inter alia*, Plaintiff's promise of reliable and forthcoming damages calculations, the Court certified the class.[1] (ECF 148 at 21). Accordingly, and with the Court's approval of its substance, (ECF 161), Plaintiff prepared and sent notices to all putative class members, informing them of their membership in a class unified by owning or leasing vehicles allegedly affected by the same, particular defect:

> Ford Explorers, model years 2011 to 2015, are defectively designed and manufactured so that exhaust may infiltrate the vehicle **when the car is driven at wide open throttle and with the internal air conditioning on recirculate**.

(ECF 159, Attach. B) (emphasis added).

## GASKIN'S INVESTIGATON AND OPINIONS

### I.  **Gaskin's Analysis: An Overview.**

The damages recoverable in this case are limited to any measurable decrease in the **market value** of class vehicles that is attributable to Plaintiff's alleged defect. In his report, Gaskin claims to have calculated this value. (Expert Report of Steven Gaskin, Ex. 2, at ¶¶11, 63).  Although Ford Explorers model year 2011-2015 enjoy a robust and active secondary market from which any alleged decreased value could be readily observed, (Expert Report of Dr. David Harless & Dr. George Hoffer, Ex. 3), Gaskin did not evaluate – or even review – any actual sales market data in his analysis. (Dep. of Steven Gaskin, Ex. 4, at 129:17-130:11). Instead, Gaskin calculated what he claims to be this decrease in "market value" by determining what 413 survey respondents said they would be **willing to pay** for an Explorer vehicle containing the defect described in Gaskin's survey. (*Id*. at 210:23-211:6 (stating that his survey measured respondents' "reactions to these hypothetical situations")). In fact, Gaskin admitted in deposition that, in earlier drafts of his report, he had actually used the term "willingness to pay"[2] instead of "diminution in value" to describe the nature of his survey results. Gaskin changed the terminology, however,  after consulting with an unidentified person (in deposition, Gaskin

---

[1] In its certification Order, the Court rejected Plaintiff's straight arithmetic theory of damages as impermissibly seeking to recover cost of repair damages, which are not recoverable under FDUTPA.

[2] This is also the term Gaskin used throughout his Reply Declaration. (ECF 122 at ¶¶ 10, 12).

referred to him as "Chris" but could not remember his last name) about his report, who advised Gaskin that "it might cause some confusion to use willingness to pay among [the] people that do this sort of litigation," (Ex. 4 at 112:20-113:5), and that "the term 'diminution in value' would be a good way to describe this[.]" (*Id.* at 109:9-21).

Gaskin may have changed the terminology in his report, but that does not change the essence of the conjoint survey or improve the results it is capable of generating, which in fact have nothing to do with the actual market value of the class vehicles. Gaskin's deposition testimony proves this point. When asked what "market value" meant in his report,  Gaskin insisted that  "the people in our survey . . . were meant to represent a market," (*Id.* at 121:3-9), and explained that his survey did not look at the "supply side" because he did not feel it "was needed here." (*Id.* at 122:4-14). Gaskin explained:

> **Gaskin:** They bought the Ford Explorers. And they had these problems and they . . . are wishing for some compensation for these problems[,] or some people are. I don't see how supply has anything to do with that. [ . . . ]
>
> **Question:** If someone were to have bought a vehicle within this class and then sold it at . . . the current market wholesale price, has that person suffered a diminution in value of the kind that you describe here?
>
> **Gaskin:** I think that might be up for others to discuss. I think that personally if I had had experience driving around with dangerous levels of exhaust gases in the cabin even for a week or two and maybe it hurt my child or something, I would feel pretty offended and damaged even if I had managed to sell the car.

(*Id.* at 229:5-230:6).

Despite his insistence that **_feelings_** of being offended or damaged were more relevant to his analysis than a consideration of what the market would be willing to supply, Gaskin admitted that "the ultimate price of a product is a combination of the market demand and market supply," (*Id.* at 131:17-20), and he agreed that market value is defined as "the amount that a purchaser willing, but not obligated, to buy will pay to one willing, but not obligated, to sell." (*Id.* at 131:21-132:3). Moreover, Gaskin conceded that because he had calculated the willingness to pay, in the aggregate, for all class members, (Ex. 2 at ¶¶11, 21, 59, 60), any individual class member could be over or under-compensated by the ultimate damages award he had calculated.

(Ex. 4 at 220:15-221:3). Specifically, Gaskin agreed that there was the potential for a windfall damages award:

> **Question:** As a hypothetical imagine someone who has a 2011 Explorer that they owned for two years and then sold for an average wholesale price. If you apply diminution in the value based solely on the purchase price, is that person going to end up with a windfall? [. . . ]

> **Gaskin:** I'm not giving each person a piece of money like Oprah Winfrey or a load of money or a new car. If they had already received most of the value of the vehicle and then they get it over again, I could see how that might be redundant.

(*Id.* at 221:10-222:10). This answer is, of course, in complete contradiction to his later answer that "feelings" are compensable (see above), and these internal contradictions accentuate Gaskin's own uncertainty about whether his analysis actually measures diminished market value.

## II.  Gaskin's Analysis: The Details.

Gaskin calculated the supposed "diminution in value" of Ford Explorers in the Florida marketplace from the results of a nationwide survey[3] completed by 413 respondents who indicated that they had owned or leased[4] one or more 2011-2015 Ford Explorers. Each respondent was asked to choose between three hypothetical Explorer vehicle profiles, where each profile was made up of different versions, or "levels," of the same seven vehicle "features." (Ex. 2 at ¶13). The price "feature" (which arbitrarily ranged from $15,000 to $45,000 and represented no actual price for which an Explorer was sold in the market place) enabled Gaskin to generate a number value for respondents' preferences for the other six features. (*Id.* at ¶40). The "feature" of interest –  intended to represent the defect alleged in this case – was referred to throughout the survey as "cabin air quality," and the varying "levels" of this feature were described as follows:

---

[3] Although in his Declaration Gaskin said he would survey only Florida residents (the class members in this case), he was not able to find enough Florida residents to take the survey, so Gaskin expanded it to a nationwide survey. (Ex. 4 at 40:6-23). His use of a nationwide survey is inconsistent with this Court's July 22, 2015 Order, which expressly dismissed Plaintiff's nationwide Magnuson Moss claim. (ECF 110 at 9).

[4] Gaskin admitted that he had no way of knowing how many survey respondents were former or current lessees or purchasers. (Ex. 4 at 166:14-24).

> 1) accelerating with max AC may lead to dangerous levels of exhaust gases entering the cabin ("level one");
> 2) accelerating with max AC may lead to the smell of exhaust gases entering the cabin ("level two"); or
> 3) accelerating with max AC will have no effect on the cabin air quality ("level three").

(Ex. 2 at ¶40). The five remaining "features," chosen ostensibly to "simulate a real vehicle comparison experience," (*Id*. at ¶ 22), were also presented throughout the survey in varying levels.

Three of these five features – drive type, model year/mileage, and model package – are standard vehicle features; a prospective car purchaser could realistically be expected to consider whether she might purchase a new or used vehicle, with front or four-wheel drive. (*Id*. at ¶ 40). The remaining two features ("powertrain performance" and "braking performance"), termed "distractor features" because they were intended to distract survey respondents from the purpose of the exercise, were not presented as desirable vehicle attributes, but, like "cabin air quality," as increasingly severe problems affecting the vehicle. Gaskin acknowledged that the problem "features" were not ones that, in reality, a vehicle purchaser or lessor would consider during the purchase or leasing process. (Ex. 4 at 193:23-194:2). Gaskin also conceded that his presentation of the "problem features" as increasingly worsening levels of an otherwise neutral vehicle attribute was atypical for a conjoint survey. (*Id*. at 194:8-19).

Although "cabin air quality," "powertrain performance," and "braking performance" were similarly (albeit atypically) presented as progressively worsening vehicle problems, the descriptions and levels of "cabin air quality" differed in three significant ways from the other two. First, levels two and three of "cabin air quality" were described not as certain characteristics, but, rather as problems that only "may" manifest themselves. (Ex. 2 at ¶40). Respondents were given no guidance as to the likelihood that "dangerous levels of exhaust gases [would enter] the cabin," for example, but were simply told that it "may" happen when "accelerating with max AC." Indeed, respondents were also not told what amount of acceleration would trigger the problem. (Ex. 4 at 198:21-199:9). Although the class notice in this case explicitly described the relevant defect as "exhaust gas [that] may infiltrate the vehicle when the car is driven at **wide open throttle and with the internal air conditioning on recirculate**," (ECF 159, Attach. B) (emphasis added), Gaskin's survey did not include that detailed description

of the alleged defect. To the contrary, his survey omitted these details, leaving respondents with no understanding of the conditions under which the alleged defect may (or may not) manifest. Notably, Gaskin himself stated that he had not reviewed or interpreted the class claims regarding the alleged defects, and instead he "relied on Plaintiff's counsel to ensure that the problems were fairly and accurately portrayed." (Ex. 2 at ¶ 23).

Second, the worst "cabin air quality" level was the only one in the entire survey described as "dangerous," despite the fact that the  other "distractor" features were intended to prevent respondents from guessing the reason behind the survey. (*Id*. at ¶40; Ex. 4 at 149:8-24). Gaskin admitted in deposition that he had read no professional literature on conjoint analysis in which a surveyed feature was affirmatively described as dangerous, or that determined that conjoint surveys involving "dangerous" features could be reliably performed. (Ex. 4 at 151:3-8).

Finally, the "cabin air quality" descriptor provided no information about the cause of the problem. Unlike the "powertrain performance" problem, for example, which was explained as "a problem with the transmission which is preventing it from shifting above first gear," or the "braking performance" problem that was attributed to warped rotors, (Ex. 2 at ¶ 40), the root cause of the "cabin air quality" problem was not disclosed. (*Id*.) Thus, while respondents had information about the problem cause and potential cure for the braking and powertrain problems, they lacked that same information for cabin air quality.

In addition to ambiguously presenting "cabin air quality" as a problem with an unexplained root cause and an unknown likelihood of occurrence, Gaskin intentionally obscured the background assumptions respondents were asked to make when evaluating each vehicle profile choice set. Notably, although Gaskin claimed that his entire exercise was intended to simulate a "market" transaction to determine values, he intentionally obfuscated key considerations in vehicle purchasing decisions: the availability of warranty coverage and the potential for repair. In order to  prevent respondents from taking "factors such as warranty and repairs into account," the survey asked respondents to assume that all three problem features "may or may not be able to be repaired and may or may not be covered by warranty." (*Id*.)

Gaskin added this assumption to the survey instructions after his pretesting respondents – initial survey participants used to test and tune the ultimate survey – indicated that the potential for a warranty repair coverage impacted how they valued the vehicle profile options. (Exhibit I, page 2 to Expert Report of Steven Gaskin, Ex. 5). Despite the fact that Gaskin's survey was

intended to "simulate a **real** vehicle comparison experience," (Ex. 2 at ¶ 22), Gaskin determined that it was problematic for survey respondents to accurately assume that the problem would be covered by a warranty, as it may be in the **real** market. He explained: "we wanted to say . . . that you should worry about these problems to some degree [so] we said this may or may not be covered under warranty." (Ex. 4 at 196:23-197:16).[5] Gaskin admitted, however, that there was no way to assess the "degree" to which any given respondent interpreted the likelihood of repair under warranty. (*Id*. at 205:11-18).

On the basis of these survey results, Gaskin concluded that each class member has "experienced a diminution in value of $21,000, or 46.7% per vehicle, in the aggregate . . . due to problems with 'Accelerating with max AC may lead to the **smell of exhaust gases** entering the cabin'" and that the "diminution in value due to problems with 'Accelerating with max AC may lead to **dangerous levels of exhaust gases** entering the cabin' is $30,000 per vehicle, or 66.7% per vehicle, in the aggregate." (Ex. 2 at ¶11). Gaskin calculated these percentages – which he purports to apply to **all** class members although they are not necessarily representative of **any** individual class member's actual damages – by aggregating the individual survey responses. Gaskin then multiplied these percentages by $45,000, a number he arbitrarily chose for vehicle purchase price, despite the fact that he had no idea what any individual class member actually paid for his or her vehicle. (Ex. 4 at 218:6-8). Moreover, in deposition Gaskin confessed that these values were actually low estimates, constrained by the levels he had chosen for price, and that, had they been given the choice, survey respondents would likely have reported a much lower willingness-to-pay than the survey otherwise allowed. Gaskin explained that he intentionally designed the survey to avoid the option of "offering Ford Explorers in there for nothing," noting any results then would have been "a hard sell for believability." (*Id*. at 175:6-176:22).

## ARGUMENT

Gaskin's proffered opinions cannot satisfy the requirements of Fed. R. Evid. 702 or *Daubert* and its progeny because conjoint analysis can never be used to measure actual market value, much less serve as proof of diminished market value. Moreover, Gaskin's conjoint survey

---

[5] In fact, Gaskin opined that it was important that respondents not take **any** outside, real-world factors into account, including the possibility that the issues could be fixed through utilization of Lemon Laws. (Ex. 4 at 203:23-204:9).

suffers from significant design flaws that render it unreliable even if it could be used here. Finally, Gaskin is not qualified to offer opinions in areas unrelated to his field of expertise.

## I.     Legal Standard for Admissibility of Expert Testimony

Expert testimony must meet the standards of Federal Rule of Evidence 702 to be admissible. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The language of Rule 702 tracks the substantive rulings of the United States Supreme Court in a series of cases starting with *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which held that expert testimony must be both reliable and relevant to be admissible under Rule 702. *Id.* at 594. "Daubert requires that trial courts act as 'gatekeepers' to ensure that speculative, unreliable expert testimony does not reach the jury." *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (citing *Daubert*, 509 U.S. at 597, n. 7); *see also Banta Props., Inc. v. Arch Specialty Ins. Co.*, Case. No. 10-61485-CIV-DIMITROULEAS/SNOW, 2011 U.S. Dist. LEXIS 152930, at *3 (S.D. Fla. Dec. 23, 2011) (Dimitrouleas, J.) (holding that it is the court's role "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony'") (internal quotations omitted).

The Eleventh Circuit has established the following requirements for district courts evaluating expert testimony under *Daubert*:

> This circuit requires trial courts acting as gatekeepers to engage in a rigorous three-part inquiry assessing whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (citing *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)) (internal quotations omitted). The proponent of the

proffered testimony must prove, by a preponderance of the evidence, that the testimony satisfies each of these three prongs. *Hendrix*, 609 F.3d at 1194.[6]

## II.   **Gaskin's Opinion On Classwide Damages Cannot Survive Scrutiny Under Rule 702.**

### A.   **Gaskin's Opinions Do Not Fit With The Facts Or Legal Theories In This Case.**

#### 1.   **Conjoint Analysis Cannot Measure Diminished Market Value.**

The measure of "actual damages" recoverable in this case is "the difference in the **market value** of the product or service in the condition in which it was delivered and **its market value** in the condition in which it should have been delivered according to the contract of the parties." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006) (emphasis added). Consequential damages, such as repair costs, are not recoverable under FDUTPA. *Id.*; *see also* ECF 148 at 13 (rejecting Plaintiff's proposed "straight arithmetic" damages model as impermissibly seeking consequential repair damages). The formula for establishing fair market value under Florida law is "the amount a purchaser willing but not obliged to buy will pay to one willing but not obliged to sell." *ITT Community Dev. Corp. v. Seay*, 347 So. 2d 1024, 1026-27 (Fla. 1977).

Gaskin claims to have calculated this "difference in the market value," which he determined to be either 46.7% or 66.7% of the vehicles' overall value, depending on whether the defect consists of the potential for an odor of exhaust fumes, or the potential for a "dangerous" level of exhaust fumes, respectively. (Ex. 2 at ¶¶63, 65). Gaskin multiplied these percentages by $45,000, a number he arbitrarily chose for vehicle price, despite the fact that he had no idea what any individual class member actually paid for their vehicle, (Ex. 4 at 218:6-8), to arrive at an enormous absolute value for damages: either $21,000 or $30,000 per class vehicle. Gaskin calculated these percentages and absolute values using a survey-based conjoint analysis unaccompanied by any econometrics and unverified by actual market data. On the contrary, the robust and active secondary market for Ford Explorers shows **no indication** that these vehicles have experienced **any** decrease in value, much less a decrease as colossal as the one Gaskin attributes to the mere potential for a defect. (Ex. 3).

---

[6] Ford incorporates by reference the legal standard as set forth in greater detail on pages 9-13 of its Motion *In Limine* To Exclude The Testimony of David Renfroe, filed contemporaneously herewith.

For a durable consumer good like the Explorer, which is actively sold and resold in a secondary market, any diminished market value can be observed and measured by comparing the rate of the Explorer's depreciation in that market relative to its peer vehicles. If the alleged defect indeed diminished the value of the vehicle, then as dealers became aware of the problem through the TSB publications – and as original owners experienced the problem – the resale market would reflect it. (Ex. 3 at  ¶ 9). For this reason, other courts evaluating automobile "diminished value" damages under FDUTPA have relied on this secondary market data to first determine whether such a diminution even exists, and then, if so, to quantify it. *See, e.g., In re Ford Motor Co., Spark Plug & 3-Valve Engine Products Liab. Litig.,* No. 1:12-MD-2316, 2014 WL 3778592, *43 (N.D. Ohio July 30, 2014) (concluding that "the depreciation patterns for Plaintiffs' vehicles show no abnormal or excessive depreciation compared to non-defective vehicles, demonstrating that buyers do not believe the alleged defect affects the value of the vehicle"); *In re Ford Tailgate Litig*., No. 11-CV-02953-RS, 2015 WL 7571772, *9 (N.D. Cal. Nov. 25, 2015) (granting Ford's motion to exclude plaintiff's damages expert where the expert failed to "cite to any data or sales prices of vehicles with similar alleged safety risks").

In contrast, no court yet has determined that classwide damages attributable to the supposed diminished value of a vehicle can be calculated by conjoint analysis. In cases where conjoint analysis has been proposed, the product at issue was not one that is sold on a secondary market. *See, e.g., In re NJOY, Inc.*, No. CV-14-00428-MMM (JEMx), 2015 WL 4881091 (C.D. Cal. Aug. 14, 2015) ("*NJOY I*") (proposed to calculate the price premium attributable to e-cigarettes as "healthy"); *Adams v. Target*, CV-13-5944-GHK, at *3 (C.D. Cal. Nov. 25, 2014) (attached as Ex. 6) (proposed to calculate decreased value of kiddie pools that were improperly sized on their packaging); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015) (proposed to calculate the price premium associated with labeling oils as "100% Natural"); *In re Whirlpool*, 45 F. Supp. 3d 724 (N.D. Oh. 2014) (proposed to calculate diminution in value associated with front-loading washing machines containing a propensity for mold growth); *Guido v. L'Oreal, USA, Inc.*, No. 2:11-CV-01067-CAS, 2014 WL 6603730 (C.D. Cal. July 24, 2014) (proposed to estimate the portion of a hair spray's market price that was attributable to the lack of a flammability warning); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067 (D. Minn. 2015) (proposed to calculate the value of specific convenience features of download insurance products).  Plaintiff offers no explanation for why a stand-alone, survey-based conjoint analysis

that measures respondents' self-reported willingness-to-pay should substitute for an analysis of actual market data, which would capture any **actual** change in the market value of the Explorers.

Ford does not dispute that conjoint analysis may be useful in marketing research, where it can be used to measure a consumer's "willingness to pay" for a product feature and forecast the likely acceptance of a product feature if it were brought to market.[7] But "willingness to pay" is **not** synonymous with actual market value. Dr. John Hauser (a mentor of Gaskin's and someone whom Gaskin considers knowledgeable about conjoint analysis[8]) recently opined on the limitation of conjoint analysis in calculating damages in a patent case: "I just have market demand and . . . the actual price that you pay depends upon both the demand and also what Apple and Samsung would be willing to supply," and he confirmed that "none of [the] numbers would reflect . . .**what people would actually pay in the marketplace**." *Apple, Inc. v. Samsung Elecs. Co.,* No. 11-CV-01846-LHK, 2014 WL 976898, *11 (N.D. Cal. Mar. 6, 2014), *appeal dismissed* (July 30, 2014) (emphasis added) (where the court ultimately concluded that Dr. Hauser's conjoint survey gave the court no way to compare "willingness to pay metrics – which relate only to the demand for a patented feature – to the **market price** of the infringing devices, which reflects the real-world interaction of supply and demand").

Most courts that have recently considered conjoint analysis as a method for calculating classwide damages have concluded that it cannot measure diminished market value even for consumer goods not bought and sold on a secondary market. Most recently, in *In re NJOY, Inc*., CV-14-428-JFW (C.D. Cal. Feb. 2, 2016) ("*NJOY II*") (attached as Ex. 7), the court denied plaintiffs' amended motion for class certification where plaintiffs sought to prove, *inter alia*, FDUTPA damages by conjoint analysis, concluding that the conjoint analysis "focus[ed] on a consumer's subjective valuation, and thus [did] not permit the court to calculate the **true market price** of N-JOY cigarettes absent the purported misrepresentations and omissions [by the defendant.]" *Id.* at *9. The court had previously reached the same decision in *NJOY I*, explaining that plaintiff's proposed conjoint analysis "looks only to the demand side of the market equation, converting what is properly an objective evaluation of relative fair market values into a

---

[7] *See* Sawtooth Software: What is Conjoint Analysis, *http://www.sawtoothsoftware.com/products/conjoint-choice-analysis/conjoint-analysis-software* (last visited Feb. 11, 2016).

[8] *See* Ex. 4 at 72:5-73:2.

seemingly subjective inquiry of what an average consumer wants." *Id.* at 42 (citing *Saavedra v. Eli Lilly*, No. 2:12-CV-9366-SVW, 2014 WL 7338930, *5 (C.D. Cal. Dec. 13, 2014)) (internal quotations omitted).

Similarly, in *Saavedra v. Eli Lilly*, where the plaintiffs argued, as they do here, that they were harmed by receiving a product of lesser value than the value of the product they had expected to receive, the court explained that "Plaintiffs seek to prove injury [by conjoint analysis] by proving that each class member received a drug that the average consumer subjectively values less than the average consumer subjectively values the drug he expected to purchase." *Id.* at *4. The court concluded that there was "no case holding that a consumer may recover based on consumers' willingness to pay **irrespective of what would happen in a functioning market**." *Id.* at *5 (emphasis added). Because of this, the court held that plaintiffs had failed to present a workable method for calculating classwide damages. Other courts have also recently rejected conjoint analysis as a method to reliably prove classwide damages. *See, e.g., Adams v. Target*, CV-13-5944-GHK, at *3 (C.D. Cal. Nov. 25, 2014) (attached as Ex. 6) (rejecting Gaskin's proposed conjoint analysis, noting that it would "not [be] effective when the features that it focuses on are artificial because the analysis does not reflect real-world consumer behavior").

On those occasions where courts have accepted conjoint analysis in connection with damages calculations, they have done so only when the conjoint analysis is accompanied by an analysis of historical marketplace data supporting a market value injury – an analysis that is entirely absent here. For example, in *In re ConAgra Foods, Inc.*, a case cited by this Court in support of its decision to conditionally accept Gaskin's proposed damages theory for class certification purposes, the court approved the use of conjoint **in conjunction with** a hedonic regression analysis that accounted for "supply and market factors." 90 F. Supp. at 1028. In *ConAgra*, the plaintiff had proposed two experts: a marketing expert to conduct conjoint analysis **and** an economist/statistician expert to conduct a hedonic regression analysis looking at actual market data. *Id.* at 953, 944. The *ConAgra* court ultimately concluded that only "this hybrid damages methodology, which takes into account **both** Weir's hedonic regression and Howlett's conjoint analysis, satisfies *Comcast.*" *Id.* at 1031 (emphasis added); *see also In re Dial Complete Mktg. & Sales Practices Litig.*, 2015 U.S. Dist. LEXIS 164346, *107 (D.N.H. Dec. 8, 2015) (noting that other courts have accepted conjoint analysis **in conjunction** with hedonic regression,

and ultimately concluding that plaintiff's experts had not provided sufficient evidence that they would be able to calculate damages, and denying class certification).

Similarly, in *In re Whirlpool*, the court accepted the analysis of the plaintiff's conjoint expert as a method for calculating damages, **in conjunction with** the opinions of **both** an economist and statistician. 45 F. Supp. at 750-752. In *Whirlpool*, the plaintiff's conjoint analysis expert came up with a willingness-to-pay range, and her work was supported and confirmed by both econometric and statistical models **and** the independent analysis of an economist. *Id.*; s*ee also Guido v. L'Oreal*, No. 2:11-CV-01067-CAS, 2014 WL 6603730 (C.D. Cal. July 24, 2014) (certifying a class where expert had proposed conjoint analysis <u>and</u> "Random Coefficient Demand Estimation," which involved "running regressions on historical market share data"). None of these econometric analyses, using actual market data, have been performed by Plaintiff in this case.[9]

As this case law makes clear, conjoint analysis, standing alone and untethered to the many factors that impact the real-world marketplace – including the considerations that affect a company's pricing strategy, the prices at which Ford would be willing to sell its products, and the prices at which other competitors would be willing to sell theirs – cannot be the basis upon which diminution in **market value** damages are calculated. Yet that is exactly what Gaskin proposes to do. The obvious stretch of this proposition is underscored by Gaskin's abrupt decision to change the terminology in his report, substituting "diminution in value" for "willingness to pay," which arose not from any professional literature or training, but rather, from the suggestion by an essentially unknown third party.

Gaskin did not dispute that his calculations were based only upon consumers' willingness to pay and did not take into consideration the "supply side" of the market equation.  (Ex. 4 at 121:23-122:14) (*See also* Ex. 2 at ¶61: "It is my opinion that the diminution in value figures I give in this report are not affected by supply-side considerations.") Yet Gaskin agreed that the ultimate price of a product within the market place is a "combination of the market demand and

---

[9] Ford acknowledges that these cases addressed whether conjoint analysis could be used as a reliable method for calculating classwide damages at the class certification stage, rather than under a Rule 702 inquiry. This procedural distinction, however, does not detract from their relevance to this Court's determination, because the same considerations that led other courts to reject conjoint analysis under *Comcast* render Gaskin's opinions impermissible under Rule 702. A damages model that cannot accurately measure classwide damages cannot fit with the legal theories in this class action lawsuit and cannot satisfy Rule 702 in this context.

the market supply," and that a reasonable definition of market value is "the amount that a purchaser willing, but not obligated, to buy will pay to one willing, but not obligated to sell" (Ex. 4 at 131:17-132:3). Gaskin further admitted in deposition that numerous factors go into car pricing, which is "complex," (*Id.* at 127:13-24; 214:24), and acknowledged that he had no methodology for determining what individual class members had paid for their vehicles. (*Id.* at 218:6-12).

Gaskin's own confusion about the import of his analysis was highlighted  by additional inconsistent answers in deposition. When asked whether a member of the class who had purchased an allegedly defective Explorer and then sold it at the current market wholesale price would have suffered the kind of "diminution in value" described in his report, Gaskin insisted that they could have. Although he admitted this would be a question for "others to discuss" – and it is unclear who these "others" would be, as Gaskin is Plaintiff's sole damages expert – he explained that even if a class member was able to recover the wholesale market value of the car, they may still be owed damages because they would likely "feel pretty offended and damaged even if [they] had managed to sell the car." (*Id.* at 229:19 - 230:6).[10]

Gaskin directly contradicted this answer, however, when he acknowledged that because his "diminution in market value" was calculated "in the aggregate," any individual class member might receive a windfall damage award if they had been able to resell their allegedly defective vehicle at the full wholesale value: "[i]f they had already received most of the value of the vehicle [by selling it] and then they get it over again [in damages], I could see how that might be redundant." (*Id.* at 221:10-222:10.) A damages model that could result in a windfall recovery is strictly prohibited by Florida law, *see, e.g., Gastaldi v. Sunvest Resort Cmtys., LC*, 709 F. Supp. 2d 1299, 1302 (S.D. Fla. 2010), but by Gaskin's own admission, his model allows for these types of "windfall" recoveries.

That Gaskin's model allows for windfall recoveries is unsurprising given that he calculated damages "in the aggregate" and did not determine the amount that any individual class member overpaid for his or her vehicle. At the class certification hearing, the Court asked: "[if] I never drive my car fast, and I like fresh air and keep the windows open, what damages do I get?"

---

[10] But the "feelings" of being "offended" that Gaskin describes here are not recoverable **market value** damages but, rather, hedonic damages, which are not recoverable under the causes of action in this case.

(Ex. 1 at 9:12-14). Gaskin has not answered and cannot answer this question for any individual class member, because his methodology was not designed to answer it as an initial matter.

**2.      Gaskin's Survey Does Not Even Attempt to Measure Damages Attributable To The Defect For Which The Class Was Certified.**

In *Nature's Prods. v. Natrol, Inc.*, No. 11-62409-CIV-DIMITROULEAS/SNOW, 2013 U.S. Dist. LEXIS 185676 (S.D. Fla. 2013 Oct. 8, 2013), this Court held that in order to assist the trier of fact, "expert testimony must be relevant to the task at hand, . . . i.e., that it logically advances a material aspect of the case." *Id.* at *8 (citing *Coral Way, LLC v. Jones*, No. 05-21934-CIV, 2006 U.S. Dist. LEXIS 97232, *4 (S.D. Fla. Oct. 17, 2006) ("there must be an appropriate fit between the proffered opinion and the **facts** of the case")). Gaskin's opinions are not relevant to determining actual damages in this case not only because they cannot do so as a matter of law, but also because Gaskin did not even attempt to calculate damages attributable to the defect for which the case was certified: "exhaust [that] may infiltrate the vehicle **when the car is driven at wide open throttle and with the internal air conditioning on recirculate**." (ECF 159, Attach. B) (emphasis added).  Nowhere does Gaskin's survey mention that wide open throttle or driving with recirculation mode are necessary to trigger the infiltration of exhaust gases or odor. His survey description of "cabin air quality," which was the "feature of interest" intended to represent the alleged defect, states only that "accelerating with max AC" may lead to either "dangerous levels of exhaust gases entering the cabin" ("level 1") or "the smell of exhaust gases entering the cabin" ("level 2"). (Ex. 2 at ¶40).

This is a critical difference in defect description. The alleged defect as Plaintiff has described it throughout the litigation "manifests only in very unique circumstances [where there has been] a perfect storm of events." (Ex. 1 at 8:29-9:11). This "perfect storm of events" requires that the car be driven at wide-open throttle and with the recirculation mode on. If Gaskin's survey and subsequent analysis was to be in any way relevant to determining damages in this case, then it needed to determine the damages attributable to the defect alleged **in this case**. It did not. Instead, Gaskin ostensibly calculated damages associated with a different and much more expansive defect: one that may manifest itself during any amount of acceleration – a driving condition that every driver employs to increase the speed of their vehicle – and with "max AC" turned on. A survey respondent may have expressed a different willingness-to-pay for a vehicle that may smell of exhaust when driven only at wide-open throttle as compared to a vehicle that may experience the smell during any acceleration.

**B.      Gaskin's Deeply Flawed Survey Design Renders His Opinions Unreliable.**

For all the reasons discussed above, a stand-alone conjoint analysis survey, no matter how well designed, could never provide a reliable and accurate basis for calculating classwide, diminished market value damages, and thus cannot be admitted under *Daubert* for a lack of "fit" with the case. In addition to this, Gaskin's survey was poorly-designed, and its numerous flaws reinforce the conclusion that it should be excluded.

**1.      Gaskin excluded from consideration any potential warranty coverage or repair, further abstracting his results from the marketplace and the causes of action in this case.**

One of the assumptions survey respondents were asked to make regarding all three "problem features," including "cabin air quality," was that they "may or may not be able to be repaired and may or may not be covered by the warranty." (Ex. 2 at ¶40). Gaskin added this assumption to the survey instructions after his pretesting respondents indicated that the potential for a warranty repair, which they rightly assumed would apply in some circumstances, impacted how they valued the vehicle profiles they were choosing from. (Ex. 5). Despite the fact that Gaskin's survey was intended to "simulate a **real** vehicle comparison experience," (Ex. 2 at ¶ 22), and that Plaintiff is bringing a **breach of warranty claim** in this case, Gaskin concluded that it was problematic for survey respondents to assume that the "problem" would be covered by a warranty or could be addressed under Lemon law, as it may be in the real market, because respondents may not be sufficiently "worried" about the problem. (Ex. 4 at 196:18-197:16). Gaskin admitted, however, that there was no way to know how each respondent interpreted the likelihood of warranty coverage or repair, and he agreed that the respondents had presumably not interpreted that likelihood the same way. (*Id*. at 198:1-10; 204:5-205:23). Their responses were, nevertheless, improperly aggregated together for purposes of Gaskin's analysis.

**2.      The survey's price points were selected to artificially constrain the "diminution in value" calculations to make them more "believable."**

At the class certification hearing, the Court specifically inquired about certain aspects of Gaskin's proposed – but still to-be designed and performed – conjoint analysis. It asked how the analysis could be done if "no one's gonna buy a car if it fills up with carbon monoxide when you drive it," and speculated that if "you ask a bunch of people, how much would you pay for a Ford Explorer that has carbon monoxide in it . . . they're all going to say nothing." (Ex. 1 at 10:9-25). In response, Plaintiff assured the Court that she was not claiming that the vehicles were

valueless, and she promised that Gaskin's "sophisticated" analysis would confirm this by accurately determining how much their total value had diminished.

In order to deliver on this promise, however, Gaskin had to artificially constrain the parameters of his survey to come up with a "diminished value" figure that was "believable." Gaskin explained that the lowest price of $15,000 was chosen to avoid the very result the Court predicted: survey answers indicating that the Explorers were valueless, which Plaintiff had already affirmatively stated was not her claim. (Ex. 4 at 176:12-177:14). But Gaskin was not tasked with generating diminution in value figures that were "believable" – he was tasked with determining figures that are accurate and reliable. That he had to manipulate the analysis from the outset to guarantee avoiding the result the Court predicted demonstrates that his overall method is unreliable.

      **3.**     **Gaskin Combined Vehicle "Features" And "Problems" Without Confirming That They Can Accurately Be Evaluated Together.**

Gaskin admitted in deposition that his "problem features" were atypical of a normal conjoint survey, where product features are usually presented as "a good, better, best thing," and he could not identify any peer-reviewed literature that endorsed his method of mixing "problem features" and positive features. (*Id.* at 194:8-195:20). Indeed, Ford's conjoint expert, Dr. Dominque Hanssens, explained in his deposition that a successful conjoint analysis relies on the assumption that respondents are willing to make tradeoffs between all the features being offered. (Dep. of Dr. Dominique Hanssens, Ex. 8, at 97:10-98:6; 105:10-12; 108:2-18; *see also* Ex. 4 at 146:18-147:1 ("the purpose of the survey is for [respondents] to make tradeoffs")). Dr. Hanssens explained that the "problem features" used in Gaskin's survey are examples of non-compensatory attributes, or ones "on which a respondent does not make a tradeoff." (Ex. 8 at 97:10-98:6). Dr. Hanssens noted that a modern version of conjoint analysis (called "adaptive" conjoint) can test non-compensatory attributes, but that this is not what Gaskin did with his survey. (*Id.* at 98:7-10; 108:9-109:18).

      **4.**     **Gaskin Failed To Distinguish Between Purchasers And Lessors.**

Although Gaskin's survey was administered to those who identified either as purchasers or lessees of a 2011-2015 Ford Explorer, he testified in deposition that he did not know the distribution of purchasers to lessees in the survey population. (Ex. 4 at 166:21-24). In fact, Gaskin had no way of knowing if a single lessee or a single purchaser took the survey, much less if the distribution between the two categories was even. Yet Gaskin admitted that purchases and

leases are "distinct economic transactions," distinguishable, in part, because a "lessee does not retain the residual value of the vehicle after the lease is up." (*Id.* 167:1-6). Gaskin also acknowledged that he did nothing to test whether lessees and purchasers share common views on valuation. (*Id.* 168:7-21). Because there is no way to know whether Gaskin surveyed a sample that was representative of the entire class, which is made up of both purchasers and lessees, Gaskin's survey is inherently unreliable. *See In re Horizon Organic Milk Plus DHA Omega-3 Marketing & Sales Practice Litig.*, No. 12-MD-02324, 2014 WL 1669930, *14 (S.D. Fla. Apr. 28, 2014) (finding expert's opinion unreliable where sample size did not adequately represent entire class).

### 5.   Gaskin's Particular Usage of Conjoint Is Unsupported By The Relevant Literature and Not Accepted By the Scientific Community.

Gaskin's proffered opinions flunk the second and fourth *Daubert* factors, because the relevant peer-reviewed articles and publications do not support the use to which Gaskin put his conjoint analysis in this case. *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) (these two factors are "whether the theory has been subjected to a peer review and publication . . . [and] whether the technique is generally accepted in the scientific community"). Indeed, the pertinent literature cautions against using conjoint analysis to calculate absolute valuations of market share. Bryan Orme, the founder of Sawtooth, the conjoint software Gaskin used for his data analysis (whom Gaskin himself cites as an authority on the subject (*See* Ex. 4 at 20:7-15), observed:

> Believing that we have an accurate predictor of market share can lead us to misuse a model . . . Conjoint analysis can reveal product modifications that can increase market share, but it will probably **not reveal how much** actual market share will increase . . . **We must avoid thinking that adjusted conjoint models can consistently and accurately predict volumetric absolutes such as market share**.

Orme, Bryan K., *Getting Started with Conjoint Analysis*, 2d Ed., Research Publishers, 2010, pp. 26-27 (emphasis added) (attached as Ex. 9). In addition, the literature advises against some of the specific survey designs that Gaskin used. For example:

> [Feature] levels should be concise statements with concrete meaning. Avoid using ranges to describe a single level of an attribute . . . Levels such as "superior performance" also leave too much in question. What does "superior performance" mean? Try to use specific language to quantify (if possible) the exact meaning of the level.

Orme, Bryan, K., "Formulating Attributes and Levels in Conjoint Analysis," *Sawtooth Software Paper Series*, 2002, pp. 1-4:1 (attached as Ex. 10). Gaskin's descriptions of the "cabin air quality" "levels" were not definitive; the descriptions stated only that the feature "may" manifest itself when accelerating on "Max AC," but it gave no further explanation about the likelihood of that happening. Gaskin himself admitted that this caused a "range" problem, where some respondents could have made their survey choices assuming there was a high likelihood the smell would be present in the vehicles, while others could have assumed it was not likely at all. (Ex. 4 at 198:21-199:9). Conjoint analysis, however, aggregates these responses under the assumption that all respondents are answering the same question – an assumption that cannot be validated under Gaskin's study design. He has interjected exactly the kind of non-concise level description cautioned against in the literature because it introduces the possibility that each survey respondent ascribed a different meaning to "may happen," which makes Gaskin's overall results inherently unreliable.

      **C.    Gaskin Lacks The Qualifications And Experience To Render Opinions Regarding Diminution in Market Value of Class Vehicles.**

For all the reasons discussed in Section II.A.1, Gaskin's opinions must be excluded as a matter of law because conjoint analysis cannot be used to measure diminished **<u>market value</u>** of a consumer good that is sold and resold on a robust secondary market, and it certainly cannot measure such damages with an accompanying econometrics analysis. Gaskin himself is not qualified to perform the econometrics that would be necessary (although still not sufficient) to salvage his opinions, nor is he qualified to evaluate the secondary market data as Ford's experts have done. Gaskin is not an economist or a vehicle pricing expert. Therefore, to the extent Gaskin attempts to offer opinions beyond his conjoint analysis, they should be excluded. *See Cordoves v. Miami-Dade County*, 104 F. Supp. 3d 1350, 1358 (S.D. Fla. 2015) ("expert testimony regarding matters outside of the scope of the witness's experience is inadmissible, even if the expert is qualified to testify about other matters").

<u>CONCLUSION</u>

For all of the reasons discussed above, Gaskin's expert testimony should be excluded from consideration because it is unreliable, speculative, and does not comport with the legal theory or facts of this case.

February 15, 2016

Respectfully submitted,

/s/ Fredrick H.L. McClure

Janet L. Conigliaro
JConigliaro@Dykema.com
Admitted *Pro Hac Vice*
DYKEMA GOSSETT PLLC
400 Renaissance Center
Detroit, Michigan 48243
Phone: (313) 568-5372
Fax: (855) 262-6803

Fred J. Fresard
ffresard@dykema.com
Admitted *Pro Hac Vice*
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, Michigan 48304
Phone: (248) 203-0700
Fax: (248) 203-0763

Paul V. Lankford
plankford@lclaw.com
Admitted *Pro Hac Vice*
Lankford Crawford Moreno & Ostertag LLP
1850 Mt. Diablo Boulevard, Suite 600
Walnut Creek, California 94596
Phone: (925) 300-3520
Fax: (925) 300-3386

Fredrick H.L. McClure
Florida Bar No. 147354
fredrick.mcclure@dlapiper.com
J. Trumon Phillips
Florida Bar No. 0084568
trumon.phillips@dlapiper.com
DLA PIPER LLP (US)
100 North Tampa Street, Suite 2200
Tampa, FL 33602-5809
Phone: (813) 229-2111
Fax: (813) 229-1447

Joel A. Dewey
Joel.dewey@dlapiper.com
Admitted *Pro Hac Vice*
Jeffrey Yeatman
Jeffrey.yeatman@dlapiper.com
Admitted *Pro Hac Vice*
DLA PIPER LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209-3600
Phone: (410) 580.3000
Fax: (410 580.3001

Attorneys for Defendant

<u>**CERTIFICATE OF SERVICE (electronic filing)**</u>

**I HEREBY CERTIFY** that on February 15, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Fredrick H.L. McClure
Attorney

**SERVICE LIST**

John J. Uustal, Esq.
jju@kulaw.com
Jordan M. Lewis, Esq.
jml@kulaw.com
Michael A. Hersh, Esq.
mah@kulaw.com
Kelly Uustal, PLC
700 S.E. 3rd Ave., Suite 300
Fort Lauderdale, Florida 33316

**Attorneys for Plaintiff**

Fredrick H.L. McClure
fredrick.mcclure@dlapiper.com
J. Trumon Phillips
trumon.phillips@dlapiper.com
DLA PIPER LLP (US)
100 North Tampa Street, Suite 2200
Tampa, FL 33602-5809

Joel A. Dewey
Joel.dewey@dlapiper.com
Jeffrey Yeatman
jeffrey.yeatman@dlapiper.com
DLA PIPER LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209-3600

**Attorneys for Defendant**

Fred J. Fresard
ffresard@dykema.com
DYKEMA GOSSETT PLLC
39577 Woodward Avenue
Suite 300
Bloomfield Hills, Michigan 48304

**Attorney for Defendant**

Paul V. Lankford
plankford@lclaw.com
Lankford Crawford Moreno & Ostertag LLP
1850 Mt. Diablo Boulevard, Suite 600
Walnut Creek, California 94596

**Attorney for Defendant**

Janet L. Conigliaro
JConigliaro@Dykema.com
DYKEMA GOSSETT PLLC
400 Renaissance Center
Detroit, Michigan 48243

**Attorneys for Defendant**

-22-