UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-61344-CIV-DIMITROULEAS

Angela Sanchez-Knutson,

    Plaintiff,
vs.

Ford Motor Company,

    Defendant.
_____/

## **OMNIBUS ORDER ON *DAUBERT* MOTIONS**

THIS CAUSE is before the Court on Defendant Ford Motor Company's Motions in Limine to Exclude the Testimony of David Renfroe, David G. Penney, and Steven Gaskin, filed herein on February 15, 2016. [DE's 178, 180, 182]. The Court has carefully considered the Motions, Plaintiff Angela Sanchez-Knutson's Responses [DE's 190, 191, 192], Defendant's Replies [DE's 196, 198, 200], the documents and exhibits filed in the record, argument by counsel at the March 25, 2016 hearing, and is otherwise fully advised in the premises.

The relevant background facts have been set forth in the Court's October 7, 2014 Order Denying Ford's Motion to Dismiss, *see* [DE 33], and the Court's October 7, 2015 Order Granting in Part and Denying in Part Plaintiff's Renewed Motion for Class Certification, *see* [DE 148], and need not be repeated herein. Defendant has raised arguments to exclude each of these three witnesses under *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence (the "Rules"). The Court will first set forth the applicable legal standards governing the admissibility of expert testimony and will then consider each expert witness in turn.

1

**A.     Legal Standard**

Rule 702,[1] as explained by *Daubert* and its progeny, governs the admissibility of expert testimony. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "Under Rule 702 and *Daubert*, district courts must act as 'gatekeepers' which admit expert testimony only if it is both reliable and relevant." *Rink*, 400 F.3d at 1291 (quoting *Daubert*, 509 U.S. at 589). Expert evidence is reliable and relevant—and, therefore, admissible—when the following factors are met:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches her conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id*. (internal quotations omitted). The party offering the expert must prove admissibility—under these three prongs—by a preponderance of the evidence. *Daubert*, 509 U.S. at 1292.

Under the first prong, "experts may be qualified in various ways." *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Therefore, "[w]hile scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *Id.* at 1260-61. "The qualification standard for expert testimony is 'not stringent,' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.'" *Kilpatrick v. Breg, Inc.*, No. 08-10052-CIV, 2009

---

[1] Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

WL 2058384, at *3 (S.D. Fla. June 25, 2009) (quoting *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 585 (N.D. Fla. 2009)).

Under the second prong, courts have set forth the following list of *nonexclusive* factors to assist in determining whether an expert's methodology is reliable: "(1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Rink*, 400 F.3d at 1291 (citing *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "Notably, however, these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech*, 326 F.3d at 1341. When determining whether a party has met its burden, "[a] trial judge has 'considerable leeway' in deciding how to determine when a particular expert's testimony is reliable and how to establish reliability." *Coconut Key Homeowners Ass'n, Inc. v. Lexington Ins. Co.*, 649 F. Supp. 2d 1363, 1371 (S.D. Fla. 2009) (quoting *Graff v. Baja Marine Corp.*, 310 F. App'x 298, 302 (11th Cir. 2009)). Accordingly, "[t]o the extent that expert opinions are derived from literature review, witness interviews and data analysis, they are not automatically rendered unreliable by their non-susceptibility to empirical verification." *United States v. Levinson*, No. 10–80166–CR, 2011 WL 1467225, at *4 (S.D. Fla. Mar. 17, 2011) (citing *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir.2009)).

Under the third prong, "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262-63. "[W]here an expert opinion has a tendency to confuse the trier of fact, it may not satisfy the helpfulness prong." *J.G.*

*v. Carnival Corp.*, No. 12–21089–CIV, 2013 WL 752697, at *4 (S.D. Fla. Feb. 27, 2013) (citing *Frazier*, 387 F. 3d at 1263). Moreover, to assist the trier of fact, "'[e]xpert testimony must be relevant to the task at hand, . . . *i.e.*, that it logically advances a material aspect of the case.'" *Coral Way, L.L.C. v. Jones*, No. 05-21934-CIV, 2006 WL 5249734, at *2 (S.D. Fla. Oct. 17, 2006) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)).

**B.     David Renfroe**

Plaintiff has proffered the expert testimony of David Renfroe ("Renfroe"), a mechanical engineer[2] with experience in the area of vehicle design and manufacturing, for the purpose of testifying about an alleged defect in Ford Explorers 2011-2015 that allows exhaust fumes with carbon monoxide to enter the passenger cabin of the vehicles under certain driving conditions and when the air-conditioning is on certain settings. Renfroe's expert report describes how he conducted tests on Plaintiff's Ford Explorer, and other 2011-2015 Ford Explorers. Renfroe details his testing on the subject vehicles for air/gas leakage into the vehicles, pressure differentials between the inside and outside rear of the vehicles, and carbon monoxide accumulation inside the vehicles.

Ford takes issue with the reliability and repeatability of Renfroe's tests, including the chosen sample class and various aspects of the testing methodology. The Court agrees with Plaintiff that these challenges as to Renfroe's testing go to the weight of the testimony, not the admissibility, and are properly addressed through cross-examination and the presentation of contrary evidence at trial. *See, e.g.*, *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 844 (11th Cir. 1983) (holding that alleged deficiencies, including poor sampling, inexperienced interviewers, poorly designed questions, and other errors in execution, affected the weight of a proffered survey, and not its admissibility).

---

[2] Renfroe received a bachelor of science in mechanical engineering in 1972, and a Masters and Ph.D. in mechanical engineering in 1979 and 1981, respectively.

Ford also argues that Renfroe's opinion should be excluded because his conclusions have no valid connection to the present case. The Court disagrees. That Renfroe's testing purportedly demonstrates additional driving conditions in which exhaust fumes infiltrate the interiors of the subject Ford Explorers is not fundamentally inconsistent with the defect theory in this case. Additionally, Renfroe's tests and conclusions appear similar to those conducted by Ford and its experts.

Lastly, Ford argues that some of Renfroe's proffered testimony is outside of Renfroe's area of expertise, and thus should be excluded. The Court, having examined Renfroe's credentials in light of the subject matter of his proposed testimony, agrees that Renfroe should not be permitted to testify as to the matters of diminution in value, toxicology, and the costs of replacing an HVAC system. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (explaining "the expert [must be] qualified to testify competently regarding the matters he intends to address").

Based upon the foregoing, the Court will allow Renfroe's proffered expert testimony, except as to the issues of diminution in value, toxicology, and the costs of replacing an HVAC system.

## C.    David Penney

Plaintiff has proffered the expert testimony of David G. Penney ("Penney"), an author and researcher on the effects of carbon monoxide ("CO")[3], for the purpose of testifying about the effects of CO at varying levels of exposure. Penny intends to testify that it is his opinion that the World Health Organization ("WHO") and the U.S. Environmental Protection Agency ("EPA") standards should apply to the permissible amount of CO exposure in the subject Ford Explorers.

---

[3] Penney has written and published 75 research papers on carbon monoxide, 65 in peer-reviewed journals.

5

Ford primarily argues that Penney's opinions are speculative and unreliable because Penney adopts a "zero CO exposure level" as the permissible level of CO exposure that should be allowed in Ford Explorers. However, a reading of Penney's November 13, 2015 Expert Report reveals that Penney does not advocate such a standard. *See* [DE 181-2]. Rather, Penney's report merely mentions that recent prospective clinical studies have hinted that a lower standard may evolve in future science. *Id.* at p. 9; p. 11 at ¶ 13. Penney clearly states his expert opinion that exposure to CO greater than the WHO and EPA standards inside a 2011-2015 Explorer produces an unacceptable level of risk of health harm. *Id.* at p. 11 at ¶¶ 7-9. Thus, Ford's numerous arguments regarding Penney's supposed position that the proper standard is a zero CO exposure level are inapposite.

Additionally, Ford takes issue with the fact that Penney did not conduct any testing. However, Penney's opinion that the EPA and WHO standards should apply to Ford Explorers does not require testing. Further, Penney's opinion is limited to what CO levels are acceptable in the Ford Explorers, not to determining whether the Explorer testing data shows that the subject Explorer vehicles' CO levels exceed those levels.

Ford also contends that Penney's opinion should be excluded because Penney and his wife own a 2015 Ford Explorer and because Penney stated in his deposition that he does not feel at greater risk than other vehicles that he owns. Plaintiff points out that Penney continued in his deposition to explain that the reason he is not concerned is because he is "a light foot" and "drive[]s too slow" and thus that he would not expect that his driving patterns would induce CO to enter the vehicle. Moreover, this type of impeachment/credibility challenge goes to the weight the jury may attribute to his testimony, not to the admissibility of his opinion.

Based upon the foregoing, the Court will allow Penney's proffered expert testimony.

6

**D.      Steven Gaskin**

Plaintiff has proffered the expert testimony of Steven Gaskin ("Gaskin")[4], an expert in the fields of market research and marketing science models[5], for the purpose of testifying about the results of the conjoint analysis survey he developed and analyzed, which purports to demonstrate that the Explorers' value was diminished by 46.7% when test-takers (comprised of 413 self-identified owners or lessors of a 2011-2015 Explorer) were asked to consider a vehicle for which "[a]ccelerating with max AC may lead to the smell of exhaust gases entering the cabin."[6]

Ford challenges Gaskin's methodology, including but not limited to Gaskin's use of a national sample rather than a Florida sample, his combining of lessors and purchasers into one survey group, the variables he used, and the descriptions of those variables. These arguments go to the weight of the survey, not its admissibility, and may be addressed by cross-examination and the presentation of contrary evidence at trial:

> To the extent Defendants believe Gaskin's analysis should have included additional factors or that it does not adequately explain the conclusions Gaskin reached, "[d]irect and cross-examination, testimony by supporting and opposing witnesses, and argument by plaintiff and defense counsel will provide the additional guidance 'needed to justify the inferences' the parties seek to draw from [Gaskin]'s survey." Id. The Court will allow Gaskin to testify to his conclusions reached by applying a conjoint analysis, and Defendants may cross-examine Gaskin to attempt to address the weaknesses they perceive in his analysis.

---

[4] At the class certification stage of this litigation, the Court accepted Gaskin's proposed conjoint analysis damages model, overruling Ford's objections. *See* [DE 148].

[5] Gaskin has worked in the fields of market research and marketing science models since 1982, has authored numerous articles and papers in peer-reviewed publications such as Marketing Science, Management Science and Journal of Marketing Research. Gaskin is a member of the Institute for Operations Research and Management Science. He received his bachelor's of science degree and his master of science degree from the Massachusetts Institute of Technology.

[6] Plaintiff's counsel proffered at oral argument that Gaskin does not intend to testify about the result that there is a 66.7% reduction in value when the cabin air quality was described in the survey as "dangerous." Therefore, the Court will not address Ford's argument as to this opinion.

*Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1083 (D. Minn. 2015), *as amended* (Apr. 15, 2015) (allowing Gaskin to testify about his conjoint analysis survey). *See Jellibeans*, 716 F.2d at 844. For instance, Gaskin could explain in cross-examination that he chose a nationwide sample in order to have a sufficient number of test-takers, and/or that the uncertainty presented in the descriptors over the likelihood of occurrence of the proposed defects, the warranty coverage of the defects and the reparability of the defects was designed to reflect the experience of many class members in this action.

Further, Ford argues that Gaskin's conjoint analysis model does not take into account whether Ford would be willing to sell the allegedly defective vehicle at reduced prices, but instead focuses on the purchasers' side with regard to the diminished value of the allegedly defective vehicles. Ford contends that this damages model results in speculative damages, rather than actual damages, which is impermissible under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201–501.213 ("FDUTPA").

> "As a general rule, the measure of actual damages under [FDUTPA] is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered." 10A Fla. Jur.2d Consumer and Borrower Protection § 172 (2009); *accord Rollins*, 951 So.2d at 869; *Eclipse Med. v. Am. Hydro–Surgical Instruments*, 262 F.Supp.2d 1334, 1357 (S.D. Fla. 1999). "Florida courts have allowed diminished value to serve as 'actual damages' recoverable in a FDUTPA claim." *Collins v. DaimlerChrysler Corp.*, 894 So.2d 988, 990 (Fla. 5th DCA 2004). In addition, "actual out of pocket losses" are not a prerequisite to a deceptive trade practices action in Florida. *Id.* at 990. However, "FDUTPA does not provide for the recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Rollins*, 951 So.2d at 873.

*Smith v. Wm. Wrigley Jr. Co.*, 663 F.Supp.2d 1336, 1339 (S.D. Fla. 2009). A similar theory of FDUTPA damages was allowed by the Florida Fifth District Court of Appeal in *Collins v. DaimlerChrysler Corp.*, 894 So.2d 988, 990 (Fla. 5th DCA 2005). In *Collins*, the plaintiff

asserted a FDUTPA claim to recover the diminution in the value of her vehicle caused by an alleged unmanifested seat belt defect.  The trial court dismissed her claim, holding that plaintiff had failed to demonstrate that she had suffered a loss compensable under FDUTPA. The Florida appellate court reversed, explaining that FDUTPA allows for this type of damages:

> We see no requirement in FDUTPA that a defect manifest itself by failing to operate in an emergency or by causing injury. Under the facts asserted in this case, Collins has alleged more than a possible injury. She claims an actual injury in the form of insufficient product value. In other words, she contends that she did not get what she bargained for. Whether her allegations have merit remains to be decided.

*Collins*, 894 So. 2d at 990-91.  Applying the reasoning of *Collins* to the present action, the Court finds Gaskin's approach permissible for determining actual damages in the FDUTPA context.

Additionally, Ford argues that the $45,000 purchase price for Ford Explorers was arbitrarily chosen, since Gaskin does not know what any individual class member paid for the vehicle.  However, Plaintiff explains that Gaskin intends to testify regarding his conjoint analysis results for diminution in value as a percentage of the value of an Explorer.  Plaintiff cites to voluminous pricing evidence provided by Ford in the course of discovery which it plans to present at trial, so that the jury can apply Gaskin's conjoint analysis to the class.

Ford also challenges Gaskin's opinion because his conjoint analysis survey results are not accompanied by an econometrical analysis, such as a hedonic regression analysis of actual market data.  Courts should consider whether to allow or prohibit individual expert damage analyses, based on the merits of those proposed analyses. *See, e.g.*, *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *11 (C.D. Cal. July 24, 2014) (for purposes of a classwide calculation of damages, district court accepted a conjoint analysis but rejected a regression analysis).  However, there is no requirement that a conjoint analysis is inadmissible unless accompanied by a separate economic regression analysis.  Ford emphasizes that there is an active secondary market for

9

Explorers, which it contends shows successful sales of used 2011-2015 Explorers with no indication of decreased value. Ford may present this evidence to the jury in attempt to refute Plaintiff's damages evidence; it is not grounds to exclude Gaskin's opinion.

Based upon the foregoing, the Court will allow the introduction at trial of Gaskin's proffered expert testimony.

E.     Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion in Limine to Exclude the Testimony of David Renfroe [DE 178] is **GRANTED in part and DENIED in part**;

2. Defendant's Motion in Limine to Exclude the Testimony of David G. Penney [DE 180] is **DENIED**;

3. Defendant's Motion in Limine to Exclude the Testimony of Steven Gaskin [DE 182] is **DENIED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 5th day of April, 2016.

*[signature]*
WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:
Counsel of record