IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Angela Sanchez-Knutson, individually
and on behalf of all those similarly
situated,                                              CASE NO.  14-cv-61344 WPD

          Plaintiff,

v.

Ford Motor Company,

          Defendant.

_____

**PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT**

**MOTION**

Named plaintiff Angela Sanchez-Knutson, by and through her undersigned counsel,

moves this Court under authority of Fed. R. Civ. P. 23(e) for an order that approves a

national class action settlement with defendant Ford Motor Company for claims arising out

allegations concerning leakage of exhaust in certain models of the Ford Explorer. The

claims were litigated in this Court up to the final weekend before jury trial was to

commence, and their strengths and weaknesses were fully vetted. (Plaintiff's motion for an

award of attorneys' fees and costs and for the award of class representative awards was

filed in May in accord with the Court's preliminary approval order.)

In addition, Sanchez-Knutson seeks an order rejecting the two filed objections to the

settlement. And finally, because the objections are meritless and because of nature of the

settlement – where the value of class members' settlement claims depends, in part, on the

age and number of miles driven on their Explorers – Sanchez-Knutson seeks an order

requiring a bond if either of the objectors seeks an appeal of this Court's approval.

1

## INCORPORATED SUPPORTING MEMORANDUM

### I.    INTRODUCTION

"There is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex."[1] Further, "[s]ettlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, and achieve the speedy resolution of justice, for a just result is often no more than an arbitrary point between competing notions of reasonableness."[2] Accordingly, "[a] class action settlement … should be approved so long as it is fair, adequate and reasonable and is not the product of collusion between the parties."[3]

On the merits, this case easily warrants the "most complex" descriptor referenced above.  It involves claims that Ford Explorers, model years 2011-2015, are prone to leak exhaust through tiny holes and fissures when the cars are (a) accelerated hard while (b) the cars' air conditioning is set to maximum and "recirculate." Sanchez-Knutson contends, with supportive expert testimony, that the defect exists (usually undetected by the owner/lessee) in every Explorer as it comes off the production line and radically diminishes the vehicles' value. Ford argues, also with the aid of expert testimony, that the defect – if it exists at all – is found in a tiny percentage of these vehicles, is almost always fixed by the work prescribed in its service bulletins, has had no effect at all on the cars' value, and further that the exhaust levels never reach any known dangerous levels inside the passenger cabins.

---

[1] *Association for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002) (citation omitted).
[2] *Perez v. Asurion Corp.*, 501 F. Supp.2d 1360, 1379 (S.D. Fla. 2007) (quoting *Behrens v. Wometco Enters., Inc.,* 118 F.R.D. 534, 538 (S.D. Fla. 1988)).
[3] *Disabled Ams.*, 211 F.R.D. 457, at 466 (citations and quotation omitted).

The legal issues are as complex as the facts. This case involves such difficult legal problems as manifestation of defect; admissibility of conjoint analysis; and the post-*Comcast* class certification issues.

For 26 months, Sanchez-Knutson, on her own behalf and on behalf of a certified class, litigated – mostly successfully - these and other complexities.  With less than 72 hours before the commencement of a planned two-week jury trial, she and Ford negotiated a term sheet that was eventually converted into a settlement agreement whose "fairness" is now before this Court. If this Court grants final approval, a settlement that will motivate Explorer owners and lessees to get their cars fixed will be put into motion.

## II.    SETTLEMENT SUMMARY

The *first* element of the settlement is the dissemination of information to Explorer owners and lessees about the potential problem.[4] This took the form of a mailed notice to 1,210,675 persons in March 2017.[5] Among other things, the notice directs recipients to a lawsuit-related website[6] on which is posted a new 2016 Technical Service Bulletin[7] issued by Ford that details how it believes the exhaust problem can be fixed.  The 2016 TSB has two parts – the first mostly restates (with more detail) the fix outlined in its 2014 TSB. The second describes a much more significant and new repair. Only those Explorers (1) with a normally aspirated 3.5-liter Twin Independent Variable Camshaft Timing and (2) whose emission problem is not solved by the first half of the 2016 TSB repair are eligible for the second half of the 2016 TSB repair. According to Ford, 699,468 of the 840,608 Explorers

---

[4] **Lewis 5/3/2017 Decl., Att. A, § IIa (p. 11).**

[5] *Id.*

[6] www.explorerexhaustsettlement.com

[7] **Lewis 5/3/2017 Decl., Att. B.**

owned or leased by class members (or 83.2%) have the engine type eligible for the second half of the 2016 TSB.[8] Those class members whose cars are within warranty and who are experiencing exhaust odor will, of course, be able to immediately take advantage of the new fix described in the 2016 TSB at no cost to them.

*Second*, those class members whose warranties have expired but who can demonstrate that they attempted to fix a diagnosed exhaust smell at an authorized Ford dealer during the warranty period will be entitled to a subsidized post-warranty repair if they are still experiencing exhaust odor. The maximum permitted reimbursement for this repair is $175 for the first half of the TSB and $500 for the second half of the TSB.[9] They will have the later of 4 years/48,000 miles after their vehicle was placed into service or 60 days beyond the effective date of the settlement to present their vehicles to an authorized Ford dealer for repair.  The settlement provides reimbursement for up to two such repairs.

*Third,* those class members who did <u>not</u> complain of their Explorers' exhaust smell within warranty but who are now experiencing exhaust odor will be entitled to a subsidized post-warranty repair with a reimbursement capped at $175 for each of the two repairs described in the 2016 TSB.[10] They will have the later of 60 days after the effective date of settlement or 60 days after the expiration of the warranty period to present their vehicles to an authorized Ford dealer for repair.

*Fourth*, class members who received an exhaust odor repair under warranty, and are still experiencing exhaust odor after the repairs described in the 2016 TSB are performed will have the right, after a minimum of  two repair attempts by the authorized

---

[8] *Id.*
[9] *Id.*, Att. A, § IIb, at p. 12.
[10] *Id.*

dealer, to a no-cost (to them) appellate procedure. They will be eligible to present their

claim before a mediator/arbitrator selected by the Better Business Bureau. Participants

will be entitled to seek <u>all</u> of their unreimbursed TSB repair costs at the BBB and/or,

potentially, a buyback of their vehicle. In exchange for making this process mandatory from

which neither party has the right of appeal, Ford has waived certain statute of limitations

defenses and its defense that the exhaust odor is allegedly caused by a design defect which

is not covered by its warranty.[11]

### III.   THE SETTLEMENT WARRANTS FINAL APPROVAL

**A.   Legal standard**

In *Bennett v. Behring Corp.,*[12] the 11th Circuit articulated the following standard to

determine whether a class action settlement is fair, adequate, and reasonable:

> (1) the likelihood of success at trial;
> (2) the range of possible recovery;
> (3) the point on or below the range of possible recovery at which a settlement is fair,
> adequate and reasonable;
> (4) the complexity, expense and duration of litigation;
> (5) the substance and amount of opposition to the settlement; and
> (6) the stage of proceedings at which the settlement was achieved.[13]

"In evaluating these considerations, the district court should not try the case on the

merits."[14] Instead, "the district court may rely upon the judgment of experienced counsel

for the parties," and "[a]bsent fraud, collusion, or the like, the district court should be

hesitant to substitute its own judgment for that of counsel."[15]

In addition to a consideration of the *Bennett* factors, courts within the 11th Circuit

---

[11] ***Id.*, IId, at 14.**
[12] *Bennett v. Behring Corp.,* 737 F.2d 982 (11th Cir. 1984).
[13] *Id.* at 986.
[14] *Perez*, 501 F. Supp.2d at 1380 (citations and quotations omitted).
[15] *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed Appx 429, 434 (11th Cir. 2012).

must also determine whether the settlement was the production of collusion.[16] All of these issues are discussed below.

**B.      The settlement is the product of good-faith arms-length negotiation**

"There is a presumption of good faith in the negotiation process. Where the parties have negotiated at arm's length, the Court should find that the settlement is not the product of collusion."[17]

The negotiations in this case were overseen by Rodney A. Max, "a highly respected mediator … one of the top mediators in Florida  … [and] probably one of the top mediators in the country."[18] Max has submitted a declaration supporting final approval that attests to the procedural fairness of the mediation process.[19] This sworn testimony attesting to the arms-length and good-faith negotiation is unrebutted, and supports final approval.

**C.      Plaintiffs' significant trial and appellate obstacles warrant final approval**

In assessing the first *Bennett* factor, "[t]he likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement."[20] The Court is "not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial."[21]

---

[16] *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014)("This Court must thus determine whether the settlement was a product of collusion. It will then turn to an analysis of the *Bennett* factors.").
[17] *Id.*
[18] *Lee v. Ocwen Loan Servicing, LLC*, 2015 U.S. Dist. LEXIS 121998, *33 (S.D. Fla. Sept. 14, 2015).
[19] **Max Decl.**
[20] *Lipuma v. American Express Co.*, 406 F. Supp.2d 1298, 1319 (S.D. Fla. 2005).
[21] *Gevaerts v. TD Bank, N.A.*, 2015 U.S. Dist. LEXIS 150354, *16 (S.D. Fla. Nov. 2015)(citations and quotations omitted).

Even at this late stage of the litigation, there are myriad of unresolved issues, both at the trial stage and on appeal, that satisfy this first *Bennett* factor. Damages is just one example. Sanchez-Knutson's damages methodology would be an issue ripe for appellate review, along with the timing of her damage disclosure and the use of a non-expert in applying the conjoint methodology to certain Ford databases. Moreover, the *amount* that Sanchez-Knutson's damages model rendered was going to be a significant trial problem, as it appeared to her counsel that the conjoint methodology could be discredited because it rendered, roughly $500 million in damages for the Florida class, a number a jury seemed unlikely to award.

### D.      The settlement is within the range of possible recovery

Courts combine the second and third *Bennett* factors by determining "the possible range of recovery" and then determining "where in this range of possible recovery do fair, adequate and reasonable settlements lie."[22]

The appropriate measure of damages in a case brought under the Florida Unfair and Deceptive Trade Practices Act "is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered."[23] At the far end of the possible range of recoveries is plaintiff's damage theory, supported by her conjoint analysis. Based on that theory, which is a sort of sophisticated internet sampling of other Explorer owners and lessees, plaintiff intended to request from the jury hundreds of millions of dollars in class damages. At the other end of the range was Ford's position, which was essentially that the class's damages,

---

[22] *Behrens v. Wometco Enters. Inc.*, 118 F.R.D. 534, 541 (S.D. Fla. 1988).
[23] *Sanchez-Knutson v. Ford Motor Company*, 181 F. Supp.3d 988, 995 (S.D. Fla. 2016)(internal quote marks and citations omitted).

even if liability was demonstrated, was $0. Ford had expert witnesses who had surveyed

the auction sale value of class vehicles and found no depreciated value whatsoever. This

finding, Ford maintained, was consistent with its internal warranty claim records, which

showed roughly 1% of Explorers owners/lessees complained to their dealers about the

exhaust smell within warranty, and of those who sought warranty repair, the

overwhelming majority didn't return for a second repair. In other words, a huge range of

damages was in play, and there was no way to know what a jury would do:

> In the battle of experts, it is virtually impossible to predict with certainty which testimony will be credited. Plaintiffs, therefore, would face great difficulty in establishing any damages…. The mere fact that the proposed settlement []is a small fraction of the desired recovery []is not indicative of an inadequate compromise. A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery. The settlement in this case affords a material percentage recovery to the plaintiff class in light of all the risks of litigation.[24]

## E.   The complexity, expense and duration of continued litigation

The fourth *Bennett* factor "weighs in favor of settlement approval where the

litigation, including the appellate process, involves numerous class members and

significant time and expense."[25] This factor is further supported where "[t]he claims and

defenses are complex; litigating them has been difficult and time consuming … [and]

recovery by any means other than settlement would require additional years of litigation in

this Court and the appellate courts."[26]

Plaintiff (and counsel) were in an unusually complex situation when this case

settled. They had survived 26 months of bare-knuckled litigation against a host of high-

---

[24] *Behrens*, 118 F.R.D. at 542-43 (internal quote marks and citations omitted).
[25] *Morgan v. Public Storage*, 2016 U.S. Dist. LEXIS 54937, *18 (S.D. Fla. March 9, 2016).
[26] *Torres v. Bank of America*, 830 F. Supp.2d 1330, 1345 (S.D. Fla. 2011).

profile defense law firms, and were less than three days away from a two-week jury trial. But they were not near the end of the litigation. While the Florida case was mature, the companion cases in New York, New Jersey, Texas, California, Ohio and North Carolina were literally just beginning. Plaintiffs, who spent nearly $700,000 in out-of-pocket costs *alone* in Florida,[27] could expect to spend hundreds of thousands of dollars in each of the companion cases simply to get them to the same posture as the Florida case when it settled. As with the other *Bennett* factors, this supports final approval.

F.    **The class supports the settlement**

"In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor…. [A] low percentage of objections points to the reasonableness of a proposed settlement and supports its approval."[28] This factor also supports approval where the objections "lack … substance."[29] Out of 1,210,675 class notices mailed, a total of 86 valid opt-outs were received, representing a total of 399 class vehicles[30] (another 23 attempted opt-outs were received containing various material deficiencies in their papers). In addition, two purported objections, on behalf of three class members, were filed. This is tiny percentage is a strong endorsement of the settlement.

Additionally, courts look to the opinions of class counsel and the class representatives under this factor.[31] Class counsel, strongly endorse the settlement because it confers substantial benefits on the class and is in the best interest of the class

---

[27] **Uustal 6/1/2017 Decl.**
[28] *Lipuma*, 406 F. Supp.2d 1298, at 1324.
[29] *Perez*, 501 F. Supp.2d 1360, at 1382.
[30] **Lucchesi Decl.** (attached to Ford submissions).
[31] *Wilson v. Everbank*, 2016 U.S. Dist. LEXIS 15751, *21 (S.D. Fla. Feb. 3, 2016).

representatives and the class as a whole.[32] The class representative, who closely

supervised this litigation, similarly endorses the settlement.[33]

### G.    The settlement was achieved at the eve of trial

"The last *Bennett* factor is the stage of the proceedings at which [s]ettlement was

achieved."[34] The reason: "A court evaluates the stage of the proceedings at the time of

settlement to ensure that the plaintiffs have access to sufficient information to adequately

evaluate the merits of the case and weigh the benefits of the settlement against further

litigation."[35] Here, the parties reached a signed term sheet less than 72 hours before trial

was to commence. At this stage, there were no secrets; the parties knew their own, and

each other's, strengths and weaknesses. This factor strongly favors approval.[36]

### IV.    THE TWO OBJECTIONS SHOULD BE OVERRULED

### A.    Legal standard

Where, as here, "the consent decree previously has been preliminarily approved, the

decree is 'presumptively reasonable,' and an objector must overcome a 'heavy burden' to

prove the settlement unreasonable."[37] "[A] small number of objectors from a plaintiff class

of many thousands is strong evidence of a settlement's fairness and reasonableness."[38]

---

[32] **Lewis 6/7/2017 Decl.; Uustal 6/7/2017 Decl.**
[33] **Sanchez-Knutson Decl.**
[34] *Oakes v. Blue Cross & Blue Shield of Florida, Inc.*, 2016 U.S. Dist. LEXIS 147252, *5 (S.D. Fla. Oct. 21, 2016).
[35] *Perez*, 501 F. Supp.2d at 1383.
[36] *See, e.g., Morgan*, 2016 U.S. Dist. LEXIS 54937, *22 ("Because the case settled two days prior to trial, Class Counsel had completed substantial briefing on the merits, prepared for trial, engaged in voluminous discovery, and reviewed thousands of anticipated trial exhibits.  Additionally, Plaintiff deposed dozens of potential trial witnesses. This factor strongly favors final approval of the Settlement.")(internal citation omitted).
[37] *Disabled Ams.*, 211 F.R.D. at 467 (citations and quotations omitted).
[38] *Id.* (citations and quotations omitted).

In this matter, there are two purported objections filed on behalf of three purported class members. They are, pure and simply, meritless; the Court should reject them outright.

This brief will address first the Canales objection and then the Schiesser objection. Where there are overlapping arguments, they will be addressed in a final section, below.

**B.**     **Canales**

### 1.     *Standing*

The objection of Gabi Canales is flawed by the strategic mistakes of her lawyer, Christopher Bandas, of Bandas Law Firm, PC, Corpus Christi, TX. (Though Bandas is not a signatory to any pleading, he is identified as Canales's "general counsel in objecting to the settlement."[39])

The Court's preliminary approval order required, among other things, that objectors and their lawyers list all class action cases in the preceding five years in which they had previously filed objections.[40] Canales intentionally failed to do so, and her failure forms the basis of her first objection, as she contends that this requirement – that her lawyers disclose how many cases over the preceding five years they've filed objections – offends due process.[41] But how? None of the cases cited by Canales supports this claim. Why shouldn't an objector - who seeks to, in effect, represent a class by undoing a settlement - be subject to the same kind of demand required of class counsel, who must demonstrate "adequacy" under Fed. R. Civ. P. 23 by proving up their own "*bona fides*"?

A few minutes on LEXIS explains the reason (a) behind Canales's argument and (b)

---

[39] Canales Obj., Docket Entry #457, at 3.
[40] Prelim. Order, Docket Entry #434, ¶ 17e.
[41] Canales Obj., Docket Entry #457, at 4 ("As a preliminary matter, the settlement and requested attorneys' fees cannot be approved because the content of the Class Notice infringes upon Class Members' due process rights to object to the settlement.").

why such a requirement is appropriate. According to LEXIS, Bandas is listed as an objector

or as objector's counsel in dozens of published cases.  His meritless objections are often the

subject of published decisions. An example:

> This Court joins the other courts throughout the country in finding that
> Bandas has orchestrated the filing of a frivolous objection in an attempt to
> throw a monkey wrench into the settlement process and to extort a pay-
> off. His plan was thwarted when the Court permitted discovery to proceed
> on the sanctions motions, which ultimately, apparently, created more risk
> for Bandas than he was prepared to endure. Hull testified that in Bandas'
> numerous representations of him in objections to class action settlements,
> Hull has *never* received funds from the settlement of any of his objections,
> whereas Bandas has. That testimony, if true, is gravely concerning. It
> indicates that Bandas' settlement of objections has been without *any*
> benefit to his client, Hull, or to the class, supporting the conclusion that
> many, if not most, of the objections being raised by Bandas are not being
> pursued in good faith. Ultimately, Bandas wasted a substantial amount of
> judicial time and effort, without any benefit to Hull or to the class.[42]

To confirm the LEXIS search, Bandas is listed as an objector in 69 cases – the most

recorded – at www.serialobjector.com. This is exactly the sort of context that, at minimum,

informs the Court, the parties, and the class as to the quality and motive behind the Canales

objection.

It should not be surprising that Bandas's argument – that objectors should not have

to disclose their prior record of objections – has been rejected by cases <u>in which he</u>

<u>objected</u>:

> Finally, attorney disclosures serve the purpose of providing basic
> information to both the parties and the Court regarding the lawyers'
> experience and background. The objectors provide no authority indicating
> why it is unfair to provide this Court and counsel with full knowledge about
> the record and experience of the objectors' counsel. Additionally, class
> counsel are required to provide this same information. Accordingly, the
> objections regarding any chilling effect the settlement may have are

---

[42] *Garber v. Office of the Commissioner of Baseball*, 2017 U.S. Dist. LEXIS 27394, *39 (N.Y.S.D. Feb. 17, 2017).

overruled.[43]

In the case quoted above, Bandas provided the required information; here, Bandas has not. The Court should not credit Canales with a valid objection.[44]

### 2.    The fee petition properly relies on potential value

The standing issue is dispositive, but if the Court wishes to go further, the Canales arguments are meritless. Start with this complaint: "Class counsels' fee motion … relies on *potential* settlement value.  The *actual* settlement value is certain to be lower."[45] The problem: That – the potential settlement value – is exactly how the case is to be valued: "This is so because a settlement's fairness is judged by the opportunity created for the class members, not by how many submit claims … What matters is the settlement's value to each class member—it is ultimately up to class members whether to participate or not."[46]

### 3.    Counsels' time is properly submitted

The Canales objection – again, to the extent it is credited at all – also raises technical complaints concerning the fee petition. It complains that the Uustal declaration is not

---

[43] *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 316 (W.D. Tex. 2007).

[44] *E.g., Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 830, 855 (E.D. La. 2007).

[45] Canales Obj., Docket Entry #457, at 9.

[46] *Wilson,* 2016 U.S. Dist. LEXIS 15751, *33-34 (internal quote marks and citation omitted.) *Accord*, *Hall v. Bank of America, N.A.*, 2014 U.S. Dist. LEXIS 177155, *23-24 (S.D. Fla. Dec. 17, 2014)("A settlement's fairness is judged by the opportunity created for the class members, not by how many submit claims.  What matters is the settlement's value to each class member — it is ultimately up to class members to participate or not. ")(internal citation omitted); *Hamilton v. SunTrust Mortg., Inc*., 2014 U.S. Dist. LEXIS 154762, *15 (S.D. Fla. Oct. 24, 2014)("The question for the Court at the Final Fairness Hearing stage is whether the settlement provided to the class is 'fair, reasonable, and adequate,' not whether the class decides to actually take advantage of the opportunity provided."); *Lee*, 2015 U.S. Dist. LEXIS 121998, *556 ("A settlement's fairness is judged by the opportunity created for the class members, not by how many submit claims.")(internal quote marks and citation omitted).

properly signed,[47] a concern that has been corrected.[48] (This corrected declaration is identical to the earlier one except for the few missing characters on the signature line and a footnote explaining that other than that change the declarations are the same.)

Canales complains that the lodestar time isn't allocated between successful and unsuccessful claims.[49] But the problem is that this approach – not allocating the time - is consistent with FDUTPA law: "For such a circumstance there is ample authority under Florida law that supports DRC's claim for recovery of FDUTPA fees where similar, intertwined claims were also presented to the jury."[50]

Canales contends that there isn't enough detail presented in the lodestar submissions, which – according to Canales – is made more worrisome "[c]onsidering the number of firms and attorneys seeking compensation."[51] Three points: *First*, to the extent that more detail is necessary, counsel is happy to supply it. But, particularly given the transparent motive of Canales's lawyers, this sort of complaint must be understood for what it is – an obvious attempt to mine time sheets to find nits and then hold up a settlement. *Second*, while counsel have submitted their fees as a lodestar, it isn't obvious that their fees shouldn't be considered as a percentage of recovery, in which case the individual entries are even less important. *Third*, Canales fails to recognize that the fee submission represents the fees incurred in a total of <u>eight</u> class cases, though at different stages. In this context, plaintiff's fee request is modest indeed.

---

[47] Canales Obj., Docket Entry #457, at 13.
[48] Docket Entry #461.
[49] Canales Obj., Docket Entry #457, at 14.
[50] *Democratic Republic of the Congo v. Air Capital Group*, 2016 U.S. Dist. LEXIS 137048, *12-13 (S.D. Fla. Sept. 14, 2016).
[51] Canales Obj., Docket Entry #457, at 12.

Finally, Canales argues that the Court should supervise the allocation of the fee award.[52] Why that's appropriate in this case isn't discussed, much less proved, by Canales.

### 4.   *Canales's demand for a negative multiplier is meritless*

Canales's demand for a reduction in fees[53] is premised on an obvious misreading of the law she cites. Canales argues that where "the result was partial or limited success, then the lodestar must be reduced to an amount that is not excessive."[54] This "result" from which the fee request should be considered is, in this context, the settlement and not the litigation that preceded it. Thus, in the single case that Canales cites, the 11th Circuit observed that "[a]fter the lodestar is determined by multiplication of a reasonable hourly rate times hours reasonably expended, the court must next consider the necessity of an adjustment for <u>results obtained</u>."[55] The "results obtained" here is the settlement, a topic that Canales doesn't discuss beyond the fee petition. Canales has framed the wrong issue, and the Court need go no further with this argument.

### C.   **Schiesser/Helton objections**

#### 1.   *Standing*

Neither Schiesser nor Helton have standing here.

Schiesser was the named plaintiff in a copycat lawsuit filed by objectors' counsel in the Northern District of Illinois. His first amended complaint was dismissed in 2016,[56] and his second amended complaint was dismissed *with prejudice* more than a month before counsel filed his objection here.  Schiesser is now out of court and did nothing to preserve

---

[52] Canales Obj., Docket Entry #457, at 19.
[53] Canales Obj., Docket Entry #457, at 15-18.
[54] Canales Obj., Docket Entry #457, at 15 (citation and quote marks omitted).
[55] *Norman v. Housing Authority*, 836 F.2d 1292, 1302 (11th Cir. 1988)(emphasis added).
[56] *Schiesser v. Ford Motor Co.*, 2016 U.S. Dist. LEXIS 149392 (N.D. Ill. Oct. 28, 2016).

his appellate rights. Schiesser's lawyers acknowledge the dismissal in a single sentence[57] but attempt (a) to hide the decision by providing no citation or docket entry to the Court and (b) to qualify the decision by representing that the dismissal was "in part on reliance upon the pendency of the proposed Settlement."[58]

The decision is at *Schiesser v. Ford Motor Co*., 2017 U.S. Dist. LEXIS 53180 (N.D. Ill. April 6, 2017). The Court can see for itself whether counsel has fairly described it.

Schiesser's counsels' candor is the smaller problem. The bigger problem is the effect of the dismissal on Schiesser's ability to object.

If this Court grants Schiesser's motion and rejects the settlement, the parties return to their *status quo ante*.[59] For Schiesser, that is out of court with no rights against Ford. His 3 year/36,000 mile warranty has expired[60] and his other legal claims are dismissed with prejudice, with the right to appeal expired. In this context, Schiesser is without standing:

> Formal objections may only be made by class members. The burden rests with objectors to establish their standing. Simply being a member of a class is not enough to establish standing. One must be an aggrieved class member. One who suffered no injury likely to be redressed by a favorable decision lacks standing.[61]

---

[57] Schiesser Obj., Docket Entry #458, at 4.

[58] *Id.*

[59] *E.g., Hester v. Vision Airlines, Inc*., 2014 U.S. Dist. LEXIS 97172, *15 (D. Nev. July 17, 2014)("In the event that the Settlement is rejected ... the Parties will return to the *status quo ante* before the Settlement Agreement was entered into by them.").

[60] *Schiesser*, 2017 U.S. Dist. LEXIS 53180, *6 ("Schiesser acknowledges that he brought his Vehicle to the dealership for repairs in October 2015, after the Warranty expired, meaning that he must sufficiently allege that the Warranty's time and mileage limitations are unconscionable for the claim to proceed.").

[61] *In re: Cathode Ray Tube (CRT) Antitrust Litig.,* 2016 U.S. Dist. LEXIS 88665, *231-32 (N.D. Cal. July 7, 2016)(internal quote marks and citations omitted).

Helton's standing presents a different problem. Under the terms of the settlement[62]

and the Court's preliminary approval order,[63] class members must be either a current or

former owner or lessee of a 2011-2015 Ford Explorer. Helton is neither. His filing shows

that the Explorer is titled to "Xiomara Secoff Helton"[64] and not to the named objector.

Because he is not a class member, Matthew Helton has no standing to object.[65]

### 2.    The central thrust of the Schiesser/Helton objection is improper

Though the Schiesser/Helton pleading is titled an objection, it actually asks more of

the Court than a rejection of the settlement; it wants the Court to order the parties

(presumably this includes the Schiesser/Helton lawyers) back to mediation to "improve"

the agreement.[66] But that goal – along with the bulk of the Schiesser/Helton objections –

gives away the game. They don't want the Court to reject the settlement; they want to

tinker with its terms.  And that's not a proper basis for objecting to a settlement:

"[O]bjections seeking a 'better' result are not sufficient to overturn a settlement

agreement."[67] Thus,

> [s]ettlement is the offspring of compromise; the question we address is not
> whether the final product could be prettier, smarter or snazzier, but
> whether it is fair, adequate and free from collusion. In this regard, the fact
> that the overwhelming majority of the class willingly approved the offer

---

[62] **Lewis 5/3/2017 Decl., Att. A, § Ix (p. 9).**

[63] **Order, Docket Entry #434, at 2.**

[64] Ex. 2 to Schiesser/Helton Obj., Docket Entry #458.

[65] *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co*., 211 F.R.D. 457, 474 (S.D. Fla. 2002) ("[N]on-class members have no standing to object, pursuant to a Rule 23(e) notice directed to class members, to a proposed class settlement.").

[66] Schiesser/Helton Obj., Docket Entry #458, at 6 ("The Court should command the parties back to mediation to engage in further, arm's length negotiations.").

[67] *Wilson*, 2016 U.S. Dist. LEXIS 15751, *66 (internal quote marks and citations omitted). *Accord*, *Torres*, 830 F. Supp.2d at 1345 ("The Court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from a settlement as they might have recovered from victory at trial.")(internal quote marks omitted).

17

and stayed in the class presents at least some objective positive commentary as to its fairness.[68]

The focus of the Schiesser/Helton objection is improper.

### 3.   *The Schiesser/Helton objections are based on false premises*

While the standing issue is dispositive, the substance of the Schiesser/Helton objection is ruined by its reliance on false premises. One is its complaint that the settlement is the result of a reverse auction,[69] which occurs when a defendant negotiates with a weaker plaintiff over a stronger one.  This argument, is defeated by the fact that the Schiesser/Helton lawyers could not state a *prima facie* claim concerning the Explorer exhaust issue despite three attempts to get it right.

Schiesser/Helton represent to this Court that this is a "coupon settlement,"[70] which is a sloppy mischaracterization. Real dollars and not coupons will go to class members, which means that it is not a coupon settlement. Schiesser/Helton complain that they have no information as to how the class representative award is to be divided.[71] In fact, the proposed division is set forth in the fee petition filed two weeks before the Schiesser/Helton objections were filed.[72] Schiesser/Helton argue that the release is overbroad because – they claim – it discharges personal injury claims[73] when it expressly preserves those claims.[74] Schiesser/Helton assert that "Ford is essentially benefitting from refusing to fix the problem under the warranty for free"[75] when nothing is done in the

---

[68] *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998).
[69] Schiesser/Helton Obj., Docket Entry #458, at 16.
[70] Schiesser/Helton Obj., Docket Entry #458, at 13.
[71] Schiesser/Helton Obj., Docket Entry #458, at 17.
[72] Docket Entry #440.
[73] Schiesser/Helton Obj., Docket Entry #458, at 15.
[74] **Lewis 5/3/2017 Decl., Att. A, § Iu (p. 9).**
[75] Schiesser/Helton Obj., Docket Entry #458, at 2.

settlement to change that obligation. Schiesser/Helton assume that Ford's dealers – who will actually perform the TSB repairs – have an interest in concluding that there is no exhaust problem,[76] when logic and Ford's experience shows that the dealers, who are independent entities, have an interest in performing as many TSB repairs as permitted. Schiesser/Helton represent that "[t]he claims process is to be administered by Ford itself,"[77] when it will be administered by an independent third party, and appeals (the results of which are binding) will be directed to a separate independent administrator.

**D.      The "clear sailing" and "kicker" complaints are meritless**

Both Canales[78] and Schiesser/Helton[79] complain about what they call the "clear sailing" and/or "kicker" attorneys' fee structure. Even assuming that they have fairly characterized the fee proposal, there is nothing improper about it. The following from the 11th Circuit has equal application here:

> []Frank devotes a lot of attention to the settlement's "red flags" of unfairness: the "clear-sailing" and "kicker" clauses relating to class counsel's fees and costs. [] But we conclude that Frank's self-dealing contention is belied by the record: the parties settled only after engaging in extensive arms-length negotiations moderated by an experienced, court-appointed mediator.[80]

**V.      THE COURT SHOULD REQUIRE AN APPEAL BOND**

The Federal Rules of Appellate Procedure authorize a district court to "require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal" and specifically allows a district court to order a bond

---

[76] *Id.*

[77] *Id.* at 3.

[78] Canales Obj., Docket Entry #457, at 9-11.

[79] Schiesser/Helton Obj., Docket Entry #458, at 18.

[80] *Poertner v. Gillette Co.*, 618 Fed. Appx. 624, 630 (11th Cir. 2015).

*after* an appeal has been filed.[81]

There are three reasons why the Court should impose a bond. *First* is the nature of the defect at issue. While plaintiffs acknowledge that they were unable to show dangerous levels of carbon monoxide exposure in the class vehicles, the fact remains that some levels of carbon monoxide were traceable to the Explorers' alleged defect, according to plaintiff's experts. *Second* is the nature of the class members' rights. Class members whose vehicles are still within warranty will have more subsidized opportunities to get their vehicles fixed than those who are outside of warranty.  A delay in the settlement will result in fewer opportunities for class members to obtain subsidized repairs. *Third* is the quality of the objections.

> Under these circumstances, Fed. R. App. 7 makes perfect sense: by requiring objectors to post a bond that would cover the costs of losing the appeal, the burden of litigating frivolous appeals shifts to them instead of to the class. Posting a bond sufficient to ensure that the class can recoup the costs of appeal provides the class with an appropriate incentive to litigate the appeals and establish their lack of merit.[82]

## VI.   CONCLUSION

The settlement easily satisfies the applicable standard. The Court should approve the settlement and overrule the two objections.

Dated: June 7, 2017.

By: */s/ Jordan M. Lewis*
Jordan M. Lewis (FBN: 97997)
**Jordan Lewis, P.A.**
4473 N.E. 11th Avenue
Fort Lauderdale, FL 33334
jordan@jml-lawfirm.com

---

[81] Fed. R. App. P. 7. *See, e.g., In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 267–68 (3rd Cir. 2005)("Whether to require a cost bond is within the sound discretion of the district court and, because there is no fixed amount for the cost bond, the district court has discretion as to the form and amount of the bond.").

[82] *In re GE Co. Secs. Litig.*, 998 F. Supp.2d 145, 152 (S.D.N.Y.  2014)(citation omitted).

-and-

Michael A. Hersh (FBN: 56019)
John J. Uustal (FBN: 73547)
**Kelley⁄Uustal, PLC**
500 North Federal Highway
Suite 200
Fort Lauderdale, Florida 33316
Telephone:    (954) 522-6601
 Facsimile:    (954) 522-6608
Email:         jju@kulaw.com
              mah@kulaw.com

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing has been

furnished by CM/ECF Notification 7th day of June 2017 to:

| | |
|---|---|
| J. Trumon Phillips, Esquire<br>Fredrick H.L. McClure<br>**DLA Piper LLP**<br>3111 W.  Dr. Martin Luther King, Jr. Blvd.<br>Suite 300<br>Tampa, FL 33607<br>trumon.phillips@dlapiper.com<br>fredrick.mcclure@dlapiper.com | Joel A. Dewey, Esquire<br>Jeffrey Yeatman, Esquire (pro hac vice)<br>**DLA Piper LLP**<br>The Marbury Building<br>6225 Smith Avenue<br>Baltimore, Maryland 21209-3600<br>joel.dewey@dlapiper.com<br>Jeffrey.yeatman@dlapiper.com |
| Janet Conigliaro, Esquire<br>**Dykema**<br>400 Renaissance Center<br>Detroit, Michigan 48243<br>jconigliaro@dykema.com | Paul V. Lankford, Esquire (pro hac vice)<br>**Lankford Crawford Moreno & Ostertag, LLP**<br>1850 Mt. Diablo Boulevard, Suite 600<br>Walnut Creek, CA  94596<br>plankford@lclaw.com |
| Fred J. Fresard, Esquire (pro hac vice)<br>**Dykema**<br>39577 Woodward Avenue<br>Suite 300<br>Bloomfield Hills, MI  48304<br>ffresard@dykema.com | Henry Salas, Esquire<br>**Cole, Scot & Kissane, P.A.**<br>9150 S. Dadeland Blvd., 14th Floor<br>Miami, FL  33156<br>Henry.salas@csklegal.com<br>Hazel.colon@csklegal.com |
| David R. Dorey Esquire (pro hac vice) | Edward A. Wallace, Esquire |

21

| | |
|---|---|
| Scott Hammack, Esquire (pro hac vice)<br>Brian Anderson, Esquire (pro hac vice)<br>**O'Melveny & Myers, LLP**<br>1625 Eye Street NW<br>Washington, DC  20006<br>ddorey@omm.com<br>shammack@omm.com<br>banderson@omm.com | Amy E. Keller, Esquire<br>Adam Prom, Esquire<br>**Wexler Wallace LLP**<br>55 West Monroe Street<br>Suite 3300<br>Chicago, IL 60603<br>eaw@wexlerwallace.com<br>aek@wexlerwallace.com<br>ap@wexlerwallace.com |
| William M. Audet, Esquire<br>Steven R. Weinmann, Esquire<br>Joshua C. Ezrin, Esquire<br>Audet & Partners, LLP<br>711 Van Ness, Suite 500<br>San Francisco, CA 94102<br>waudet@audetlaw.com<br>sweinmann@audetlaw.com<br>jezrin@audetlaw.com | Jeff M. Brown<br>Lavalle, Brown & Ronan, P.A.,<br>750 South Dixie Highway<br>Boca Raton, Florida 33432<br>jbrown@lavallebrown.com<br>cmartin@lavallebrown.com<br>efiling@lavallebrown.com |

*/s/ Jordan M. Lewis*
Jordan M. Lewis