UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  14-cv-61344 WPD

Angela Sanchez-Knutson, individually and
on behalf of all those similarly situated,

      Plaintiff,

v.

Ford Motor Company,

      Defendant.

_____

## ORDER GRANTING MOTION FOR FEES AND COSTS

THIS CAUSE is before the Court on Class Counsel's Fee and Expense Application [DE 440].  The Court has carefully considered the Application, any and all objections presented thereto, arguments by counsel at the June 14, 2017 fairness hearing, and is otherwise fully advised in the premises.  The Court notes the non-objection by Ford.

### a.  Background

The Ford Explorer exhaust fume litigation formally commenced on June 9, 2014 with the filing of a four-count class action complaint in this Court.  In her Complaint, Plaintiff Angela Sanchez-Knutson contended that her 2013 Ford Explorer tended to leak exhaust into the passenger cab when the car was accelerated hard *and* while the air conditioning was on recirculate.  Sanchez-Knutson brought her action as a class action on behalf of all Florida 2011-2013 Explorer owners and lessees.  That class eventually expanded to include Explorers from model years 2014-15.

The Florida litigation escalated quickly.  Among other things, this Court denied Ford's

1

motion to dismiss;[1] granted in part Ford's motion to dismiss Sanchez-Knutson's Second Amended Complaint;[2] granted in part Sanchez-Knutson's motion for class certification;[3] denied in part Ford's *Daubert* motions;[4] and further resolved more than a dozen motions in *limine* and other pretrial motions.[5]  Along the way, the parties engaged in two formal mediations and several informal ones. The final informal negotiation resulted in a settlement term sheet on August 5, 2016; less than 72 hours before trial was set to commence. That settlement was preliminarily approved on November 21, 2016[6] and amended once.[7]  As part of the preliminary approval, a total of 1,210,675 Court-approved class notices were mailed in March 2017.  As of this date, a total of three persons, represented by two sets of law firms, filed objections to the settlement, and approximately 86 class members (representing 399 Ford Explorer vehicles) have opted out.[8]

During the pendency of this litigation, plaintiffs' counsel in this case, along with law firms in other states, commenced parallel class litigation in Ohio,[9] Louisiana,[10] California,[11] New York,[12] North Carolina,[13] Texas[14] and New Jersey.[15] None of these additional cases made much headway.

On late Friday, August 5, less than three days before their two-week jury trial was to commence, the parties announced they had achieved an enforceable settlement term sheet. That

---

[1] *Sanchez-Knutson v. Ford Motor Co.,* 52 F. Supp.3d 1223 (S.D. Fla. 2014).
[2] *Sanchez-Knutson v. Ford Motor Co.*, 2015 U.S. Dist. LEXIS 181103 (S.D. Fla. July 22, 2015).
[3] *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529 (S.D. Fla. 2015).
[4] *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp.3d 988 (S.D. Fla. 2016).
[5] Docket Entry #399.
[6] Docket Entry #434.
[7] Docket Entry #437.
[8] **Lewis Decl.**
[9] No. 16-CV-00797 (S.D. Ohio).
[10] 15-CV-02483 (E.D. La.).
[11] 15-CV-000124 (S.D. Cal.).
[12] 14-CIV-06135 (E.D.N.Y.).
[13] 16-CV-00239 (W.D.N.C.).
[14] 15-CV-00011 (S.D. Tex.).
[15] 15-CV-05188-MAS-LHG (D.N.J.).

term sheet was eventually reduced to a settlement agreement, which this Court preliminarily approved on November 21, 2016 (with one subsequent amendment approved February 21, 2017).  The Court granted final approval over the settlement by separate order entered today. The settlement has four distinct elements.

The first element of the settlement is the dissemination of information to Explorer owners and lessees about the potential problem.  This took the form of a mailed notice to 1,210,675 persons beginning March 2017.  Among other things, the notice directs recipients to a lawsuit-related website  that links to a new Technical Service Bulletin ("TSB").  The 2016 TSB has two parts – the first mostly restates (with more detail) the fix outlined in its 2014 TSB.  The second describes a much more significant (and new) repair.  Only those Explorers (1) with a normally aspirated 3.5-liter Twin Independent Variable Camshaft Timing and (2) whose emission problem is not solved by the first half of the 2016 TSB repair are eligible for the second half of the 2016 TSB repair.  According to Ford, 699,468 of the 840,608 Explorers owned or leased by class members (or 83.2%) have the engine type eligible for the second half of the 2016 TSB.

Second, those class members whose cars are within warranty and who are experiencing exhaust odor will, of course, be able to immediately take advantage of the new fix described in the 2016 TSB at no cost.

Third, those class members whose warranties have expired but who can demonstrate that they attempted to fix a diagnosed the exhaust smell at an authorized Ford dealer during the warranty period will be entitled to a subsidized post-warranty repair if they are still experiencing exhaust odor. The maximum permitted reimbursement for this repair is $175 for the first half of the TSB and $500 for the second half of the TSB.  They will have the later of 4 years/48,000 miles after their vehicle was placed into service or 60 days beyond the effective date of the

settlement to present their vehicles to an authorized Ford dealer for repair. The settlement provides reimbursement for up to two such repairs.

Fourth, those class members who did not complain of their Explorers' exhaust smell within warranty but who are now experiencing exhaust odor will be entitled to a subsidized post-warranty repair with a reimbursement capped at $175 for each of the two repairs described in the 2016 TSB. They will have the later of 60 days after the effective date of settlement or 60 days after the expiration of the warranty period to present their vehicles to an authorized Ford dealer for repair. The settlement provides reimbursement for up to two such repairs.

Class members who received an exhaust odor repair under warranty, and are still experiencing exhaust odor after the repairs described in the 2016 TSB are performed will have the right to a no-cost (to them) appellate procedure. They will be eligible to present their claim before a mediator/arbitrator selected by the Better Business Bureau. Participants will be entitled to seek all of their unreimbursed TSB repair costs at the BBB or, potentially, a buyback of their vehicle. In exchange for making this process mandatory from which neither party has the right of appeal, Ford has waived certain statute of limitations defenses and its defense that the exhaust odor is allegedly caused by a design defect which is not covered by its warranty.

**b. Discussion**

In general, the "American Rule" requires parties to bear their own costs in litigation.[16] There is an exception to this rule in cases where counsel has obtained a substantial monetary or non-monetary benefit for a class. This exception is known as the "common fund exception [and]

---

[16] *Dowdell v. Apopka*, 698 F.2d 1181, 1189 n.12 (11th Cir. 1983)("Numerous policies have been considered to underlie the American rule. Among them are the following: (1) it is a prophylactic against abuses in the form of excessive litigation or unreasonable fees being generated by a client and his attorney [;] 2) it prevents those with just but monetarily small claims from being hesitant to litigate them for fear of being saddled with their opponent's counsel fees; (3) it avoids the substantial burdens for judicial administration which would result from litigation fees.")(citations omitted).

'rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense.' "[17] Thus, "[a]ttorneys in a class action in which a common fund is created are entitled to compensation for their services from the common fund, but the amount is subject to court approval."[18]

The settlement agreement provides that plaintiffs will seek no more than $5 million in fees, and that Ford will not object to a request that doesn't exceed that cap. Plaintiffs have requested this amount.

In assessing the motion, the Court applies the following principles:

*First*, the fact that the fees are being paid separately from the class recovery does not change the legal analysis. So explained Judge Gold in *David v. American Suzuki Motor Corp*.:[19]

> While I recognize that the fee award requested by Class Counsel will be paid separately by Defendants and is not drawn from a "common fund" in the traditional sense, there is authority directing "district courts to exercise their equitable jurisdiction to review counsel-fee arrangements negotiated in connection with class-action settlements — even where the counsel fees are not taken from a common fund but are instead paid separately by a class-action defendant." *Duhaime v. John Hancock Mut. Life Ins. Co.,* 183 F.3d 1, 4 (1st Cir. 1999*); see also* Fed. R. Civ. P. 23(h). Here, unlike other cases where the common fund approach has been rejected because the non-monetary settlement's value was inflated, difficult to calculate, or illusory because of the nature of the benefits, *see e.g., Strong v. BellSouth Telecommunications, Inc.,* 137 F.3d 844, 853 (5th Cir. 1998), the value of the proposed settlement's benefits is ascertainable and has been estimated at approximately $5 million.[20]

*Second*, for purposes of analyzing the fee petition, the settlement value is determined by the opportunity created by the settlement, and not by the number of claims actually filed. As

---

[17] *Camden I Condominium Assoc., Inc. v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).
[18] *Id.* (citing Fed. R. Civ. P. 23(e)).
[19] 2010 U.S. Dist. LEXIS 146073 (S.D. Fla. April 15, 2010).
[20] *Id.* at *26-27. *Accord, Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 695 (S.D. Fla. 2014)("The attorneys' fees in a class action can be determined based upon the total fund, not just the actual payout to the class.").

explained by Judge Bloom in *Wilson v. Everbank*:[21]

> This is so because "[a] settlement's fairness is judged by the opportunity created for the class members, not by how many submit claims ... What matters is the settlement's value to each class member—it is ultimately up to class members whether to participate or not."[22]

*Third*, the final approval of this settlement will not conclude plaintiffs' counsel's labors on behalf of the class. Explained Judge Gold in *Allapattah Servs. v. Exxon Corp.*:[23]

> Even after the settlement approval, Class Counsel remains responsible to pursue each claim to judgment. This will require Class Counsel (as later addressed) to place a large staff of attorneys, paralegals and other professionals to assist claimants in prosecuting their claims. They will stay in that role for the duration of the Claims Administration Process. No other attorneys' fees will be charged by Class Counsel for these services. By fully aligning Class Counsel's interest in attorneys' fees with the maximum recovery for each Class member, the Class, as a whole receives a benefit, as compared to leaving each member on his or her own after the settlement. There is a price to the Class, however, for this full alignment of interest. In my view, the Class, and each Class Member, must be prepared to compensate Class Counsel at the full market rate for such past and present extraordinary services.[24]

All three of these principles support the fee petition.

The Court also concludes that the fact that this is a claims-made settlement doesn't change the analysis:

> While no published opinion of ours extends *Camden I* [*Condo. Ass'n . Dunkle's*] percentage-of-recovery rule to claims-made settlements, no principled reason counsels against doing so. For, as one learned treatise aptly illustrates, properly understood "[a] claims-made settlement is . . . the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant"; indeed, the two types of settlements are "fully synonymous." 4 [William B. Rubenstein, NEWBERG ON CLASS

---

[21] 2016 U.S. Dist. LEXIS 15751 (S.D. Fla. Feb. 3, 2016).
[22] *Id.* at *33-34 (citing *Hall v. Bank of America, N.A.,* 2014 U.S. Dist. LEXIS 177155, *26-27 (S.D. Fla. Dec. 17, 2014)).
[23] 454 F. Supp.2d 1185 (S.D. Fla. 2006).
[24] *Id.* at 1203-04.

ACTIONS § 13:7. (5th ed. 2011)].[25]

The Court will review the fee petition through both the "common fund" rule and through the lodestar rule.

As to the lodestar approach, plaintiffs' principal claim – the one that, as of the date of settlement, had survived all of Ford's dispositive motions and motions in *limine* – was the Florida Deceptive and Unfair Trade Practices Act claim.[26] That statute has an attorneys' fees provision,[27] as do virtually all other state consumer protection statutes, and it is under those statutes that this case was conditionally certified for settlement purposes.[28] And because all of the legal claims, those dismissed and those remaining, involved the same set of constituent facts, it is appropriate to consider the entire lodestar, and not just those entries directed exclusively at the consumer fraud statute.[29]

Under *Blum v. Stenson*,[30] the initial calculation of a reasonable attorneys' fee is determined by multiplying the number of hours reasonable expended on the litigation multiplied by a reasonable hourly rate.[31] The lodestar may then be adjusted – either up or down – based on the results obtained.[32]

Here, as of April 27, 2017, the total costs incurred by plaintiffs' counsel is $744,396.36.

---

[25] *Poertner v. Gillette Co.*, 618 Fed. Appx. 624, 628 n.2 (11th Cir. 2015). *Accord*, *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 285 (6th Cir. 2016)("an option to file a claim creates a prospective value, even if the option is never exercised."); *Waters v. International Precious Metals Corp.,* 190 F.3d 1291, 1295 (11th Cir. 1999)("Contrary to defendants' assertion, no case has held that a district court must consider only the actual payout in determining attorneys' fees.").
[26] **Second Amended Complaint, Docket Entry #85, at ¶¶ 84-97.**
[27] Fla. Stat. § 501.2015.
[28] Docket Entry #434.
[29] *Democratic Republic of the Congo v. Air Capital Group*, 2016 U.S. Dist. LEXIS 137048, *12-13 (S.D. Fla. Sept. 14, 2016)("For such a circumstance there is ample authority under Florida law that supports DRC's claim for recovery of FDUTPA fees where similar, intertwined claims were also presented to the jury.").
[30] 465 U.S. 886 (1984).
[31] *Blum*, 465 U.S. at 888.
[32] *American Civil Liberties Union v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999)("A reasonable attorney fees award [] is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.  This lodestar may then be adjusted for the results obtained.")(internal quote marks and citations omitted).

That reduces the amount available to pay fees to $4,255,643.64 ($5 million minus $744,396.36).
Again, as of April 27, 2017, the total lodestar (time billed multiplied by hourly rate) is
$4,090,861.75. That leaves the multiplier (calculated by dividing the total lodestar into requested
as 1.0402. (And, of course, both the costs incurred and lodestar will increase before this case
finally concludes, further reducing the multiplier to 1 or less). This is summarized by the table
below:

| Firm | Lodestar (by case) | Costs |
|------|--------------------|-------|
| Kelley Uustal, LLC | *Bruzina* - $375<br>*Cassidy* - $39,922.50<br>*Cunningham* - $20,082.50<br>*Dixon* - $176,740.50<br>*Regenia Ford* - $ 7,660<br>*Sanchez-Knutson* - $2,918,778.25<br>*Reid* - $750[33]<br>*Salinas* - $49,412.50<br>*Schondel* - $64,112.50 | $707,909.00 |
| Jordan Lewis, P.A. | *Cassidy* - $1,425<br>*Cunningham* - $300<br>*Dixon* - $712.50<br>*Sanchez-Knutson* - $225,225<br>*Bruzina* - $375<br>*Regenia Ford* - $4,575<br>*Reid* - $1,875<br>*Schondel* - $11,512.50<br>*Ruzanski*[34] - $75<br>*Salinas* - $2,550 | |
| Frank Castillo | *Salinas* - $6770 | $400 |
| Cohen Placitella & Roth | *Schondel* - $293,382.50 | $14,964.60 |
| Gomez Trial Attorneys | *Cunningham* - $90,600 | $5,205.32 |
| Beasley Allen | *Salinas*, *Reid* and *Sanchez-Knutson* - $136,483 | $15,227.54 |

---

[33] The *Reid* case was never filed.
[34] The *Ruzanski* case was never filed.

| Martin & Jones | *Regenia Ford* - $37,542.50 | $689.90 |
| **Totals** | **$4,090,861.75** | **$744,396.36** |

The various firms' submissions are supported by declarations from representatives of each of the constituent law firms, along with the David Buckner Declaration. This lodestar request, with an effective "multiplier" of 1.0, is well within what's considered reasonable in this jurisdiction.[35]

As to the common fund, this Court applies the framework set forth by the 11th Circuit in *Camden I Condominium Ass'n v. Dunkle*.[36]  In *Camden*, the 11th Circuit held that, in applying the "common fund" doctrine, class counsel's attorneys' fees are to be awarded as a percentage of the class' recovery, as opposed to an hours-based lodestar approach.[37] "[H]enceforth, in this circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class. The lodestar analysis shall continue to be the applicable method used for determining statutory fee-shifting awards."[38]

*Camden* further specified that, in determining such awards, the "bench mark" percentage is 25%, "which may be adjusted up or down based on the circumstances of each case."[39] In considering adjustments, *Camden* held that district courts should evaluate the twelve "Johnson factors, " which refers to *Johnson v. Georgia Highway Expr., Inc.*[40]  The 12 factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill

---

[35] *See, e.g., Pinto v. Princess Cruise Lines Ltd.*, 513 F. Supp. 2d 1334, 1344 (S.D. Fla. 2007) (noting that lodestar multipliers " 'in large and complicated class actions' range from 2.26 to 4.5" and that "three appears to be the average"); *Ingram v. The Coca-Cola Co*, 200 F.R.D. 685, 694-96 (N.D. Ga. 2001) (awarding fee representing a multiplier between 2.5 and 4); *Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 679, 702 (M.D. Ala. 1988) ("A multiplier of approximately 3.1 in a national class action securities case is not unusual or unreasonable.").
[36] 946 F.2d 768 (11th Cir. 1991).
[37] *Id.* at 773-74.
[38] *Id.* at 774.
[39] *Id.* at 775.
[40] 488 F.2d 714 (5th Cir. 1974).

requisite to perform the legal service properly; (4) the preclusion of other employment by the

attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or

contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount

involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10)

the "undesirability" of the case; (11) the nature and the length of the professional relationship

with the client, and (12) awards in similar cases.[41] "The Court may also consider its own

knowledge and experience concerning reasonable and proper fees and may form an independent

judgment either with or without the aid of witnesses as to value."[42]

     So too, it is appropriate to consider the value of the non-monetary relief as part of the

common fund from which the attorney fee percentage is applied:

> To determine whether the settlement's allocation of benefits was
> fair, the district court concluded that the value of the nonmonetary
> relief and *cy pres* award were part of the settlement pie. Neither
> conclusion rests on an incorrect or unreasonable application of our
> precedents.[43]

     This settlement is a mix of monetary and non-monetary benefits and, accordingly, a

precise to-the-penny calculation of the 100% of the common fund – from which plaintiff's

attorney fee request is to be calculated – is impossible.  But the Court is persuaded that the $5

million fee request falls within the 25% benchmark established in *Camden*.

     Consider, for example, the information campaign created by 1.2 million notices sent to

class members and the accompanying explanatory website. This notice will be the first time that,

in all probability, hundreds of thousands of class members will learn about the exhaust issue,

which until recently attracted virtually no media attention. In *In re Volkswagen & Audi Warranty*

---

[41] *Camden I*, 946 F.2d at 772 n.3.
[42] *Wachovia Bank v. Tien*, 2015 U.S. Dist. LEXIS 178364, *10 (S.D. Fla. April 7, 2015)(internal quote marks and citations omitted).
[43] *Poertner*, 618 Fed. Appx. at 628.

*Extension Litig.,*[44] - a comparable class settlement involving subsidized car repairs – the district court assigned the value of the settlement's information campaign at $18,719,788.[45]

Ford estimates that as many as 251,721 class members will be within warranty on the date of the fairness hearing. Class members who have experienced the exhaust smell and who are within warranty will not have information that explains their experience and will be entitled, at no cost to them, to take advantage of the 2016 TSB repair procedures, which cost Ford, on average $609.37 for the first phase and $715.51 for the second.

Now consider the value of the settlement to those class members who (a) are outside their warranty and (b) did not complain of the exhaust smell within warranty, again using highly conservative assumptions: Ford sent out 1,210,675 class notices. That number exceeds the number of cars at issue, which is 840,608, because some of the vehicles turned over during the class period. For purposes of this analysis, plaintiff will employ the smaller of the two numbers, 840,608. According to Ford, as many as 251,721 of these vehicles will be outside its 3-year/36,000-mile warranty.[46] That leaves at least 588,887 class members who are eligible for a single $175 TSB repair subsidy should they demonstrate an exhaust smell.

Finally, Ford's agreement to waive certain procedural defenses confers non-monetary value, too. Plaintiff is aware of a single class member who litigated the exhaust smell issue with Ford with the BBB. Ford prevailed in the proceeding based on one of the defenses it has agreed to waive as part of this settlement.[47]

Based on controlling law, plaintiff's request for $5 million in combined fees and costs is well within the 25% benchmark recognized in this Circuit in common fund cases. Application of

---

[44] 89 F. Supp3d 155 (D. Mass. 2015).
[45] *Id.* at 170/
[46] **Lewis Decl.**
[47] **Lewis Decl.**

11

the 12 *Camden* considerations does not change that result.

The first consideration is the time and labor required. As the lodestar discussion below explains, the combined attorney lodestar is greater than $4 million, and that number will increase through the claims process. Combined with more than $700,000 in expenses, plaintiff's counsel can expect, at most, a multiplier of their lodestar at 1.0. In this Court alone, plaintiff defended two motions to dismiss and a summary judgment motion, prevailed on class certification, persuaded the 11th Circuit to not consider Ford's request for interlocutory review, brought and defended more than a dozen motions in *limine*, and litigated at least a half dozen discovery motions, some of which ultimately proved decisive. None of that includes the two dozen depositions taken and defended and the more than 100,000 pages of documents reviewed, nor the motion practice and discovery in the other related cases.

The second *Camden* consideration is the novelty and difficulty of the questions. The Court is well-aware of the complexity of many of the legal issues involved in this case. Perhaps the best testimony to the difficulty of the issues presented is found in the results of the Schiesser plaintiff, who attempted to intervene in this action at the preliminary approval stage. On April 6, 2017, Schiesser's complaint was dismissed a second time, with prejudice,[48] a result that plaintiff risked here and in the companion Ford cases on virtually every motion.

The third element is the skill required to perform the legal services. The Court is satisfied that the attorneys satisfied this element, as well.

The fourth element is the preclusion of other employment due to taking on the Ford case. Plaintiff's counsel recorded 7,112.98 hours in time in the Ford case, almost all of which was generated in less than three years. This is time spent on Ford at the expense of other cases, added to more than $700,000 spent in prosecuting this action.

---

[48] *Schiesser v. Ford Motor Co.*, 2017 U.S. Dist. LEXIS 53180 (N.D. Ill. April 6, 2017).

The fifth consideration is the customary fee. A one-third contingency is customary.[49]

The sixth consideration is whether the fee was fixed or contingent. It was contingent, and plaintiff risked losing a considerable investment of time and capital if they had lost this action. That, too, favors their fee request.

The seventh consideration is the time limitation imposed by the client or the circumstances. Here, there were only 26 months between the commencement of this action and the start of trial – less time than most car accident cases take. This compressed schedule put a heavy burden on plaintiff's counsel, a factor that also supports the fee request.

The eighth element is the result obtained. Plaintiff has discussed (above) the calculation of the common fund, based on controlling law. The Court is satisfied that the request here is within the 25% benchmark established by *Camden*.

The ninth consideration is the experience and ability of the undersigned attorneys. This factor, too, supports the fee request.

The tenth consideration is the undesirability of the case. That is perhaps best demonstrated by the lack of copycat litigation. In the 26 months between case commencement and settlement, only one copycat lawsuit was filed, and that one was dismissed.[50] If the legal market means anything, the market itself didn't like this lawsuit.

Plaintiff had no professional or personal relationship with the undersigned counsel before this litigation commenced, which is the eleventh *Camden* factor. It too supports plaintiff's fee request.

The final consideration requires the Court to look at similar cases. The Court is persuaded

---

[49] *Alapattah*, 454 F. Supp.2d at 1209.
[50] *Schiesser v. Ford Motor Co.*, 2017 U.S. Dist. LEXIS 53180 (N.D. Ill. April 6, 2017).

that *Rosen v. J.M. Auto Inc.*[51] is a reasonable comparator. These results are within the award in *Rosen*.

Based upon the foregoing, it is **ORDERED AND ADJUDGED** that Plaintiffs' motion for $5 million in total fees and costs, as set forth in Class Counsel's Fee and Expense Application [DE 440], is **GRANTED**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 20th day of June, 2017.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:
Counsel of record

---

[51] No. 07-61234-civ (S.D. Fla.), Docket Entry #251, 266.

14